**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **2999TC ACQUISITIONS, LLC f/k/a MO 2999 TC, LLC, AND TIMOTHY L. BARTON** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **Case No. 3:20-cv-3229** |
| | § | |
| **2999 TURTLE CREEK, LLC, HNGH TURTLE CREEK, LLC, HN GREEN HOLLOW CAPITAL PARTNERS, LLC, MADISON REALTY CAPITAL, LP, VIPIN NAMBIAR, JAMES G. GLASGOW, JR., MARC ZEGEN, AND JOSHUA ZEGEN** | § | |
| | § | |
| **Defendants.** | § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND APPLICATION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. SUMMARY ........ 1

II. PROCEDURAL POSTURE ........ 2

III. BACKGROUND FACTS ........ 2

A. Madison Loaned Money to 2999TC and Promised to Find Investors. ........ 2

B. Madison Actually Induced Barton to Share Confidential Information to Support Madison's Side Deal with HNGH and its Principals. ........ 4

C. Unbeknownst to Plaintiffs, HNGH Acquired a Controlling Interest in the Loan. ........ 6

D. Madison and HNGH then Conspired to Cause Plaintiff to Default under the Loan so that HNGH Could Acquire the Project, which Madison Would Finance. ........ 10

E. Defendants Are Using the Manufactured "Default" to Attempt Foreclosure. ........ 15

IV. ARGUMENTS & AUTHORITIES ........ 17

A. Plaintiffs Sufficiently Demonstrate Grounds for Injunctive Relief Under FRCP 65. ........ 17

1. Plaintiffs will likely prevail on the merits. ........ 17

2. This suit involving real property meets the irreparable harm standard because real estate is unique. ........ 22

3. Foreclosure outweighs any harm the injunction may cause Defendants, and the injunction will not disserve the public interest. ........ 23

B. Security Required Pursuant to Fed. R. Civ. P. 65(c) ........ 24

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases**

*Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974).......................... 17

*Claridge v. N. Am. Power & Gas, LLC*, 12-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693 (S.D.N.Y. Sep. 2, 2015)........................................................................................ 18

*Clark v. Prichard*, 812 F.2d 991 (5th Cir. 1987) ........................................................... 17

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 381 Fed. Appx. 117 (2d Cir. 2010) ........................................................................................................ 18

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625 (S.D.N.Y. 2010)...................................................................................... 18, 23

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400 (5th Cir. 2015)................ 21

*Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472 (Tex. App.—Dallas 2010, pet. denied)....... 17, 22

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423 (1974)....................................................................................................... 17

*Intel Corp. v. Rais*, 1:19-CV-20-RP, 2019 U.S. Dist. LEXIS 4932 (W.D. Tex. Jan. 10, 2019).. 17, 22, 24

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996) ........................................ 25

*Lake Eugenie Land & Dev., Inc. v. BP Exploration & Prod. (In re Deepwater Horizon)*, 643 Fed. Appx. 377 (5th Cir. 2016)............................................................................ 19

*Lexxus Int'l, Inc. v. Loghry*, 512 F. Supp. 2d 647 (N.D. Tex. 2007) ................................ 22

*Meis v. Sanitas Serv. Corp.*, 511 F.2d 655 (5th Cir. 1975)............................................ 17

*Nat'l Fedn. of Indep. Bus. v. Perez*, 2016 U.S. Dist. LEXIS 89694 (N.D. Tex. Jun. 27, 2016)... 25

*Southerland v. Thigpen*, 784 F.2d 713 (5th Cir. 1986) .................................................. 17

*Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015)....................................... 17, 24

**Rules**

Fed. R. Civ. P. 65(c) .......................................................................................... 24, 25

2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC ("***2999TC***") and Timothy L. Barton ("***Barton***" or "***Guarantor***") (together, "***Plaintiffs***") submit this *Brief in Support of Emergency Motion for Temporary Restraining Order and Application for Preliminary Injunction* (the "***Motion***") against 2999 Turtle Creek, LLC ("***Turtle Creek***" or "***Lender***"), HNGH Turtle Creek, LLC ("***HNGH***"), HN Green Hollow Capital Partners, LLC ("***Green Hollow***"), Madison Realty Capital, LP ("***Madison***"), Vipin Nambiar ("***Nambiar***"), James G. Glasgow, Jr. ("***Glasgow***"), Marc Zegen ("***M. Zegen***"), and Joshua Zegen ("***J. Zegen***") (collectively, "***Defendants***") to immediately suspend a pending foreclosure sale of Plaintiffs' property, currently set for January 5, 2021 between 10:00 a.m. and 1:00 p.m., for, at least, the following reasons: (1) the Loan is not in default and (2) is *over*-collateralized, such that there is no harm, pending, threatened, or otherwise.

## I. SUMMARY

Madison filed this foreclosure on November 20, 2020; Plaintiffs became aware of it on December 2, 2020. Plaintiffs were preparing this Motion when, immediately prior to filing (December 16, 2020), they received notice that Lender transferred the whole subject Loan to HNGH *nine days earlier* (December 7, 2020). HNGH then amended the foreclosure notice on December 11, 2020, which Plaintiffs received on December 21, 2020.

Plaintiffs seek an emergency temporary restraining order to prevent the culmination of a fraudulent scheme to deprive them of the unique and valuable piece of property on Turtle Creek Boulevard and their vision for a world-class hotel (Mandarin Oriental) on that site. The foreclosure that Plaintiffs seek to enjoin is the last step in a well-planned (but not well enough concealed) conversion of Plaintiffs' property and rights, which plan was developed without Plaintiffs' knowledge or consent and by fraudulently obtaining Plaintiffs' trade secrets. The attempted foreclosure is even more shocking, and defective, because the Lender that posted the property for foreclosure has been made whole and the Loan, which is not in default, has been transferred to

Plaintiffs' direct competitor, after Lender initiated the foreclosure process. As a competitor, transferee/purchaser HNGH was not a proper transferee entity under the Deed of Trust. If selling a participation interest to a competitor is bad faith under governing New York law (it is), surely assigning the whole loan to a competitor is even more so.

## II. PROCEDURAL POSTURE

1. On April 20, 2020, Plaintiffs filed a lawsuit in Dallas County, Texas.[1] Plaintiffs obtained a temporary restraining order against Lender and Madison on August 3, 2020 to restrain them from foreclosing on the Land. On November 13, 2020, the Fifth Court of Appeals overturned the district court's denial of Plaintiffs' request for a temporary injunction. In the meantime, Lender instigated a separate lawsuit solely against Barton in Texas state court[2] to fragment the case and isolate the guarantor knowing that, as guarantor, Barton lacked certain defenses that would otherwise be available to the borrower. Despite these favorable rulings, based on new evidence, federal court is the proper forum to bring the claims asserted in the Complaint and against the additional Defendants, some of whom were added in this action.

## III. BACKGROUND FACTS

### A. Madison Loaned Money to 2999TC and Promised to Find Investors.

2. On or about September 20, 2019, 2999TC closed on the purchase of the property and building located at 2999 Turtle Creek Boulevard, Dallas Texas (the "***Land***") for the purpose of developing the Project, a branded luxury hotel and condominium project.[3] As the Court may be aware, Turtle Creek is one of the most exclusive, high-wealth districts in Dallas with prime real estate but little space for additional development, increasing demand and cost accordingly. Barton

[1] *2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC v. HNGH Turtle Creek, LLC, William L. Hutchinson, and Vipin Nambiar*, Cause No. DC-20-05864, in the 14th Judicial District Court of Dallas County, Texas.
[2] *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, Cause No. DC-20-12133, in the 192nd Judicial District Court of Dallas County, Texas.
[3] *See* Ex. A ¶ 1 (Barton Decl.) [APP001].

had been working to acquire the Land since April 2018.[4] He successfully obtained all zoning permits and personally invested millions of dollars prior to the September 2019 closing on the Land. 2999TC executed certain licensing, marketing, servicing, and management agreements (collectively, "***Management Agreement***") with a high profile, international hotel brand, which will operate and manage the Project.[5]

3. To purchase the Land, 2999TC executed a $32.5 million Secured Promissory Note (the "***Loan***")[6] and a Deed of Trust, Security Agreement, and Fixture Filing (the "***Deed of Trust***")[7] with Lender, a special purpose entity created by Madison solely for the Project.[8] The Loan is secured by the Deed of Trust against the Land.[9]

4. The Loan was a 1-year note (with two six-month extensions) for the purchase of the Land, which was to be quickly repaid by subsequent investment for the entire Project, approximately $365 million in debt and equity.[10] Madison held first right of refusal to be the construction lender with an estimated construction loan of about $250 million.[11] In reliance upon representations by Madison (M. Zegen and J. Zegen) that it would secure equity investors for the $100 million equity portion of the Project, Barton contributed $20.5 million in equity toward the Project, including by leveraging substantially all of his available assets for the Loan, and executed a Guaranty on the amounts due under the Loan and Deed of Trust (the "***Guaranty Agreement***").[12] The Loan, Deed of Trust, and Guaranty Agreement are the "Loan Documents."

---

[4] *See id.*
[5] *See id.* at ¶ 3 [APP001-002].
[6] *See* Ex. A-1 (Loan) [APP012].
[7] *See* Ex. A-2 (Deed of Trust) [APP030].
[8] *See* Ex. A ¶ 4 (Barton Decl.) [APP002].
[9] *See id.*
[10] *See id.* at ¶ 5 [APP002].
[11] *See id.*
[12] *See id.*

**B. Madison Actually Induced Barton to Share Confidential Information to Support Madison's Side Deal with HNGH and its Principals.**

5. Green Hollow is a competing real estate investor whose founding members (*e.g.*, HN Capital Partners, LLC) already had extensive experience in the Dallas luxury hospitality space as major owners and developers.[13] That HNGH raised approximately the same amount needed to purchase the Land ($42.5 million) indicates Defendants were already pursuing the Land (purchase and development) before October 2019.[14] Thus, when Barton won the opportunity, Defendants contrived a plan to take it.

6. On October 24, Madison (J. Zegen and M. Zegen) met in New York City to discuss Glasgow and Green Hollow purchasing a junior participation interest ("***B Note***") on the Project.[15] Defendants excluded Plaintiffs from all such secret meetings and discussions.[16]

7. About one week after October 24, 2019, still concealing their meeting, J. Zegen and M. Zegen urged Barton to meet with Glasgow in New York.[17] They described Glasgow as a prospective equity investor for the Project.[18] At the time, Barton did not know Glasgow and was unaware that Glasgow was a competing developer; Barton knew only that Glasgow's company, Green Hollow, was a viable equity investor.[19] Because finding equity investors was precisely what Madison had promised, Barton promptly agreed to pitch this "prospective equity investor" on the Project and the $100 million equity raise Plaintiffs were seeking.[20]

[13] *See id.* at ¶ 8 [APP002-003]. *See also* Ex. A-3 (email from J. Zegen to potential purchaser of Loan on Jul. 29, 2020, describing Glasgow as a major owner and developer locally in Dallas, Texas) [APP089] ("The b note holder is a local Dallas group that is also a major owner and developer locally."). Nambiar has 17 years of experience in the hotel industry, including as an "investor and asset manager" in Dallas' newest luxury hotel, Virgin Hotels Dallas. *See* Ex. B at 11:5-14 (Nambiar Hr'g Tr., Nov. 5, 2020) [APP368].
[14] *See* Ex. A ¶ 8 (Barton Decl.) [APP002-003].
[15] *See* Ex. A-4 (email from Glasgow to Nambiar reflecting Madison's B Note offer on Oct. 24, 2019) [APP092].
[16] *See* Ex. A ¶ 9 (Barton Decl.) [APP003].
[17] *See id.* at ¶ 10 [APP003].
[18] *See id.*
[19] *See id.*
[20] *See* Ex. A ¶ 10 (Barton Decl.) [APP003]. *See* Ex. A-5 (Barton, J. Zegen, and Glasgow emails discussing New York meeting on Nov. 4, 2019) [APP093].

8. On November 4, 2019, Barton met with J. Zegen and Glasgow at Madison's office in New York City.[21] Again, J. Zegen introduced Glasgow as a potential equity investor, and Barton pitched the $100 million equity offering.[22] Before, during, and after the pitch, Barton made clear that the information being presented was confidential and not to be used to compete with the Project.[23] Glasgow verbally assented with the conditions.[24]

9. During the meeting, Barton disclosed information that he would never have disclosed to a direct competitor, such as construction drawings, plans for the entire development, contractor bids, the Management Agreement contract terms, balance sheets, pro formas, and projected returns (the "***Trade Secrets***").[25] Barton also shared that he had leveraged substantially everything he owned to purchase the Land and would use the $100 million capital raise to recoup approximately $12 million of the funds he invested.[26]

10. Glasgow seemed excited about the Project and said he would contribute $50 million in mezzanine funding.[27] But this was a deliberate misrepresentation. Neither Glasgow nor Madison informed Barton that Glasgow was not truly a prospective equity investor, but that he had already been negotiating with Madison to purchase the B Note on the Loan since before October 24, 2019.[28]

11. By discovering the extent of Barton's personal debt in the Project and his desire to de-leverage himself using the capital raise, Glasgow was able to identify the precise "pressure point" (*i.e.*, liquidity problems) that he might be able to exploit using the B Note for full seizure

---

[21] *See* Ex. A ¶ 11 (Barton Decl.) [APP003].
[22] *See id.*
[23] *See id.*
[24] *See id.*
[25] *See id.* at ¶¶ 11-12 [APP003-004].
[26] *See id.* at ¶ 11 [APP003].
[27] *See id.* at ¶ 13 [APP004].
[28] *See id. See also* Ex. A-4 (email from Glasgow to Nambiar reflecting Madison's B Note offer on Oct. 24, 2019) [APP092].

of the Project. Through his undisclosed scheme, Glasgow could acquire the Project for the cost of the Loan ($32.5 million) rather than the purchase price of the Land ($42.5 million) plus the equity of the development work that had already been completed, such as zoning.[29] Glasgow met with Barton not to get a return on investment, but to get control.

**C. Unbeknownst to Plaintiffs, HNGH Acquired a Controlling Interest in the Loan.**

12. In August 2019, HN Capital Partners (Nambiar) joined with Glasgow to form Green Hollow.[30] Hunt Investment Group served as the financier.[31] In September 2019, Green Hollow raised $42.5 million—substantially the same amount Plaintiffs paid for the Land, indicating that Glasgow and Nambiar had already planned to develop the Project before 2999TC even closed on the Land.[32] Upon information and belief, HNGH attempted to purchase the Land unsuccessfully,[33] causing it (and its principals) to seek an alternative method for acquiring the Land (*i.e.*, devising the fraudulent scheme described herein).

<u>*The Letter of Intent to Purchase the B Note*</u>

13. On November 15, 2019, less than two weeks after their October meeting with Barton, Green Hollow (Glasgow and Nambiar[34]) executed a Letter of Intent (the "***LOI***") to purchase the B Note from Madison for $7 million.[35] Their negotiations clearly emphasized the prospect of default and foreclosure in the event of a monetary or non-monetary breach by 2999TC,

---

[29] *See* Ex. A ¶ 14 (Barton Decl.) [APP003].
[30] *See id.* at ¶ 7 [APP002].
[31] *See id.*
[32] *See e.g.*, *id.* at ¶ 8 [APP002-003].
[33] *See id.*
[34] By way of background, Nambiar joined with a Hunt Consolidated affiliate, Hunt Investment Group, to form HN Capital Partners, LLC ("***HN Capital Partners***") with the primary purpose of investing in the acquisition and development of hospitality-sector properties. Nambiar is the managing director of HN Capital Partners, which operates with the financial backing of Hunt Investment Group. For example, HN Capital Partners was the primary investor in the W Hotel in Dallas and the Virgin Hotel in Dallas—both of which were properties developed by Plaintiffs' competitor, Dunhill Partners, which is owned by Bill Hutchinson. Described further below, Dunhill Partners is the entity Defendants intend to develop the Project if successful in carrying out their fraudulent scheme. *See also id.* at ¶ 4 [APP002].
[35] *See* Ex. A ¶ 15 (Barton Decl.) [APP004]; Ex. A-7 (Letter of Intent dated Nov. 15. 2019) [APP101].

which would give full control of the Project to Glasgow and Nambiar (and the entity they would be forming to purchase the B Note) in the event of such a default—*i.e.*, HNGH would not have purchased the B Note without the secret Participation Agreement.[36] The emails even included carrying costs and lease up analysis, which would only be relevant *after* a foreclosure.[37]

14. In other words, Plaintiffs' Lender was negotiating with Plaintiffs' competitors what steps to take after foreclosing on Plaintiffs' Land well before any "default" was even in the making and all without Plaintiffs' knowledge. Considering the LOI was executed only two weeks after Barton confidentially disclosed the details of the Project, it is evident Glasgow obtained the Project information from Barton only to further the negotiations of that LOI to purchase the B Note.

15. On December 16, 2019, Green Hollow, Glasgow, Nambiar (and/or their affiliated entities) formed HNGH Turtle Creek, LLC ("***HNGH***") to be the purported "junior subordinate participant" in the B Note purchase.[38] By this time, Barton had not received any further communication from Glasgow about the promised $50 million in mezzanine funding.[39] Barton continued to solicit other potential investors for the Project, including Nambiar, introduced to him through mutual contacts.[40] Barton was unaware that Nambiar and Glasgow had already formed HNGH to purchase the B Note.[41] Barton and Nambiar met on January 16, 2020.[42]

16. As with Glasgow, Barton pitched the Project to Nambiar conditioned upon Nambiar's assent to maintain confidentiality and not to use the information to compete with

---

[36] *See* Ex. A-7 at 1 ("Rights of B-Note Holder") [APP101]; Ex. A-22 (B Note negotiation email thread) [APP322].
[37] *See* Ex. A ¶ 15 (Barton Decl.) [APP004].
[38] *See id.* at ¶ 17 [APP005].
[39] *See id.* at ¶¶ 17-18 [APP005].
[40] *See id.* at ¶ 18 [APP005].
[41] *See id.*
[42] *See id.* at ¶ 19 [APP005]; Ex. A-8 (emails between Barton and Nambiar reflecting meeting on January 16, 2020) [APP104], and Ex. A-9 (email between Barton and Nambiar reflecting Barton's belief, and Nambiar's confirmation, that Nambiar was interested in investing in the Project) [APP106].

Plaintiffs.[43] Nambiar agreed.[44] Nambiar expressed interest in investing but did not disclose his relationship with Glasgow or Green Hollow, nor his pending negotiations with Madison for the B Note.[45] Barton never would have shared any of the information, let alone met with Nambiar, if he knew that Nambiar was preparing to buy a B Note ultimately to compete with Plaintiffs.[46]

17. Nambiar did not respond to any follow-up communications from Barton.[47]

*The Secret Participation Agreement*

18. Six days after the January meeting, HNGH (Glasgow and Nambiar) executed the B Note and secret Participation Agreement with Madison.[48] HNGH and Madison did not disclose to Barton the Participation Agreement's existence, the parties thereto, or the contents thereof.[49] Lender merely notified Plaintiffs that it had sold a "junior participation interest" to HNGH and directed 2999TC to "continue to coordinate directly with Lender in accordance with the loan Documents with respect to servicing and administration of the Loan."[50]

19. It is standard in the industry for a lender to sell portions of its loan to *junior* participants to spread risk.[51] In the traditional scenario, the junior participants, like the lender, merely wait to realize the return on their investments.[52] Because success of the deal is critical to receive any such return, lenders and junior participants want the project to succeed.[53] Not so, here.

20. A normal B Note holder also does not have rights separate from the lender and none

---

[43] *See* Ex. A ¶ 19 (Barton Decl.) [APP005].
[44] *See id.*
[45] *See* Ex. A ¶¶ 18-19 (Barton Decl.) [APP005].
[46] *See id.*at ¶¶ 19 [APP005].
[47] *See id.*
[48] *See id.* at ¶ 20 [APP005-006]; Ex. A-10 (Participation Agreement dated Jan. 24. 2020) [APP107].
[49] *See* Ex. A ¶ 20 (Barton Decl.) [APP005-006].
[50] *See id.*; Ex. A-6 (Lender notice to Plaintiffs regarding HNGH's "junior participation interest") [APP097].
[51] *See* Ex. A ¶ 21 (Barton Decl.) [APP006].
[52] *See id.*
[53] *See id.*

directly tied to the borrower.[54] However, HNGH received a secret Participation Agreement with Lender, which materially altered Plaintiffs' rights under its Loan Documents with Lender—even as basic as whether Lender would communicate with Plaintiffs about *their* Loan.[55]

21. The only way Plaintiffs obtained a copy of the Participation Agreement was by seeking an emergency order compelling production in a separate lawsuit.[56] Plaintiffs learned that Lender assigned to HNGH significant rights pertaining to the Loan and Deed of Trust (*e.g.*, HNGH could voluntarily cure a default by paying Lender on 2999TC's behalf, after which Lender would cede all control of the administration of the Loan to HNGH for HNGH to convert to "Lender").[57] At the time, not only would HNGH have the exclusive right to communicate with Plaintiffs about the Loan Documents, but it also would have the *exclusive right* to foreclose on the Land.[58]

22. The Participation Agreement also prohibited Lender from transferring or selling its interest to any party affiliated with Borrower or any party who would be adverse to HNGH.[59] In other words, the Participation Agreement completely eliminated any possibility for certain types of note sales by Lender to third-party purchasers, which would preclude Plaintiffs from finding another party to buy-out Lender, subordinate HNGH's "junior subordinate participant interest," or even pay-off HNGH's interest through refinancing of the Loan with a third party.[60] Reputable lenders would never have agreed to those onerous provisions, deeply favoring the participant, unless they had previously devised a scheme with the participant or other parties to the detriment of the borrower.[61] Plaintiffs did not know about or agree to any of these terms concerning the

---

[54] *See id.*
[55] *See id.* at ¶ 22 [APP006].
[56] *See* Ex. A ¶ 23 (Barton Decl.) [APP006].
[57] *See id.*
[58] *See id.*; Ex. A-10 § 7 (Participation Agreement) [APP113-117].
[59] *See* Ex. A-10 § 8(d) (Participation Agreement) [APP117].
[60] *See* Ex. A ¶ 24 (Barton Decl.) [APP006].
[61] *See id.*

sale/transfer of the Loan.[62]

23. Even more telling, Lender and Madison agreed that their parent investment fund, Madison Realty Capital Debt Fund IV, LP, would *fully indemnify* HNGH for any liability arising as a result of its actions in conjunction with any cure payment, exercise of remedies, or election to foreclose on the Land[63]—suggesting Defendants' awareness of legal risk with their scheme.

24. As part of the same transaction, Madison/Lender sold the majority of the Loan to Axos Bank in a Repurchase Loan Agreement.[64] As a result, Madison no longer had much meaningful risk in the Project and thus had greatly reduced its reason to secure, and its possible upside from securing, investment for the Project as it (through J. Zegen and M. Zegen) had originally represented to Barton. The Axos Assignment was executed on December 31, 2019, but for whatever reason, it appears that Axos Bank would not fund its loan to Madison until the Participation Agreement with HNGH was executed.[65]

**D. Madison and HNGH then Conspired to Cause Plaintiff to Default under the Loan so that HNGH Could Acquire the Project, which Madison Would Finance.**

25. To actualize the intent of the secret Participation Agreement (Madison ceding control of the Loan to HNGH), Defendants needed to make 2999TC default.[66] Having learned from their meetings with Barton that 2999TC was operating on a thin margin of liquidity, Glasgow and Nambiar planned to prompt 2999TC's "default" by creating additional cash-flow problems.

26. Specifically, Nambiar told potential investors he "owned" the Land on the Project and successfully persuaded two committed investors (Aju Hotels and Resorts and Mink

---

[62] *See id.*
[63] The $32.5 million for the Land purchase Loan was provided by Fund IV, which created HNGH. Madison controls Fund IV. The indemnification agreement is with Fund IV. *See also* Ex. A-12 at HNGH 00022 (Indemnity Agreement) [APP130].
[64] *See* Ex. A ¶ 26 (Barton Decl.) [APP007]; Ex. D (Axos Assignment) [APP374].
[65] *See* Ex. A-26 (email chain showing Axos Bank involved in closing of Participation Agreement) [APP338].
[66] *See* Ex. A-10 § 7 (Participation Agreement) [APP113-117].

Development) to back out of their investment.[67] Plaintiffs cannot ascertain how many other potential investors Nambiar (or his co-conspirators) have successfully dissuaded from investing.

27. Defendants then sprang on the first chance to trigger a "default." Under the Deed of Trust, 2999TC is required to pay property taxes that accrued on the Project, which were due on January 31, 2020.[68] In the normal course of business, as is standard in the industry, 2999TC began discussions with the Dallas County tax assessor to extend the due date of the 2019 taxes and create a payment structure because of the constraints on the hospitality and banking industries from the global pandemic.[69] 2999TC notified Lender of the anticipated payment plan; Lender did not object and made no mention of default under the Deed of Trust.[70]

28. Unfortunately, the global pandemic halted that negotiation process.[71] 2999TC contacted Lender on March 27, 2020 for a temporary forbearance.[72] Instead of Lender replying, someone from ***HNGH*** (the B Note holder) called Plaintiffs, demanding the tax payment.[73] Plaintiffs refused to speak with the unknown caller because *Lender* was the sole point of contact.[74]

29. On April 6, 2020, 2999TC received a demand letter from HNGH's counsel.[75] HNGH claimed to exercise rights under the Participation Agreement (Plaintiffs never saw and were not a party).[76] Specifically, HNGH proclaimed that it would pay the 2019 property taxes as a protective "Tax Advance" and then demand immediate payment from 2999TC.[77] On top of that, according to Nambiar, HNGH was required to pay $245,000 per month as the junior subordinate

[67] *See* Ex. A ¶ 28 (Barton Decl.) [APP007].
[68] *See id.* at ¶ 29 [APP007]; Ex. A-2 § 5 (Deed of Trust) [APP038].
[69] *See* Ex. A ¶ 29 (Barton Decl.) [APP007].
[70] *See id.*
[71] *See id.*
[72] *See id.*
[73] *See id.*
[74] *See id.*
[75] *See* Ex. A ¶ 30 (Barton Decl.) [APP007-008]; Ex. A-13 (HNGH Demand Letter) [APP156].
[76] *See* Ex. A ¶ 30 (Barton Decl.) [APP007-008].
[77] *See id.*; Ex. A-13 (HNGH Demand Letter) [APP156].

participant—not on Plaintiffs' behalf but rather its own.[78] That testimony exposes the oddity here: no junior subordinate participant pays a senior participant beyond the cost to buy the interest.[79]

30. HNGH refused to allow 2999TC to seek forbearance or other payment plan with Lender and Dallas County, instead opting to manufacture default by ensuring non-immediate payment of taxes.[80] HNGH also demanded default interest provided for in the Deed of Trust and threatened foreclosure proceedings *if not paid* _*within four days*_.[81]

31. Just three days later, on April 9, 2020, HNGH pressured 2999TC to sign a "_*pre*_-negotiation agreement" *with HNGH* as a prerequisite to even beginning talks about any tax forbearance *with Lender*.[82] That agreement required Plaintiffs to waive *all* claims against Lender *and* HNGH, to acknowledge HNGH as "Lender" and Lender/Turtle Creek as "Senior Participant," and to affirm the validity of the Participation Agreement—of which Plaintiffs still had no knowledge and still had not seen.[83] Plaintiffs refused to execute such an unconscionable agreement.[84] Instead, Plaintiffs sent letters to Lender, dated April 10 and 13, 2020, to gain clarity about the Participation Agreement.[85] Plaintiffs renewed their request for a temporary forbearance.[86] Shockingly, Plaintiffs received a Notice of Default from Lender on April 30, 2020 based on the tax payment[87]—even though the taxes were already paid (by HNGH) and, therefore, the Land was not at risk of any encumbrance.[88]

32. Almost one month after Plaintiffs' letters to Lender, it finally responded on May 5,

---

[78] *See* Ex. B at 7:8-11, 8:2-3, 9:14-20 (Nambiar Hr'g Tr., Nov. 5, 2020) [APP364-366].
[79] *See* Ex. A ¶ 30 (Barton Decl.) [APP007-008].
[80] *See id.* at ¶ 31 [APP008].
[81] *See id.*; Ex. A-13 (HNGH Demand Letter) [APP156].
[82] *See* Ex. A ¶ 31 (Barton Decl.) [APP008]; Ex. A-23 (HNGH letter with pre-negotiation agreement) [APP328].
[83] *See* Ex. A ¶ 31 (Barton Decl.) [APP008].
[84] *See id.* at ¶ 32 [APP008].
[85] *See id.*; Exs. A-24 [APP333] & A-25 [APP336].
[86] *See* Ex. A ¶ 32 (Barton Decl.) [APP008].
[87] *See id.*; Ex. A-15 (Apr. 30, 2020 letter alleging notice of default) [APP176].
[88] *See* Ex. A ¶ 32 (Barton Decl.) [APP008].

2020, clarifying that it had already assigned certain rights to HNGH to act on Lender's behalf.[89] Lender also informed Plaintiffs that it had authorized the tax payment by HNGH and that it would not discuss forbearance without the "pre-negotiation agreement."[90] Lender's letter made it clear that it had assigned substantive rights (including enforcement and foreclosure) to HNGH that materially affected Plaintiffs' rights provided in the Loan and Deed of Trust, to which Plaintiffs never consented.[91] At all times, Plaintiffs have continued to dispute the alleged default (including because HNGH was voluntarily making monthly payments on the Loan, as Nambiar testified[92]).[93]

33. Apparently, Lender and Madison refused to negotiate a forbearance with 2999TC simply because they did not want to disclose the Participation Agreement and reveal the extent of control they had already ceded to HNGH without Plaintiffs' consent—the most obvious evidence being the "pre-negotiation contract" to sanitize Lender's breach.[94] The three insisted upon the "pre-negotiation agreement" because Lender and Madison were aware HNGH is a competitor to Plaintiffs preparing to seize control of the Project with Lender and Madison's assistance.[95] Specifically, if HNGH made any "default" payments and Madison foreclosed, Madison was obligated to transfer the property to HNGH *and* to loan HNGH the funds to acquire the property from Madison.[96]

34. As a further example of Madison and HNGH's secretive, joint efforts concerning

---

[89] *See id.* at ¶ 33 [APP008]; Ex. A-16 (May 5, 2020 Lender response letter) [APP180].
[90] *See id.* at ¶ 33 [APP008]; A-11 (May 6, 2020 letter from Lender requiring a less onerous version of pre-negotiation agreement, which 2999TC did sign, but which yielded no perceptible improvement to the negotiation process) [APP127].
[91] *See id.* at ¶ 33 [APP008].
[92] *See* Ex. B at 7:8-11, 8:2-3, 9:14-20 (Nambiar Hr'g Tr., Nov. 5, 2020) [APP364-366].
[93] *See e.g.*, Ex. A-17 (May 4, 2020 letter from Plaintiffs disputing alleged default notice) [APP183] & Ex. A-18 (May 5, 2020 letter from Plaintiffs further disputing the manufactured default) [APP189]; Ex. A ¶ 33 (Barton Decl.) [APP008].
[94] *See* Ex. A ¶ 34 (Barton Decl.) [APP008-009].
[95] *See id.*
[96] *See id.*; Ex. A-10 § 7(e) (Participation Agreement).

the Project, a third party asked J. Zegen (Madison) about buying the Loan after reading in PRNewswire that Madison was foreclosing.[97] J. Zegen responded that Madison does not "hold the last dollar on that deal" but that he would "see if the partner is interested in selling."[98] According to J. Zegen, that other partner (Glasgow) is a "major owner and developer locally" (competitor) and would only sell "for par plus every dollar of default interest owned."[99] When the third party developer noted he was still interested in purchasing the Loan, J. Zegen "[a]dd[ed] Jim Glasgow from greenhollow [sic] for you to deal directly with. You guys take from here."[100] Put plainly, Madison and Lender ceded control to HNGH and represented the same to third parties.[101] Lender also agreed that it "shall be prohibited from transferring its interest to any entity controlled by or affiliated with Borrower or to any direct competitor of, or anyone whose interest is adverse to GHCP,"[102] which precluded certain types of remedies that might otherwise have been available to Plaintiffs, such as partnership with another lender to purchase the Loan.[103]

35. To recap, Lender induced Barton to share confidential information with competitors whom Lender presented as prospective *equity* investors in the $100 million raise; using that information, Lender and competitors (HNGH) used the confidential information to negotiate and execute a B Note transaction in exchange for a secret Participation Agreement that anticipated and facilitated an event of default and foreclosure for HNGH's benefit and acquisition of the Land; Lender transferred to Plaintiffs' competitor HNGH significant and exclusive rights, from prohibiting Lender's communication with Plaintiff-borrower about the Loan up to foreclosure on it; HNGH directed potential investors *away* from the Project.

---

[97] *See id.* at ¶ 35 [APP009].
[98] *See id.*; Ex. A-3 (email from J. Zegen to potential purchaser of Loan on Jul. 29, 2020) [APP089].
[99] *See id.*
[100] *See id.*
[101] *See* Ex. A ¶ 35 (Barton Decl.) [APP009].
[102] Ex. A-10 § 8(d) (Participation Agreement) [APP117].
[103] *See* Ex. A ¶ 35 (Barton Decl.) [APP009].

### E. Defendants Are Using the Manufactured "Default" to Attempt Foreclosure.

36. After Plaintiffs' refusal to execute the "pre-negotiation agreement," Lender continued to look for default events. Lender first issued a notice of default for 2999TC's alleged depleted interest reserve account, and second for the tax payment *and* interest reserve account.[104] Despite 2999TC's several letters requesting an accounting from Lender regarding those allegations, and despite receiving 2999TC's *own* accounting with a spreadsheet of transactions from the interest reserve account, Lender never responded with any explanation or accounting.[105]

37. Instead, Lender has continued to harass and intimidate Plaintiffs, including by accusing Plaintiffs of removing property that Lender alleged was collateral for the loan (it was not) and threatening to call the police.[106] At one point, Plaintiff Barton received a disturbing call from his construction company that Bill Hutchinson ("***Hutchinson***")[107] called, pretending to be an interested tenant in an attempt to obtain construction plans and other confidential information about the Project.[108] Hutchinson did this with the knowledge, approval, assistance, and/or encouragement of Defendants to assist them in taking over the Project with the understanding that Hutchinson's company, Dunhill Partners, would be their chosen developer.[109]

38. Eventually, based on the unsubstantiated claims of default, Lender attempted to foreclose on the Land in early August, which was prevented by an emergency temporary restraining order.[110] It was in that state court case where Plaintiffs were able to compel a copy of

---

[104] *See* Ex. A ¶¶ 37-38 (Barton Decl.) [APP009-010].

[105] *See id.* *See also e.g.*, Ex. A-19 (May 12, 2020 letter from Plaintiffs following-up on previous accounting request) [APP191]; Ex. A-20 (Jun. 16, 2020 letter from Plaintiffs disputing alleged default and requesting accounting) [APP193].

[106] *See* Ex. A ¶ 39 (Barton Decl.) [APP010].

[107] Hutchinson is an associate of Glasgow and Nambiar who had collectively developed projects in the past, including the W Hotel and the Virgin Hotel in Dallas with Nambiar's company, HN Capital.

[108] *See* Ex. A ¶ 40 (Barton Decl.) [APP010].

[109] *See id.*

[110] *See id.* at ¶ 41 [APP010].

the Participation Agreement, which confirmed what Plaintiffs had already come to suspect about the relationship between Madison, Lender, and HNGH.[111] At that time, Plaintiffs finally were able to discover that Glasgow and Nambiar own HNGH.[112]

39. On November 20, 2020, Lender filed a second notice of foreclosure against 2999TC with the sale set to occur on January 5, 2021.[113] Plaintiffs did not become aware of the posting until December 2, 2020.[114] Meanwhile, unbeknownst to Plaintiffs, Lender assigned the entirety of the Loan to HNGH on December 7, 2020[115]—*after* filing for foreclosure.[116] Plaintiffs learned about that transfer on December 16, 2020.[117] As an additional oddity, HNGH (Nambiar) received funding from Happy State Bank, but what reasonable and unbiased bank would actually lend money on a loan *allegedly in default*?[118]

40. Originally, Plaintiffs prepared this Motion to enjoin Lender/Madison from foreclosing. Madison, Lender, and HNGH changed the status quo by their improper transfer during the pendency of this foreclosure proceeding and because HNGH was never a proper party to the original B Note or Participation Agreement.[119] If HNGH were a proper party, why would Defendants go to such great lengths to hide the agreement from Plaintiffs for months yet attempt to enforce it against Plaintiffs?

---

[111] *See id*.
[112] *See id.*
[113] *See* Ex. A-14 [APP160].
[114] *See* Ex. A ¶ 42 [APP010]; Ex. A-27 (Notice of Loan Sale) [APP352].
[115] *See* Ex. E [APP379].
[116] *See id.*; Ex. A-14 [APP160].
[117] *See* Ex. A ¶ 42 [APP010].
[118] *See* Ex. F [APP384].
[119] *See* Ex. A-2 § 40 (Deed of Trust) [APP057-058] (describing disinterested, third-party investor entities, ***not*** competitors).

## IV. ARGUMENTS & AUTHORITIES

### A. Plaintiffs Sufficiently Demonstrate Grounds for Injunctive Relief Under FRCP 65.

The purpose of a TRO is to preserve the status quo, to prevent irreparable harm until a hearing can be held on a preliminary injunction,[120] and to "preserve the court's ability to render a meaningful decision on the merits."[121] Foreclosure on a piece of real property may alter the status quo.[122] A court may grant a preliminary injunction or TRO when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest.[123]

In meeting their burden, Plaintiffs "need not prove" their case.[124] A "compelling reason" to grant an injunction is to "prevent the judicial process from being rendered futile by defendant's action."[125] Plaintiffs have provided sufficient evidence to establish each of these elements.

#### 1. Plaintiffs will likely prevail on the merits.

The movant "must demonstrate a substantial case on the merits," *i.e.*, a prima facie case,[126] for only one of its claims[127] and "need not show a certainty of winning."[128] Plaintiffs will likely prevail on the merits and have demonstrated their prima facie case for several claims. For example:

a. <u>Plaintiffs will likely prevail on breach of good faith and fair dealing.</u>

---

[120] *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).
[121] *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975).
[122] *See Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, pet. denied).
[123] *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*).
[124] *Texas v. United States*, 86 F. Supp. 3d 591, 646 (S.D. Tex. 2015).
[125] *Id.* (parenthetical quote from *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).
[126] *Id.* at 646-47 (quoting *Southerland v. Thigpen*, 784 F.2d 713, 718 n.l (5th Cir. 1986)).
[127] *Intel Corp. v. Rais*, 1:19-CV-20-RP, 2019 U.S. Dist. LEXIS 4932, at *17 (W.D. Tex. Jan. 10, 2019).
[128] *Texas*, 86 F. Supp. 3d at 646-47.

New York law governs the Loan Documents[129] and recognizes in all contracts an implied covenant of good faith and fair dealing, "under which neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[130] An injunction is proper to require a lender to comply with this implied covenant.[131]

In *Empresas Cablevision*, Empresas sought to enjoin JPMorgan from selling to a third party (Banco Inbursa) a 90% participation interest in its loan.[132] The district court found that "JPMorgan, act[ed] in bad faith, under the guise of a purported 'participation' to effectuate what is in substance a forbidden assignment, with unusual provisions demanded by Inbursa that are calculated to give Inbursa" exactly what Empresas' loan agreement was designed to prevent," which acts were "at a minimum" a violation of "the covenant of good faith and fair dealing automatically implied by law" in the contract.[133] "Such an end-run, if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."[134] The Second Circuit affirmed the district court's injunction, requiring JPMorgan to uphold the implied covenant "by prohibiting…the exercise of any right under any provision of the Participation Agreement that might" give Inbursa (the participant) "a competitive advantage over" Empress (the borrower).[135]

Here, the Deed of Trust clearly prohibits Lender from making material changes to the agreement—*i.e.*, giving a competitor (HNGH) control over the Loan—without consent. By converting a junior participant to senior participant, including transferring control of *and even communications about the Loan*, Lender and Madison subverted the purpose of the Deed of Trust

---

[129] *See* Ex. A-2 § 54 [APP060-062].
[130] *Claridge v. N. Am. Power & Gas, LLC*, 12-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693, at *16 (S.D.N.Y. Sep. 2, 2015).
[131] *See e.g.*, *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 633 (S.D.N.Y. 2010).
[132] *Id.*
[133] *Id.* at 631.
[134] *Id.* at 632.
[135] *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 381 Fed. Appx. 117, 118 (2d Cir. 2010).

and other Loan Documents. Lender knowingly assigned critical rights regarding enforcement of the terms of the Deed of Trust, including foreclosure, to an entity (competitor) whose primary economic interest is to see the contract fail, default triggered, and the Project foreclosed upon. The Deed of Trust also specifies which third parties can even participate in the Loan, which list does not include a special purpose *competitor* entity like HNGH.[136] Through its actions with Defendants, Lender and Madison engaged in conduct calculated to frustrate the purpose of the contract and evade the spirit of the bargain.

Lender engaged in extensive bad-faith conduct, such as refusing to negotiate forbearance during the COVID-19 shutdowns, declaring defaults where none existed, refusing to respond to requests for information and accounting, using harassment to intimidate and coerce Plaintiffs into an onerous contract modification, and wrongfully attempting to foreclose on the Land following numerous manufactured breaches. More troubling is the fact that Lender engaged in such conduct in concert with, and for the benefit of, Plaintiffs' competitor.[137]

b. Plaintiffs will likely prevail on their claim for fraud.

Under Texas common law, the elements of fraud are:

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury.[138]

Plaintiffs are likely to succeed on their fraud claim. Defendants made various material representations to Plaintiffs, including, but not limited to: (a) Madison would fund and assist in

---

[136] *See* Ex. A-2 § 40 [APP057-058].
[137] *See* Ex. A-3 (email from J. Zegen to potential purchaser of Loan on Jul. 29, 2020, describing Glasgow as a major owner and developer locally in Dallas, Texas) [APPP089].
[138] *Lake Eugenie Land & Dev., Inc. v. BP Exploration & Prod. (In re Deepwater Horizon)*, 643 Fed. Appx. 377, 381 (5th Cir. 2016).

finding additional investors for the overall project construction; (b) Glasgow and Nambiar were interested in investing in the overall project construction, and Glasgow would contribute $50 million in mezzanine funding; (c) Glasgow and Nambiar would maintain the confidentiality of Plaintiffs' trade secrets and not use such information to compete with Plaintiffs. It became evident that the representations were false when Madison sold/assigned all of its interests in the Loan to other parties; when neither Glasgow nor Nambiar invested in the overall project but merely purchased the B Note that ultimately would—allegedly—give them control over the Project; and when Glasgow and Nambiar used Plaintiffs' confidential trade secret information to craft the Participation Agreement and default plan to gain control. Any traditional lender would have been concerned about cash-flow issues (*i.e.*, being fully leveraged for a bridge loan), but not HNGH because it could (and did) gladly use that bit of confidential information, *as a competitor*, to push Plaintiffs out of the Project that Plaintiffs created.

Defendants knew their representations were false when made and intended for Plaintiffs to rely on them. By causing Plaintiffs' reliance, Defendants could gain the information they needed to effectively carry out their plan to gain control; otherwise, Defendants might not have had such quick and easy "success." Plaintiffs relied, shared their confidential information, and took certain actions (or inaction) based upon their belief they were working with a cooperative Lender when really Lender was helping HNGH manufacture a default event. Plaintiffs have been injured by losing at least two investors, facing the threat of foreclosure and total loss of a high-profile opportunity that *Plaintiffs* found and orchestrated, and being forced to pursue legal action.

c. Plaintiffs will likely prevail on their claim for tortious interference.

Tortious interference with prospective business relations occurs when:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference

> was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.[139]

Plaintiffs are likely to succeed on their tortious interference claim. Plaintiffs had reached an informal agreement with both Aju Hotels and Resorts and Mink Development (Korean luxury hospitality investors) for investment in the project, which likely would have been formalized but for Defendants' actions. HNGH (Nambiar) intentionally interfered by asserting he/HNGH owned the Loan, ultimately causing the investors to back out of the deal. Defendants made the same representations to a third potential investor. Any reasonable and prudent investor would have concerns about buying a loan for a development when the developer's *competitor* claims to own the loan, which suggests the developer is facing financial or possible legal issues with the competitor or other difficulty that would hamper the investor's interests.

Being seasoned competitors in this very industry, Defendants knew asserting purported ownership rights over the Loan would end in the very result realized. At a minimum, Defendants consciously desired to dissuade outside investors from supporting the Project so that Defendants could attempt to create the event of default that, as they claim, would give them control over the Project. Defendants' actions were independently tortious and otherwise wrongful, as described herein and Plaintiffs' Complaint. HNGH's actions caused Plaintiffs' injury by losing *two* investors, which financial shortfall HNGH then used to its advantage to fraudulently manipulate a "default" through which it would purportedly gain control over the Loan and based on which it would seek the foreclosure that is the subject of this Motion.[140] In addition, HNGH's actions are causing further damages by requiring these legal proceedings to forestall its wrongful conduct.

---

[139] *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 417 (5th Cir. 2015).
[140] *See* Ex. A ¶ 28 (Barton Decl.) [APP007].

d. Plaintiffs will likely prevail on their claim for conspiracy.

To make a prima facie case for conspiracy, a plaintiff must allege facts demonstrating:

> (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[141]

Plaintiffs are likely to succeed on their conspiracy claim. Madison (through J. Zegen and M. Zegen), Green Hollow (through Nambiar and Glasgow), Lender, and HNGH joined to create a side deal, allegedly for the purchase of a junior interest in the Loan but actually to transfer total control of the Loan to HNGH and exclude Plaintiffs. The tortious interference, fraud, and breach of implied covenant of good faith and fair dealing are only samples of the various unlawful, overt acts that Defendants completed, which caused Plaintiffs proximate damages.

**2. This suit involving real property meets the irreparable harm standard because real estate is unique.**

The movant also must show a "likelihood of substantial and immediate irreparable injury…and the inadequacy of remedies at law."[142] The injury must not be some remote, future possibility but also need not be *certain* to occur.[143] Instead, "a movant must show that irreparable injury is *likely* in the absence of an injunction" and "will occur during the pendency of the litigation."[144] An injury is irreparable when it "cannot be undone by monetary damages or one for which monetary damages would be especially difficult to calculate."[145] Losing a competitive advantage in the industry is irreparable harm.[146] "[S]uits involving real property usually meet the irreparable injury standard because each piece of real estate is considered to be unique."[147]

---

[141] *Lexxus Int'l, Inc. v. Loghry*, 512 F. Supp. 2d 647, 670 (N.D. Tex. 2007).
[142] *Lexxus*, 512 F. Supp. 2d at 672.
[143] *Id.*
[144] *Rais*, 2019 U.S. Dist. LEXIS 4932, at *14 (emphasis in original).
[145] *Id.*
[146] *Id.*
[147] *See Graham*, 307 S.W.3d at 481.

Even though the standard is less stringent, the actual harm here is *certain* to occur if the injunction is not granted. Defendants already used Plaintiffs' trade secrets to execute a side deal to take over Plaintiffs' Project and to exclude Plaintiffs. Besides the damage likely to occur from Defendants' continued use of Plaintiffs' trade secrets (along those same lines),[148] as well as Defendants' continued interference with third parties seeking to invest in the project, the *certain* damage arises from the pending foreclosure. At that time, Defendants will gain total control over the Land and the Project; Madison will fund it; and the only parties who will lose will be Plaintiffs with no opportunity to participate in the Project that *Barton* found and initiated.

The injury far exceeds monetary damages. If the foreclosure is permitted, Plaintiffs will lose the opportunity to make business connections and relationships that could prove fruitful for years to come. Plaintiffs will lose the goodwill they would otherwise generate from bringing such a prestigious hotel to Dallas (particularly being one of so few Mandarin hotels in the United States). Plaintiffs will lose the chance to add a selective luxury hotel to its portfolio, which is not an opportunity that comes by regularly. And Plaintiffs will likely suffer reputation damage from any publicity surrounding a (fraudulently instituted) public foreclosure. These losses cannot be quantified or compensated by remedies at law.

**3. Foreclosure outweighs any harm the injunction may cause Defendants, and the injunction will not disserve the public interest.**

Balancing the imminent injury to Plaintiffs against any possible harm to Defendants, the facts strongly favor injunctive relief for Plaintiffs. Harm is not merely "likely." Absent an injunction, Defendants *will* foreclosure on the Land. Once that happens, Plaintiffs will be cut out of the deal *completely*. HNGH will continue to construct the Project that Madison will fund, all

[148] *See e.g.*, *Empress Cablevision*, at 633 (finding "a strong likelihood of irreparable harm arising from" the competitor who holds the "participation interest" obtaining the borrower-plaintiff's confidential business information to use to the borrower-plaintiff's detriment).

based on Barton's years-long efforts on the Project.

In comparison, an injunction would only "burden" Defendants by imposing inaction[149] until the parties have such opportunity to present their cases. In fact, the Lender is not "burdened" at all. The actual Lender has already been made whole by HNGH's "cure" payments *and* by HNGH's outright purchase of the Loan; thus, the party holding the note with the actual right to foreclose (in the event of an actual default, which has not occurred) has not been harmed and cannot be harmed. The requested relief through the TRO and preliminary injunction also would not grant Plaintiffs all the relief they intend to seek and may be awarded at trial.[150]

Further, the injunction here will not *serve* the public interest. The public "has an interest in the enforcement of state and federal laws."[151] Public policy favors enforcement of contractual obligations and disfavors fraudulent conduct. Absent the injunction, Defendants will fully actualize the benefits from their various breaches and violations. This is a bell that cannot be unrung. Moreover, since the beginning of the pandemic, local, state, and national executive orders have proclaimed the public is best served by the spirit of cooperation and loan forbearance during this trying economic time—not hardball tactics and hostile takeovers. There is no disservice to the public from maintaining the status quo until Defendants answer for their wrongful conduct.

### B. Security Required Pursuant to Fed. R. Civ. P. 65(c)

Federal law permits a court to grant a TRO or preliminary injunction "only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by

[149] *See Texas*, 86 F. Supp. 3d at 675 (citing *Wright & Miller* § 2948.4 ("noting that one significant factor considered by courts when balancing the hardships is whether a mandatory or prohibitory injunction is ought—the latter being substantially less burdensome to the defendant")).

[150] *See id.* (citing *Wright & Miller* § 2948.4 ("explaining that if 'a preliminary injunction would give plaintiff all or most of the relief to which the plaintiff would be entitled if successful at trial,' courts are less likely to grant the injunction")).

[151] *Rais*, 2019 U.S. Dist. LEXIS 4932, at *16.

any party found to have been wrongfully enjoined or restrained."[152] But the Fifth Circuit also "has held that a district court has the discretion to require no security at all."[153] Plaintiffs request the Court exercise such discretion here for the following reasons.

If Defendants are allowed to proceed with foreclosure, HNGH will acquire the Land and control over the Project, which Madison will finance. Essentially Madison and Lender occupy their same position regardless of any foreclosure, and HNGH will supplant Plaintiffs as the owner of this unique and valuable piece of Dallas real estate. Additionally, the Loan is over-secured already. A recent appraisal of the Land returned at no less than $46 million, which is $14 million *more than* the Loan.[154] The Land serves as collateral for the Loan. Thus, additional security is unnecessary to protect Lender's interests.

## V. CONCLUSION

Because Defendants intentionally devised a scheme to take the Project and the Land from Plaintiffs for their own benefit using Plaintiffs' confidential, trade secret information; because Defendants executed a secret Participation Agreement purportedly converting HNGH's "junior subordinate participant interest" to that of senior lender; and because Defendants took the penultimate step of finalizing their fraud through the December 2020 Loan transfer, Plaintiffs request this Court prohibit the ultimate step of their fraud via the pending foreclosure by granting the Motion and the relief set forth therein.

---

[152] FED. R. CIV. P. 65(c).
[153] *Nat'l Fedn. of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 U.S. Dist. LEXIS 89694, at *130-31 (N.D. Tex. Jun. 27, 2016) (citing *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)); *cf.* FED. R. CIV. P. 65(c).
[154] *See* Ex. A-21 (Nov. 30, 2020 Appraisal of the Land) [APP195].

Dated: December 22, 2020

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber, Esq.

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 22, 2020, Plaintiffs' counsel conferred with counsel for Madison Realty Capital, LP, who referred the matter to counsel for HNGH Turtle Creek, LLC. Plaintiffs' counsel conferred with counsel for HNGH Turtle Creek, LLC, about the relief requested herein. Defendants are opposed to the relief sought with regard to the preliminary injunction and the temporary restraining order but requested an opportunity to be heard under an expedited briefing schedule on the issue of the temporary restraining order.

*/s/ G. Michael Gruber*
G. Michael Gruber, Esq.