# EXHIBIT A-19

# 2999TC Acquisitions, LLC

13901 Midway Road, Suite 102-243
Dallas, Texas 75244

May 12, 2020

2999 Turtle Creek LLC
c/o Madison Capital
520 Madison Avenue, Suite 3501
New York, NY 10022
Attention: Shoshanna Carmel

Kriss & Feuerstein LLP
360 Lexington Ave., Suite 1200
New York, New York
Attention: Jerold Feuerstein

RE: Follow up to Borrower's Letter dated May 5, 2020 related to (i) that certain Secured Promissory Note, dated as of September 16, 2019, in the principal amount of $32,500,000.00 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), by 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company ("Borrower" or "we" or "us") in favor of 2999 Turtle Creek LLC, a Delaware limited liability company (the "Lender" or "you"), (ii) that certain Deed of Trust, Security Agreement and Fixture Filings, dated as of September 16, 2019, made by Borrower in favor of Michael B. Massey, as trustee for the benefit of Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Deed of Trust", and together with the Note, the "Loan Documents"),

Dear Ladies and Gentlemen:

This letter is being sent as a follow up to the letter sent on behalf of Borrower dated May 5, 2020 in which Borrower requested the following accounting under the Note:

> "[P]lease provide an accounting statement since closing of the Loan showing each of the following: dates each interest reserve deposit was made and the amount of such deposits, dates each interest payment was withdrawn by Lender from the reserve, the month such interest payments correspond to, the amounts of such interest payments, and the balance of the interest reserve upon each date of the foregoing deposits and payments. Furthermore, please provide the schedule for the remaining interest payments, interest reserve deposits and anticipated reserve balances as of each future due date.

Furthermore, Borrower requested that Lender "confirm that Lender is still the holder of the Note and if so, please provide a true and correct copy of the entire executed Note in possession of the Lender especially considering the issues previously identified by

Borrower regarding certain revisions that were made to the Note and otherwise, please identity the current holder of the Note."

Seven days have passed since Borrower made the above requests, yet Lender has still not provided the requested information. As a result, Borrower once again requests that the Lender send to Borrower the above information.

Thank you.

Sincerely,

Tim Barton
President
2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC

# EXHIBIT A-20

**2999TC Acquisitions, LLC**

13901 Midway Road, Suite 102-243
Dallas, Texas 75244

**VIA EMAIL**

June 16, 2020

2999 Turtle Creek LLC
c/o Madison Capital
520 Madison Avenue, Suite 3501
New York, NY 10022

**Attention: Jerold Feuerstein**
Kriss & Feuerstein LLP
360 Lexington Ave., Suite 1200
New York, New York

Re: Reference is hereby made to: (i) that certain Secured Promissory Note, dated as of September 16, 2019 in the principal amount of $32,500,000.00 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), by MO 2999TC, LLC, a Delaware limited liability company ("Borrower" or "we" or "us") in favor of 2999 Turtle Creek LLC, a Delaware limited liability company (the "Lender" or "you"), and (ii) that certain Deed of Trust, Security Agreement and Fixture Filings, dated as of September 16, 2019, made by Borrower in favor of Michael B. Massey, as trustee for the benefit of the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Deed of Trust" and together with Note, the "Loan Documents").

Dear Ladies and Gentlemen:

I write in response to your letter dated June 9, 2020 asserting an alleged "Interest Payment Default" by the Borrower (the "Letter"). Your Letter also asserts alleged "Tax Payment Default" and an alleged "Interest Reserve Default" under the Loan Documents For the reasons previously stated in my prior correspondence to you that was dated May 5, 2020, Borrower disputes that any Event of Default has been triggered under the Loan Documents. Given the conflicting positions between the Borrower and Lender regarding the interest reserve and interest payment requirements especially under section 35 of the Note, Borrower had provided a detailed schedule of the interest reserve and interest payments as determined by the Borrower based on the language of the Note and requested the Lender to "please provide the schedule for the remaining interest payments, interest reserve deposits and anticipated reserve balances as of each future due date" in order to determine what the disconnect is between Borrower and Lender and to support Lender's asserted Interest Payment Default and Interest Reserve Default.. Borrower reiterated this request in a separate letter sent on May 12, 2020. Nonetheless Lender has failed to provide such information after nearly six weeks and instead chose to send only a copy of the Promissory Note via counsel on May 14, 2020 followed by the latest Letter on June 9, 2020 without including the requested information. Once again, please send Borrower the requested information from its May 5 letter.

Separately, please advise whether HNGH Turtle Creek, LLC has remitted any interest payments pursuant to that January 2020 Participation Agreement, as amended, between it and Lender. If such payment was remitted, kindly confirm the date of payment.

Finally, Borrower previously provided you with a proposal for forbearance as follows:

- Forbearance through maturity date of loan;
- Interest applied on an accrual basis through maturity date of loan and paid at maturity, to include any extension;
- Ability for Borrower to put second lien on the property, with a value not to exceed $10 million, and with no pre-approval from Lender required;
- Borrower will re-pay HNGH Turtle Creek, LLC for its payment of the 2019 property taxes; and
- Statement of no event of default triggered.

Please advise on Lender's position with regard to this outstanding forbearance proposal.

Sincerely,

Tim Barton
President
2999TC Acquisitions, LLC f/k/a MO2999 TC, LLC

# EXHIBIT A-21

**Integra Realty Resources**
**Dallas**

**Appraisal of Real Property**

**MO 2999 TC Acquisitions, LLC Property**
Redevelopment Site
Western corner of Turtle Creek Boulevard and Dickason Avenue
Dallas, Dallas County, Texas 75219

**Prepared For:**
MO 2999 TC Acquisitions, LLC

**Effective Date of the Appraisal:**
November 3, 2020

**Report Format:**
Appraisal Report – Comprehensive Format

**IRR - Dallas**
File Number: 191-2020-0809






I



**MO 2999 TC Acquisitions, LLC Property**
Western corner of Turtle Creek Boulevard and Dickason Avenue
Dallas, Dallas County, Texas

Integra Realty Resources
Dallas

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T 972.881.7191
F 972.733.1403
www.irr.com

November 4, 2020

To Whom It May Concern
MO 2999 TC Acquisitions, LLC
1755 Wittington Place
Dallas, TX 75243

SUBJECT: Market Value Appraisal
MO 2999 TC Acquisitions, LLC Property
Western corner of Turtle Creek Boulevard and Dickason Avenue
Dallas, Dallas County, Texas 75219
IRR - Dallas File No. 191-2020-0809

Dear To Whom It May Concern:

Integra Realty Resources – Dallas is pleased to submit the accompanying appraisal of the referenced property. The purpose of the appraisal is to develop an opinion of the "not less than" market value of the fee simple interest in the property. The client for the assignment is MO 2999 TC Acquisitions, LLC, and the intended use is for court presentation and internal decision making purposes.

The subject represents an existing single tenant office building containing 28,907 square feet situated on 2.473 acres or 107,711 square feet of land which represents a very low building to land ratio for the neighborhood. However, the existing improvements are of a very high-quality construction and finish out. The property is zoned PD-193 (Planned Development 193), which allows for office as well as a special hotel project, and the neighborhood is generally high density in nature. Thus, the highest and best use of the site is for redevelopment at a higher density. In fact, the current owner has designed and planned the site to be redeveloped with a combination high-rise luxury hotel/residential condominium project and incorporate the existing office building into the new project with a total of 565,472 square feet of building space (5.25 FAR). Thus, the improvements are considered to contribute additional value to the site as if vacant. However, due to the lack of time provided to complete this assignment, we have only valued the underlying land herein providing for a "not less than" market value assignment.

The appraisal is intended to conform with the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute and applicable state appraisal regulations.

To report the assignment results, we use the Appraisal Report option of Standards Rule 2-2(a) of USPAP. As USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal, we adhere to the Integra Realty Resources internal standards for an Appraisal Report – Comprehensive Format. This format contains the greatest depth and detail of IRR's available report types.

Based on the valuation analysis in the accompanying report, and subject to the definitions, assumptions, and limiting conditions expressed in the report, our opinion of value is as follows:

**Value Conclusion**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| "Not Less Than" Market Value | Fee Simple | November 3, 2020 | $42,690,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. Based on the building plans supplied by JMJ Development, the subject site is planned for a building size of 565,472 square feet. Our value is based on this development potenital. If the information supplied is significantly different than our assumption, our assignment results may be affected.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. As discussed, due to time restraints, we have only valued the land area of the subject and provided a "Not Less Than" Market Value.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

As of the date of value, the economy (globally, nationally, and locally) was in a state of rapid transition with a widespread expectation of the imminent onset of a significant recession. The outbreak of COVID-19 (coronavirus disease of 2019) in China was declared a global pandemic by the World Health Organization (WHO) on March 11, 2020. Some market deterioration had occurred shortly before this date, but the declaration by the WHO soon led to municipal and statewide orders to "shelter in place," causing widespread closures of businesses and a massive disruption to general commerce. The status of economic conditions is changing rapidly, creating great uncertainty in the markets. Our analysis of these and related issues is presented in the attached report. The value expressed herein represents our opinion based on the best available data reflective as of the date of value. While values are always subject to change over time, we caution the reader that in the current economic climate, market volatility creates the potential for a more significant change in value over a relatively short period of time.

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

**INTEGRA REALTY RESOURCES - DALLAS**

Ernest Gatewood
Senior Director
Certified General Real Estate Appraiser
Texas Certificate #TX 1324355 G
Telephone: (972) 725-7755
Email: egatewood@irr.com

Jimmy H. Jackson, MAI
Executive Director
Certified General Real Estate Appraiser
Texas Certificate #TX 1324004 G
Telephone: (972) 725-7724
Email: jhjackson@irr.com

# Table of Contents


**Executive Summary** **1**

**Quality Assurance** **2**

**General Information** **3**
Identification of Subject 3
Sale History 3
Pending Transactions 4
Purpose of the Appraisal 4
Definition of Market Value 4
Definition of Property Rights Appraised 4
Intended Use and User 5
Applicable Requirements 5
Report Format 5
Prior Services 5
Scope of Work 5

**Economic Analysis** **7**
Dallas County Area Analysis 7
Surrounding Area 14
Multifamily Market Analysis 22
  Class A Multifamily Overview 24
Office Market Analysis 35
  Class A Office Overview 37
Lodging Market Analysis 47

**Property Analysis** **58**
Land Description and Analysis 58
Real Estate Taxes 70
Highest and Best Use 71

**Valuation** **73**
Valuation Methodology 73
Sales Comparison Approach 74
  Adjustment Factors 77
  Analysis and Adjustment of Sales 78
  Land Value Conclusion 80
Reconciliation and Conclusion of Value 81
  Exposure Time 82
  Marketing Time 82

**Certification** **83**

**Assumptions and Limiting Conditions** **85**

**Addenda**
A. Appraiser Qualifications
B. Definitions
C. Property Information
D. Comparable Data

# Executive Summary

| | | |
|---|---|---|
| Property Name | MO 2999 TC Acquisitions, LLC Property | |
| Address | Western corner of Turtle Creek Boulevard and Dickason<br>Dallas, Dallas County, Texas 75219 | |
| Property Type | Land - Multifamily | |
| Owner of Record | MO 2999TC LLC | |
| Tax ID | 001031000A0040000 | |
| Land Area | 2.473 acres; 107,711 SF | |
| Zoning Designation | Planned Development 193 (PD-193), Subdistrict 147, O-2 Office Subdistrict | |
| Highest and Best Use | Mixed-use development | |
| Exposure Time; Marketing Period | 6-12 months; 6-12 months | |
| Effective Date of the Appraisal | November 3, 2020 | |
| Date of the Report | November 4, 2020 | |
| Property Interest Appraised | Fee Simple | |
| Sales Comparison Approach | | |
| Number of Sales | 4 | |
| Range of Sale Dates | Oct 18 to Aug 20 | |
| Range of Prices per Land SF (Unadjusted) | $269.88 - $410.89 | |
| Range of Prices per Bldg. SF (Unadjusted) | $42.29 - $67.47 | |
| Market Value Conclusion | $42,690,000 | ($75.49/Bldg. SF) |

The values reported above are subject to the definitions, assumptions, and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than MO 2999 TC Acquisitions, LLC may use or rely on the information, opinions, and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions, and limiting conditions contained therein.

## Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser’s opinions or conclusions.

1. Based on the building plans supplied by JMJ Development, the subject site is planned for a building size of 565,472 square feet. Our value is based on this development potenital. If the information supplied is significantly different than our assumption, our assignment results may be affected.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. As discussed, due to time restraints, we have only valued the land area of the subject and provided a "Not Less Than" Market Value.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

# Quality Assurance

Delivering superior value is a top priority at IRR and we place a premium on feedback from our valued clients. By learning more about your experience with IRR, we will be better able to serve your needs – to enhance our products, service offerings, and client communications.

Attached is a short survey applicable to this appraisal report and the service that you received. Please take a few minutes to share your experience of IRR with us. Your feedback will be reviewed by our Quality Control team. If you desire a follow-up telephone call, please provide your contact information and a member of our Quality Control team will contact you.

Access the online survey here: quality.irr.com.

Thank you in advance for assisting us with this important endeavor. Please feel free to contact your Local Office using the contact information provided within the letter of transmittal or our Quality Control team at quality@irr.com, with any questions or suggestions you may have.

# General Information

## Identification of Subject

The subject represents an existing single tenant office building containing 28,907 square feet situated on 2.473 acres or 107,711 square feet of land which represents a very low building to land ratio for the neighborhood. However, the existing improvements are of a very high-quality construction and finish out. The property is zoned PD-193 (Planned Development 193), which allows for office as well as a special hotel project, and the neighborhood is generally high density in nature. Thus, the highest and best use of the site is for redevelopment at a higher density. In fact, the current owner has designed and planned the site to be redeveloped with a combination high-rise luxury hotel/residential condominium project and incorporate the existing office building into the new project with a total of 565,472 square feet of building space (5.25 FAR). Thus, the improvements are considered to contribute additional value to the site as if vacant. However, due to the lack of time provided to complete this assignment, we have only valued the underlying land herein providing for a "not less than" market value assignment.

The full legal description of the property can be found in the addenda:

| Property Identification | |
|---|---|
| Property Name | MO 2999 TC Acquisitions, LLC Property |
| Address | Western corner of Turtle Creek Boulevard and Dickason Avenue |
| | Dallas, Texas 75219 |
| Tax ID | 001031000A0040000 |
| Owner of Record | MO 2999TC LLC |
| Legal Description | Lot 4, Block A/1031, Turtle Creek Office |

## Sale History

The most recent closed sale of the subject is summarized as follows:

| | |
|---|---|
| Sale Date | September 23, 2019 |
| Seller | Turtle Creek Dickason LTD |
| Buyer | MO 2999TC LLC |
| Sale Price | $43,049,926 |
| Recording Instrument Number | 201900253449 |

The subject sold for $399.68 per square foot of land, or $76.13 per square foot of planned building area in September 2019. The sale price is consistent with our market value conclusion. To the best of our knowledge, no sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date.

## Pending Transactions

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

## Purpose of the Appraisal

The purpose of the appraisal is to develop an opinion of the "not less than" market value of the fee simple interest in the property as of the effective date of the appraisal, November 3, 2020. The date of the report is November 4, 2020. The appraisal is valid only as of the stated effective date or dates.

## Definition of Market Value

Market value is defined as:

“The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.”

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## Definition of Property Rights Appraised

Fee simple estate is defined as, “Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.”

*Source*: Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015)

## Intended Use and User

The intended use of the appraisal is for court presentation and internal decision making purposes. The client and intended user is MO 2999 TC Acquisitions, LLC. The appraisal is not intended for any other use or user. No party or parties other than MO 2999 TC Acquisitions, LLC may use or rely on the information, opinions, and conclusions contained in this report.

## Applicable Requirements

This appraisal is intended to conform to the requirements of the following:

- Uniform Standards of Professional Appraisal Practice (USPAP)
- Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute
- Applicable state appraisal regulations

## Report Format

This report is prepared under the Appraisal Report option of Standards Rule 2-2(a) of USPAP. As USPAP gives appraisers the flexibility to vary the level of information in an Appraisal Report depending on the intended use and intended users of the appraisal, we adhere to the Integra Realty Resources internal standards for an Appraisal Report – Comprehensive Format. This format contains the greatest depth and detail of IRR's available report types.

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

## Scope of Work

To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the complexity of the property, and other pertinent factors. Our concluded scope of work is described below.

## Valuation Methodology

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. Use of the approaches in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Not Applicable | Not Utilized |

We use only the sales comparison approach in developing an opinion of value for the subject. This approach is applicable to the subject because there is an active market for similar properties, and sufficient sales data is available for analysis.

The cost approach is not applicable because there are no improvements that contribute value to the property, and the income approach is not applicable because the subject is not likely to generate rental income in its current state.

## Research and Analysis

The type and extent of our research and analysis is detailed in individual sections of the report. This includes the steps we took to verify comparable sales, which are disclosed in the comparable sale profile sheets in the addenda to the report. Although we make an effort to confirm the arms-length nature of each sale with a party to the transaction, it is sometimes necessary to rely on secondary verification from sources deemed reliable.

## Inspection

Ernest Gatewood conducted an on-site inspection of the property on November 3, 2020. Jimmy H. Jackson, MAI, did not conduct an inspection.

## Significant Appraisal Assistance

It is acknowledged that Joe Ponder, Appraiser Trainee, License #1342016 and Garrett Cook, Appraiser Trainee, License #1342407 made a significant professional contribution to this appraisal, consisting of participating in the property inspection, conducting research on the subject and transactions involving comparable properties, performing appraisal analyses, and assisting in report writing, under the supervision of the persons signing the report.

# Economic Analysis

The reader is reminded that the demographics presented on this and the following pages were gathered during the period that preceded the COVID-19 pandemic and imminent recession. The data provides useful information for purposes of considering the population and economy of the local area under stabilized market conditions. However, job losses, unemployment (overall and in different sectors), impaired commerce, and reduced income levels will result in demographic statistics after February 2020 that do not follow the stabilized trend that would have been expected based only on a review of data through 2019 and the first few weeks of 2020.

## Dallas County Area Analysis

Dallas County is located in Texas approximately 871 square miles in size and has a population density of 3,072 persons per square mile.

### Population

Dallas County has an estimated 2021 population of 2,676,273, which represents an average annual 1.1% increase over the 2010 census of 2,368,139. Dallas County added an average of 28,012 residents per year over the 2010-2021 period, but its annual growth rate lagged the Dallas MSA rate of 1.7%.

Looking forward, Dallas County's population is projected to increase at a 1.2% annual rate from 2021-2026, equivalent to the addition of an average of 34,198 residents per year. Dallas County's growth rate is expected to lag that of the Dallas MSA, which is projected to be 1.4%.

**Population Trends**

| | Population | | | Compound Ann. % Chng | |
|---|---|---|---|---|---|
| | 2010 Census | 2021 Estimate | 2026 Projection | 2010 - 2021 | 2021 - 2026 |
| Dallas County | 2,368,139 | 2,676,273 | 2,847,264 | 1.1% | 1.2% |
| Dallas-Ft. Worth, TX | 7,020,482 | 8,433,646 | 9,045,789 | 1.7% | 1.4% |
| Texas | 25,145,561 | 29,570,729 | 31,576,003 | 1.5% | 1.3% |
| USA | 308,745,538 | 330,946,040 | 340,574,349 | 0.6% | 0.6% |

Source: Environics Analytics

## Employment

Total employment in Dallas County was estimated at 1,750,722 jobs as of September 2019. Between year-end 2009 and 2019, employment rose by 338,969 jobs, equivalent to a 24.0% increase over the entire period. There were gains in employment in ten out of the past ten years, as the national economy expanded following the downturn of 2007-2009. Although Dallas County's employment rose over the last decade, it underperformed the Dallas MSA, which experienced an increase in employment of 29.1% or 818,934 jobs over this period.

A comparison of unemployment rates is another way of gauging an area's economic health. Over the past decade, the Dallas County unemployment rate has been consistently higher than that of the Dallas MSA, with an average unemployment rate of 5.8% in comparison to a 5.4% rate for the Dallas MSA. A higher unemployment rate is a negative indicator.
Recent data shows that the Dallas County unemployment rate is 3.3% in comparison to a 3.2% rate for the Dallas MSA, a negative sign that is consistent with the fact that Dallas County has underperformed the Dallas MSA in the rate of job growth over the past two years.

**Employment Trends**

| | Total Employment (Year End) | | | | Unemployment Rate (Ann. Avg.) | |
|---|---|---|---|---|---|---|
| Year | Dallas County | % Change | Dallas MSA | % Change | Dallas County | Dallas MSA |
| 2009 | 1,411,753 | | 2,818,709 | | 8.2% | 7.8% |
| 2010 | 1,431,757 | 1.4% | 2,876,418 | 2.0% | 8.6% | 8.1% |
| 2011 | 1,459,402 | 1.9% | 2,943,465 | 2.3% | 8.1% | 7.6% |
| 2012 | 1,501,273 | 2.9% | 3,044,114 | 3.4% | 7.1% | 6.6% |
| 2013 | 1,530,834 | 2.0% | 3,127,712 | 2.7% | 6.6% | 6.1% |
| 2014 | 1,592,969 | 4.1% | 3,254,583 | 4.1% | 5.4% | 5.0% |
| 2015 | 1,650,696 | 3.6% | 3,360,668 | 3.3% | 4.3% | 4.1% |
| 2016 | 1,689,422 | 2.3% | 3,441,839 | 2.4% | 4.0% | 3.9% |
| 2017 | 1,717,458 | 1.7% | 3,526,930 | 2.5% | 3.9% | 3.7% |
| 2018 | 1,742,213 | 1.4% | 3,606,436 | 2.3% | 3.7% | 3.5% |
| 2019* | 1,750,722 | 0.5% | 3,637,643 | 0.9% | 3.4% | 3.2% |
| Overall Change 2009-2019 | 338,969 | 24.0% | 818,934 | 29.1% | | |
| Avg Unemp. Rate 2009-2019 | | | | | 5.8% | 5.4% |
| Unemployment Rate - February 2020 | | | | | 3.3% | 3.2% |

*Total employment data is as of September 2019; unemployment rate data reflects the average of 12 months of 2019.

Source: U.S. Bureau of Labor Statistics and Moody's Analytics. Employment figures are from the Quarterly Census of Employment and Wages (QCEW). Unemployment rates are from the Current Population Survey (CPS). The figures are not seasonally adjusted.

## Employment Sectors

The composition of the Dallas County job market is depicted in the chart below. A complete data set is not available for the Dallas MSA, so we will compare Dallas County to the United States. Total employment for the two areas is broken down by major employment sector, and the sectors are ranked from largest to smallest based on the percentage of Dallas County jobs in each category.

**Employment Sectors - 2019**




Source: U.S. Bureau of Labor Statistics and Moody's Analytics

Dallas County has greater concentrations than the United States in the following employment sectors:

1. Professional and Business Services, representing 21.0% of Dallas County payroll employment compared to 14.3% for the nation overall. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.
2. Trade; Transportation; and Utilities, representing 20.2% of Dallas County payroll employment compared to 18.4% for the nation overall. This sector includes jobs in retail trade, wholesale trade, trucking, warehousing, and electric, gas, and water utilities.
3. Financial Activities, representing 9.6% of Dallas County payroll employment compared to 5.6% for the nation overall. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.

4. Construction, representing 5.3% of Dallas County payroll employment compared to 5.1% for the nation overall. This sector includes construction of buildings, roads, and utility systems.

Dallas County is underrepresented in the following sectors:

1. Education and Health Services, representing 11.7% of Dallas County payroll employment compared to 15.6% for the nation overall. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.
2. Government, representing 10.1% of Dallas County payroll employment compared to 14.7% for the nation overall. This sector includes employment in local, state, and federal government agencies.
3. Leisure and Hospitality, representing 9.6% of Dallas County payroll employment compared to 11.2% for the nation overall. This sector includes employment in hotels, restaurants, recreation facilities, and arts and cultural institutions.
4. Manufacturing, representing 6.8% of Dallas County payroll employment compared to 8.6% for the nation overall. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.

Major employers in Dallas County are shown in the following table.

**Major Employers - Dallas County**

| | Name | Number of Employees |
|---|---|---|
| 1 | American Airlines | 24,700 |
| 2 | Bank of America Corp | 20,000 |
| 3 | Texas Health Resources Inc. | 19,230 |
| 4 | Dallas ISD | 18,314 |
| 5 | Baylor Health Care System | 17,097 |
| 6 | AT&T | 15,800 |
| 7 | Lockheed Martin Aeronautics Co. | 14,126 |
| 8 | JP Morgan Chase & Co. | 13,500 |
| 9 | UT-Southwestern Medical Center | 13,122 |
| 10 | City of Dallas | 12,836 |

Source: destinationdfw.com

## Gross Domestic Product

Gross Domestic Product (GDP) is a measure of economic activity based on the total value of goods and services produced in a defined geographic area, and annual changes in Gross Domestic Product (GDP) are a gauge of economic growth.

Economic growth, as measured by annual changes in GDP, has been somewhat lower in Dallas County than the Dallas MSA overall during the past eight years. Dallas County has grown at a 3.5% average annual rate while the Dallas MSA has grown at a 3.7% rate.

Dallas County has a per capita GDP of $91,507, which is 46% greater than the Dallas MSA's GDP of $62,772. This means that Dallas County industries and employers are adding relatively more value to the economy than their counterparts in the Dallas MSA.

**Gross Domestic Product**

| Year | ($,000s) Dallas County | % Change | ($,000s) Dallas MSA | % Change |
|---|---|---|---|---|
| 2011 | 189,636,572 | | 362,930,984 | |
| 2012 | 194,441,633 | 2.5% | 375,286,232 | 3.4% |
| 2013 | 200,315,402 | 3.0% | 386,681,388 | 3.0% |
| 2014 | 208,158,051 | 3.9% | 404,622,644 | 4.6% |
| 2015 | 220,137,057 | 5.8% | 425,323,274 | 5.1% |
| 2016 | 226,056,902 | 2.7% | 436,717,395 | 2.7% |
| 2017 | 233,731,905 | 3.4% | 451,414,779 | 3.4% |
| 2018 | 241,375,801 | 3.3% | 468,918,434 | 3.9% |
| Compound % Chg (2011-2018) | | 3.5% | | 3.7% |
| GDP Per Capita 2018 | $91,507 | | $62,772 | |

Source: U.S. Bureau of Economic Analysis and Moody's Analytics; data released December 2019. The release of state and local GDP data has a longer lag time than national data. The data represents inflation-adjusted ""real"" GDP stated in 2012 dollars.

## Household Income

Dallas County has a lower level of household income than the Dallas MSA. Median household income for Dallas County is $65,015, which is 11.3% less than the corresponding figure for the Dallas MSA.

**Median Household Income - 2021**

| | Median |
|---|---|
| Dallas County | $65,015 |
| Dallas-Ft. Worth, TX | $73,334 |
| Comparison of Dallas County to Dallas-Ft. Worth, TX | - 11.3% |

Source: Environics Analytics

The following chart shows the distribution of households across twelve income levels. Dallas County has a greater concentration of households in the lower income levels than the Dallas MSA. Specifically, 25% of Dallas County households are below the $35,000 level in household income as compared to 22% of

Dallas MSA households. A lesser concentration of households is apparent in the higher income levels, as 43% of Dallas County households are at the $75,000 or greater levels in household income versus 49% of Dallas MSA households.

**Household Income Distribution - 2021**




Source: Environics Analytics

## Education and Age

Residents of Dallas County have a lower level of educational attainment than those of the Dallas MSA. An estimated 31% of Dallas County residents are college graduates with four-year degrees, versus 34% of Dallas MSA residents. People in Dallas County are younger than their Dallas MSA counterparts. The median age for Dallas County is 34 years, while the median age for the Dallas MSA is 36 years.

**Education & Age - 2021**







Source: Environics Analytics

## Conclusion

The Dallas County economy will be affected by a growing population base and lower income and education levels. Dallas County experienced growth in the number of jobs over the past decade, and it is reasonable to assume that employment growth will occur in the future. We anticipate that the Dallas County economy will improve and employment will grow, strengthening the demand for real estate.

As previously referenced, COVID-19 has pushed the economy at all levels into a recession which has yet to be statistically proven or definitively quantified. Therefore, the statistical summary of the region provided above must be considered in light of the fact that economic indicators available in the near future will show a substantial contraction of economic activity beginning in the first quarter of 2020. This issue is discussed more fully after the Market Analysis section of this report.

# Surrounding Area

## Boundaries

The subject property is located in the "Uptown" neighborhood of Dallas in an affluent area directly north of the Dallas Central Business District. The neighborhood is bordered by the Oak Lawn/Turtle Creek area to the north, one of the wealthiest areas of Dallas with upscale townhomes, condos, apartments, and duplexes. This area is generally delineated as follows.

| | |
|---|---|
| **North** | Lemmon Avenue |
| **South** | Woodall Rodgers Freeway |
| **East** | US-75 (N. Central Expressway) |
| **West** | Dallas North Tollway |

A map identifying the location of the property follows this section.

## Access and Linkages

Primary access to the area is provided by two major highways: US-75 and I-35 East. In addition, Woodall Rodgers Freeway provides additional freeway access to the south and connects US-75 to I-35 East. Access to the neighborhood is provided by McKinney Avenue and Cedar Springs Road, the two primary thoroughfares serving Uptown and Oak Lawn/Turtle Creek.

Public transportation is provided by Dallas Area Rapid Transit (DART) which provides bus and light rail service to Dallas County and the surrounding communities. In addition, the McKinney Avenue Transit Authority operates the M-Line, a free trolley service which extends from Uptown to the northern part of Downtown Dallas.

The DFW International Airport is located about 20 miles from the subject; travel time is about 30 minutes, depending on traffic conditions. Further, Dallas Love Field is located less than 5 miles from the subject.

## Demand Generators

Uptown and Oak Law/Turtle Creek are upscale neighborhoods that are one of the most pedestrian-friendly areas of Dallas. The district is one of the densest in Dallas with a diverse mix of office, residential towers, apartment complexes, retail centers, night life, and hotels. The area is an attractive destination with significant drawing power for the region. The daytime population is estimated between 18.000 to 30,000.

## Demographics

A demographic profile of the surrounding area, including population, households, and income data, is presented in the following table.

**Surrounding Area Demographics**

| 2021 Estimates | 1-Mile Radius | 3-Mile Radius | 5-Mile Radius | Dallas County | Dallas-Ft. Worth, TX |
|---|---|---|---|---|---|
| Population 2010 | 28,869 | 150,122 | 320,716 | 2,368,139 | 7,020,482 |
| Population 2021 | 40,378 | 187,332 | 374,194 | 2,676,273 | 8,433,646 |
| Population 2026 | 43,886 | 200,186 | 397,205 | 2,847,264 | 9,045,789 |
| Compound % Change 2010-2021 | 3.1% | 2.0% | 1.4% | 1.1% | 1.7% |
| Compound % Change 2021-2026 | 1.7% | 1.3% | 1.2% | 1.2% | 1.4% |
| | | | | | |
| Households 2010 | 18,310 | 69,106 | 137,315 | 855,960 | 2,543,030 |
| Households 2021 | 25,757 | 90,117 | 165,042 | 961,876 | 3,028,838 |
| Households 2026 | 27,949 | 97,068 | 176,050 | 1,020,709 | 3,243,500 |
| Compound % Change 2010-2021 | 3.2% | 2.4% | 1.7% | 1.1% | 1.6% |
| Compound % Change 2021-2026 | 1.6% | 1.5% | 1.3% | 1.2% | 1.4% |
| | | | | | |
| Median Household Income 2021 | $102,761 | $83,633 | $76,573 | $65,015 | $73,334 |
| Average Household Size | 1.6 | 1.9 | 2.2 | 2.8 | 2.8 |
| College Graduate % | 78% | 59% | 52% | 31% | 34% |
| Median Age | 36 | 35 | 35 | 34 | 36 |
| Owner Occupied % | 25% | 29% | 38% | 52% | 63% |
| Renter Occupied % | 75% | 71% | 62% | 48% | 37% |
| Median Owner Occupied Housing Value | $465,405 | $497,144 | $482,724 | $210,500 | $247,098 |
| Median Year Structure Built | 2003 | 1998 | 1986 | 1982 | 1990 |
| Average Travel Time to Work in Minutes | 24 | 25 | 26 | 30 | 31 |

Source: Environics Analytics

As shown above, the current population within a 10-minute drive time of the subject is 283,550, and the average household size is 2.1. Population in the area has grown since the 2010 census, and this trend is projected to continue over the next five years. Compared to Dallas County overall, the population within a 10-minute drive time is projected to grow at a slower rate.

Median household income is $71,306, which is higher than the household income for Dallas County. Residents within a 10-minute drive time have a considerably higher level of educational attainment than those of Dallas County, while median owner-occupied home values are considerably higher.

## Land Use

In the immediate vicinity of the subject, predominant land uses are commercial and multi-family uses. Other land use characteristics are summarized as follows:

| Subject's Immediate Surroundings | |
|---|---|
| North | Multi-Family Residential |
| South | Commercial/Turtle Creek Park |
| East | Commercial |
| West | Multi-Family Residential |



## Development Activity and Trends

There is a growing presence of multi-family residential in the subject neighborhood which are typically housed in low to mid-rise buildings. However, several high-rise projects have been developed over the past decade. The subject neighborhood is densely developed with little vacant land available for new development. Developers are increasingly looking to assemble properties to building mid to high-rise mixed-used developments. The subject neighborhood has several high-profile developments. The most important are discussed as follows:

- **McKinney and Olive** is a 530,000+ square foot, 20-story mixed-use project built in 2016. It was built on one of the last large empty blocks north of downtown Dallas. The office tower's lower floors include retail and restaurant space with almost one-acre of outdoor public space. McKinney and Olive is located across from the Ritz-Carlton Hotel and Residences. Retail and office rents in the building are in the mid $40s to $50s per square foot.

- **Viceroy Investments** has acquired 0.89-acres in an assemblage at the northeast corner of Fairmount Avenue and Howell Street to build a four-story, 65,000 square foot office building. The Fairmount Building will be designed by Robert A.M Stern out of New York, whose notable Dallas projects include the George W. Bush Presidential Center and Ritz Carlton Hotel. The project is anticipated to be complete in 2020.

- **Ardan West Village** is a 23-story, 393-unit luxury residential towner located at 2975 Blackburn Street. The project opened in mid-2018 and features 25 penthouses and more than 10,000 square feet of indoor amenities and an outdoor pool deck with cabana lounges, grilling stations, bistro seating, and fire pits.

- **Park District** is a two-tower, mixed-use development with more than 900,000 square feet of Class A office space, restaurants, and luxury residences. The development is located at 2121 Woodall Rodgers Freeway across from Klyde Warren Park. The project was complete in 2018 and offers residents pedestrian access to restaurants, retail, performing arts venues, and urban green space.

- The **Residences at The Ritz-Carlton**, Dallas, are a unique urban oasis. The Tower Residences feature 95 luxury homes of one to three bedrooms as well as two spacious penthouses, all located in Uptown's most exclusive neighborhood. This 23-story Regency-style building created by renowned architect Robert A.M. Stern and Hayslip Interior Design Company complements the Ritz-Carlton neighborhood. Its state-of-the-art features and amenities include an outdoor resortstyle pool, wine-tasting room, manicured grounds, and the legendary Ritz-Carlton service. Nearby art galleries and high-end retailers make The Tower Residences lifestyle even richer and more exciting.

- **Klyde Warren Park** is a 5.2-acre deck park designed to create an urban green space over Woodall Rodgers Freeway between Pearl and St. Paul Streets. It provides connectivity to the city's flourishing Arts District from other neighborhoods, brings together cultural events and experiences, and serves as a central public gathering space for Dallas residents and visitors to enjoy. Designed by landscape architecture firm (The Office of James Burnett), the park features flexible, pedestrian-oriented design, offering a mix of active and passive spaces, which include a children's park, reading room, great lawn, restaurant, performance pavilion, fountain plaza, games area, urban dog park, and botanical garden around a sweeping pedestrian promenade. A 6,000- square-foot restaurant and performance stage, designed by Thomas Phifer and Partners, is in the center of the park. In addition, it provides jogging trails, a children's playground, and an area for games.

- **Victory Park**, a 75-acre neighborhood located at the northeast quadrant of IH-35 and Woodall Rodgers Freeway, is filled with options for upscale shopping, dining, entertainment and nightlife, yet only steps away from jogging trails like the Katy Trail and green spaces. Victory Park is in the heart of the "new Dallas" – an area on the northwest side of downtown. More than $6.5 billion in new construction is now under development in Victory Park and the area surrounding it, from the Calatrava Bridges to the Arts District and Woodall Rodgers Park to the Perot Museum of Nature and Science. The Victory Park neighborhood is the crossroads for nearby urban districts, from Uptown to the Design District to the Central Business District and steps away from the DART commuter rail station and the Trinity Railway Express connecting Victory Park to Dallas and Fort Worth. Today, Victory Park is one of the "greenest" developments in the country. More than 1,000 trees have been planted in the neighborhood and all of the electricity in Victory Park is purchased from providers generating 100% renewable energy.

- With the construction of the **American Airlines Center** in 2001, the subject neighborhood has experienced increased interest in residential and supporting retail uses. This major sports arena is located in the southwest portion of the neighborhood and is the home of two major professional sporting teams (Dallas Stars and Dallas Mavericks). The neighborhood is a strong commercial based area that is a major employment center for the residential areas in Dallas and surrounding suburban cities. Surrounding the American Airlines Center is a master-planned development which will include office, retail, and residential properties. The "W" Hotel is a 251-room luxury hotel with 94 upscale residential condominium units.

- **Oak Lawn** is one of the wealthier parts of Dallas, with many professionals and urban types living in upscale townhouses, condos, apartments, and duplexes. Along the Uptown portion on McKinney Avenue and along Turtle Creek Boulevard, there are many new high-rise condominiums and apartments. It is also a very diverse neighborhood with well-established areas of older, single family homes. Oak Lawn is known for its premium restaurants as well as its many bars and clubs. Running through the center of Oak Lawn from downtown to Love Field is Cedar Springs Road. The first luxury high-rise along Turtle Creek, 3525 Turtle Creek Boulevard, was announced in 1957, a strip that has since become Dallas' version of Chicago's Gold Coast.

- **<u>1999 McKinney Avenue Apartments</u>** have sweeping views of Downtown and Turtle Creek which are the focal points of each two-story loft home. Impeccable craftsmanship, spacious balconies, sleek modern appliances, sophisticated amenities, impressive features, and genuine personal service are the finishing touches to superior city living. Easy Uptown access is available to the American Airlines Center, the "Arts District", restaurants, retail shops, and museums. With the trolley at the front door, residents can consider themselves well-connected —in a very Uptown sort of way.

- **<u>Granite Properties and Gables Residential</u>** have partnered to develop two towers, one residential and one office, as part of a development at the northwest intersection of McKinney Avenue, North Akard Street, and Cedar Springs Road. The 2.2-acre site, known as 1717 McKinney, is on the edge of downtown and Uptown. The 26-story, residential tower will offer 20 stories of living space over six floors of parking. Because of differences in construction requirements, the residential high-rise is about the same height as the office tower and will have 292 units with balconies. Residences will have views of Uptown, downtown and the future Woodall Rodgers Park and Calatrava Bridge. The Granite office tower will contain 19 stories of office space on top of six levels of parking with a total of 361,524 square feet of space. Plans also call for a one-acre, heavily landscaped amenity deck on the seventh floor level between the towers. The deck will feature a 4,000 square foot fitness center and outdoor infinity-edge pool in a park-like setting that overlooks Victory Park and downtown.

- **<u>1900 McKinney Avenue</u>** luxury apartments have panoramic views of Victory Park, Downtown, Dallas Arts District, and the future Woodall Rodgers Park. Premier resident services such as inroom dining, eco-friendly valet dry cleaning and green cleaning solutions, verdant rooftop terrace with a trellised misting system, chaise lounge seating, lush groupings of mature trees, landscaping, resort-style heated pool, dual-sided fireplace and grilling area, private entertainment suite with multimedia, dedicated dining room and gourmet catering kitchen, plush clubhouse with porte cochere, guest seating area and separate resident amenity spaces, private controlled-access parking, and dedicated parking for low-emission and fuel-efficient vehicles; private garages and storage rooms are available.

- There is continued growth and expansion of **<u>Children's Medical Hospital</u>**, **<u>Parkland Hospital</u>**, and the **<u>University of Texas Southwestern Medical School</u>**. This medical district is reported to have over 20,000 employees with over 4,000 students.

- The **<u>Trinity River Corridor Project</u>** will transform a flood protection solution into an opportunity for community revitalization with the proposed construction of three signature bridges by Santiago Calatrava, a 20,000 square foot Audubon Center, a trail system, and a Horse Park. At 10,000 acres, Dallas is creating one of the largest urban parks in America.

- **<u>Crescent Hotel</u>**, located in the "Uptown Oak Lawn and Turtle Creek" area of downtown Dallas represents one of the finest luxury hotels in Dallas. Accommodations range from single rooms to lavish two-story suites with private kitchens. The hotel features a year-round outdoor pool and spa/fitness centre, a variety of dining options, as well as two ballrooms with outdoor space for large receptions, a series of boardrooms, and small meeting rooms.

### Outlook and Conclusions

In conclusion, the subject neighborhood is situated in an upper-class area located in North Dallas within the Oak Lawn/Park Cities and Uptown Dallas submarket. Aside from its upscale, cosmopolitan like urban community within West Village, City Place, McKinney Avenue, and Turtle Creek, it is also complemented with the highly affluent residential neighborhoods of Highland Park and University Park. The neighborhood is highly accessible from nearby highways, tollway, and other major localized thoroughfares and is readily accessible to various employment centers. In addition, schools, hospitals, neighborhood shopping, recreation areas, and cultural activities are in the immediate area or located nearby. The neighborhood is in its stable to growth cycle. Furthermore, the existing multifamily and single-family housing as well as commercial/retail development within the neighborhood are of above-average to luxury quality. The steady development in and around the subject neighborhood provides attractive environs for future development. We anticipate that property values will increase in the near future.

## Surrounding Area Map



## Multifamily Market Analysis

As referenced previously, the data presented in the following section is based on historical reporting and pre-COVID-19. At the conclusion of this section, market factors impacting current economic trends will be analyzed as to what extent they may impact property valuation assumptions.

### Metro Area Overview

The subject is located in the Dallas metro area as defined by REIS. Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the ensuing table.

**Dallas Multifamily Market Trends and Forecasts**

| Year | Inventory (Units) | Occupied (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Effective Rent ($/Unit) | Effective Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 407,851 | 364,214 | 43,637 | 10.7% | 13,126 | 1,240 | $742 | 0.3% | $727 |
| 2010 | 415,063 | 381,261 | 33,802 | 8.1% | 7,649 | 17,047 | $756 | 1.9% | $758 |
| 2011 | 416,403 | 390,737 | 25,666 | 6.2% | 2,211 | 9,476 | $778 | 3.0% | $795 |
| 2012 | 420,098 | 397,446 | 22,652 | 5.4% | 4,081 | 6,709 | $807 | 3.7% | $826 |
| 2013 | 430,197 | 409,106 | 21,091 | 4.9% | 10,236 | 11,660 | $838 | 3.9% | $861 |
| 2014 | 442,503 | 421,128 | 21,375 | 4.8% | 12,366 | 12,022 | $878 | 4.8% | $901 |
| 2015 | 453,932 | 433,493 | 20,439 | 4.5% | 11,476 | 12,365 | $929 | 5.8% | $959 |
| 2016 | 468,400 | 450,063 | 18,337 | 3.9% | 15,154 | 16,570 | $998 | 7.4% | $1,030 |
| 2017 | 485,868 | 461,463 | 24,405 | 5.0% | 17,468 | 11,400 | $1,063 | 6.5% | $1,078 |
| 2018 | 505,671 | 477,288 | 28,383 | 5.6% | 20,120 | 15,825 | $1,127 | 6.0% | $1,133 |
| 2019 | 527,703 | 494,531 | 33,172 | 6.3% | 19,042 | 17,243 | $1,175 | 4.3% | $1,176 |
| Q2 2020 | 530,727 | 497,999 | 32,728 | 6.2% | 1,631 | 1,240 | $1,180 | -0.3% | $1,181 |
| 2020 | 541,489 | 494,228 | 47,261 | 8.7% | 13,786 | -303 | $1,137 | -3.3% | $1,114 |
| 2021 | 553,304 | 500,574 | 52,730 | 9.5% | 11,815 | 6,346 | $1,139 | 0.2% | $1,108 |
| 2022 | 560,206 | 512,863 | 47,343 | 8.5% | 6,902 | 12,289 | $1,170 | 2.7% | $1,147 |
| 2023 | 564,392 | 520,015 | 44,377 | 7.9% | 4,186 | 7,152 | $1,206 | 3.1% | $1,188 |
| 2024 | 568,353 | 527,614 | 40,739 | 7.2% | 3,961 | 7,599 | $1,245 | 3.2% | $1,232 |
| 2009 - 2019 Average | 452,154 | 425,521 | 26,633 | 5.9% | 12,084 | 11,960 | $917 | 4.3% | $931 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.

**Dallas Metro Trends and Forecasts**




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate in the metro area is 6.2%; the vacancy rate has increased by 140 bps from 2014.
- Four-year forecasts project a 7.2% vacancy rate in the metro area, representing an increase of 100 bps by year-end 2024.
- Effective rent averages $1,180/Unit in the metro area; future rent values are expected to increase by 5.5% to $1,245/Unit by year-end 2024.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Inventory in the metro area has increased by 19.9% from 2014, while the occupied stock has increased by 18.3%.
- Between 2014 and 2019, completions averaged 15,938 Units annually and reached a peak of 20,120 Units in 2018.
- Between 2014 and 2019, absorption figures reached a peak of 17,243 Units in 2019 and a low of 11,400 Units in 2017.

## Class A Multifamily Overview

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all Class A space in the Dallas metro area are presented in the following table.

**Dallas Multifamily Class A Market Trends**

| Year | Inventory (Units) | Occupied (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) | Asking Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 196,050 | 176,093 | 19,957 | 10.2% | 12,542 | 6,430 | $996 | -0.7% | $895 |
| 2010 | 202,719 | 188,856 | 13,863 | 6.8% | 6,994 | 12,763 | $1,011 | 1.5% | $942 |
| 2011 | 204,930 | 194,753 | 10,177 | 5.0% | 2,211 | 5,897 | $1,042 | 3.1% | $990 |
| 2012 | 209,011 | 199,260 | 9,751 | 4.7% | 4,081 | 4,507 | $1,074 | 3.1% | $1,024 |
| 2013 | 219,247 | 208,626 | 10,621 | 4.8% | 10,236 | 9,366 | $1,113 | 3.6% | $1,059 |
| 2014 | 231,362 | 218,914 | 12,448 | 5.4% | 12,115 | 10,288 | $1,162 | 4.4% | $1,099 |
| 2015 | 242,838 | 230,188 | 12,650 | 5.2% | 11,476 | 11,274 | $1,228 | 5.7% | $1,164 |
| 2016 | 257,693 | 245,390 | 12,303 | 4.8% | 14,855 | 15,202 | $1,301 | 5.9% | $1,239 |
| 2017 | 275,019 | 258,536 | 16,483 | 6.0% | 17,326 | 13,146 | $1,373 | 5.5% | $1,291 |
| 2018 | 294,727 | 275,275 | 19,452 | 6.6% | 19,708 | 16,739 | $1,436 | 4.6% | $1,341 |
| 2019 | 314,057 | 290,635 | 23,422 | 7.5% | 18,930 | 15,360 | $1,495 | 4.1% | $1,384 |
| Q2 2020 | 317,081 | 293,962 | 23,119 | 7.3% | 1,631 | 1,122 | $1,494 | -0.6% | $1,385 |
| 2009 - 2019 Average | 240,696 | 226,048 | 14,648 | 6.1% | 11,861 | 10,997 | $1,203 | 3.7% | $1,130 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.

### Class A Multifamily Trends and Insights




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate for Class A properties in the metro area is 7.3%; the vacancy rate has increased by 190 bps from 2014.
- Asking rent currently averages $1,494/Unit and has increased by 28.6% from 2014.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Class A metro area inventory has increased by 37.0% from 2014, while the occupied stock has increased by 34.3%.
- Between 2014 and 2019, completions averaged 15,735 Units annually and reached a peak of 19,708 Units in 2018.
- Between 2014 and 2019, absorption figures reached a peak of 16,739 Units in 2018 and a low of 10,288 Units in 2014.
- Between 2014 and 2019, gross revenue for Class A properties in the metro area averaged $1,253/Unit and has increased by 19.0%.

## Submarket Overview

The subject is located in the Central Dallas submarket. In order to evaluate the market appeal of the subject's submarket in comparison to others in the Dallas metro area, we compare key supply and demand indicators for all classes of space in the ensuing table.

**Dallas Multifamily Submarket Comparison**

| Submarket | Inventory (Buildings) | Inventory (Units) | Asking Rent ($/Unit) | Vacancy (%) | Free Rent (mos) | Expenses (%) |
|---|---|---|---|---|---|---|
| Mesquite/Seagovlle | 45 | 10,360 | $930 | 2.4% | 0.41 | 44.5% |
| South County | 36 | 7,088 | $942 | 5.3% | 0.57 | 43.3% |
| Southwest Dallas | 122 | 22,829 | $961 | 5.3% | 0.57 | 46.3% |
| North Irving | 168 | 46,303 | $1,305 | 5.5% | 0.74 | 44.3% |
| South Irving | 88 | 11,195 | $934 | 2.6% | 0.49 | 43.9% |
| Far North | 147 | 38,876 | $1,113 | 3.7% | 0.60 | 43.4% |
| Far Northeast | 53 | 14,229 | $907 | 5.5% | 0.49 | 43.7% |
| NW Denton County | 85 | 20,921 | $1,404 | 8.9% | 0.93 | 43.6% |
| Richardson | 96 | 23,381 | $1,245 | 6.4% | 0.89 | 44.7% |
| North | 29 | 7,979 | $1,359 | 5.7% | 0.80 | 43.9% |
| Crrlltn/Addsn/Copp | 151 | 38,307 | $1,107 | 4.7% | 0.44 | 43.1% |
| Lewisville | 127 | 34,272 | $1,281 | 4.8% | 0.69 | 43.5% |
| Plano/Allen/McKinn | 234 | 67,518 | $1,508 | 7.7% | 0.75 | 44.0% |
| Northwest | 95 | 15,961 | $1,320 | 8.0% | 1.03 | 44.8% |
| Central Dallas | 105 | 25,304 | $2,438 | 7.5% | 1.01 | 41.6% |
| South | 22 | 3,459 | $1,017 | 4.5% | 0.72 | 43.8% |
| East Dallas | 146 | 18,611 | $1,465 | 10.5% | 0.75 | 44.2% |
| Southeast Dallas | 34 | 5,742 | $742 | 6.2% | 0.50 | 43.7% |
| Far Northwest | 77 | 16,066 | $1,097 | 10.0% | 0.84 | 44.6% |
| Oaklawn | 44 | 5,502 | $1,891 | 4.4% | 0.84 | 44.9% |
| Grand Prairie | 51 | 10,493 | $1,173 | 5.4% | 0.35 | 43.0% |
| Ellis County | 27 | 3,315 | $1,123 | 4.8% | 0.65 | 43.0% |
| Garland | 108 | 21,805 | $1,039 | 7.3% | 0.81 | 44.4% |
| N White Rock | 177 | 47,918 | $1,036 | 6.3% | 0.93 | 45.6% |
| S White Rock/I-30 | 70 | 13,293 | $829 | 4.1% | 0.60 | 44.5% |
| Market Averages/Totals | 2,337 | 530,727 | $1,207 | 6.2% | 0.70 | 44.0% |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

### Central Dallas Submarket Comparison

- The submarket contains 4.5% of the metro building inventory and 4.8% of the metro unit inventory.
- The submarket's asking rent is $2,438/Unit which is greater than the metro average of $1,207/Unit.
- The submarket's vacancy rate is 7.5% which is greater than the metro average of 6.2%.
- Operating expenses, as a percent of potential rent revenue, average 41.6% in the submarket compared to 44.0% for the overall metro area.

- Average free rent in the subject property's submarket is greater than the free rent for the metro area.

In comparison to other submarkets in the region, the Central Dallas submarket is rated as follows:

| Submarket Attribute Ratings | |
|---|---|
| Market Size/Stature | Average |
| Market Demand | Stable |
| Vacancy Trends | Stable |
| Threat of New Supply | Average |
| Rental Trends | Stable |

### Central Dallas Submarket Trends and Forecasts

Supply and demand indicators for all classes of space in the Central Dallas submarket are displayed in the following table.

**Central Dallas Multifamily Submarket Trends and Forecasts**

| Year | Inventory (Units) | Occupied (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Effective Rent ($/Unit) | Effective Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 12,572 | 10,812 | 1,760 | 14.0% | 1,172 | 962 | $1,562 | -4.2% | $1,458 |
| 2010 | 13,026 | 11,958 | 1,068 | 8.2% | 454 | 1,146 | $1,580 | 1.1% | $1,569 |
| 2011 | 13,316 | 12,437 | 879 | 6.6% | 290 | 479 | $1,632 | 3.3% | $1,646 |
| 2012 | 13,392 | 12,682 | 710 | 5.3% | 76 | 245 | $1,687 | 3.4% | $1,709 |
| 2013 | 14,686 | 13,864 | 822 | 5.6% | 1,294 | 1,182 | $1,759 | 4.2% | $1,772 |
| 2014 | 16,752 | 15,295 | 1,457 | 8.7% | 2,066 | 1,431 | $1,839 | 4.6% | $1,792 |
| 2015 | 18,173 | 16,890 | 1,283 | 7.1% | 1,421 | 1,595 | $1,933 | 5.1% | $1,917 |
| 2016 | 20,176 | 18,895 | 1,281 | 6.3% | 2,003 | 2,005 | $2,003 | 3.6% | $2,004 |
| 2017 | 22,480 | 20,338 | 2,142 | 9.5% | 2,304 | 1,443 | $2,094 | 4.6% | $2,055 |
| 2018 | 23,723 | 21,896 | 1,827 | 7.7% | 1,243 | 1,558 | $2,195 | 4.8% | $2,222 |
| 2019 | 25,120 | 23,208 | 1,912 | 7.6% | 1,397 | 1,312 | $2,219 | 1.1% | $2,239 |
| Q2 2020 | 25,304 | 23,404 | 1,900 | 7.5% | 0 | -28 | $2,235 | -0.3% | $2,255 |
| 2020 | 26,488 | 24,202 | 2,286 | 8.6% | 1,368 | 994 | $2,122 | -4.4% | $2,111 |
| 2021 | 27,492 | 24,990 | 2,502 | 9.1% | 1,004 | 788 | $2,131 | 0.4% | $2,107 |
| 2022 | 28,449 | 25,968 | 2,481 | 8.7% | 957 | 978 | $2,196 | 3.1% | $2,164 |
| 2023 | 29,152 | 26,703 | 2,449 | 8.4% | 703 | 735 | $2,268 | 3.3% | $2,239 |
| 2024 | 29,825 | 27,561 | 2,264 | 7.6% | 673 | 858 | $2,361 | 4.1% | $2,337 |
| 2009 - 2019 Average | 17,583 | 16,207 | 1,376 | 7.9% | 1,247 | 1,214 | $1,864 | 2.9% | $1,853 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate in the submarket is 7.5%; the vacancy rate has decreased by 120 bps from 2014.
- Four-year forecasts project a 7.6% vacancy rate in the submarket, representing an increase of 10 bps by year-end 2024.
- Effective rent averages $2,235/Unit in the submarket; future rent values are expected to increase by 5.6% to $2,361/Unit by year-end 2024.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current inventory level of 25,304 Units is expected to increase by 17.9% through year-end 2024.
- The inventory in the submarket has increased by 51.1% from 2014, while the occupied stock has increased by 53.0%.
- Between 2014 and 2019, completions have averaged 1,739 Units annually and reached a peak of 2,304 Units in 2017.
- Between 2014 and 2019, absorption figures reached a peak of 2,005 Units in 2016 and a low of 1,312 Units in 2019.

**Class A Central Dallas Submarket Trends and Insights**

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for Class A space in the submarket are presented in the ensuing table.

**Central Dallas Multifamily Class A Submarket Trends**

| Year | Inventory (Units) | Occupied (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) | Asking Rental Rate (% Change) | Gross Revenue ($/Unit) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 11,836 | 10,143 | 1,693 | 14.3% | 1,172 | 963 | $1,735 | -4.0% | $1,487 |
| 2010 | 12,290 | 11,264 | 1,026 | 8.3% | 454 | 1,121 | $1,749 | 0.8% | $1,603 |
| 2011 | 12,580 | 11,743 | 837 | 6.7% | 290 | 479 | $1,805 | 3.2% | $1,685 |
| 2012 | 12,656 | 11,975 | 681 | 5.4% | 76 | 232 | $1,845 | 2.2% | $1,746 |
| 2013 | 13,950 | 13,152 | 798 | 5.7% | 1,294 | 1,177 | $1,917 | 3.9% | $1,807 |
| 2014 | 15,957 | 14,553 | 1,404 | 8.8% | 2,007 | 1,401 | $2,002 | 4.4% | $1,826 |
| 2015 | 17,378 | 16,141 | 1,237 | 7.1% | 1,421 | 1,588 | $2,101 | 4.9% | $1,951 |
| 2016 | 19,381 | 18,152 | 1,229 | 6.3% | 2,003 | 2,011 | $2,176 | 3.6% | $2,038 |
| 2017 | 21,685 | 19,596 | 2,089 | 9.6% | 2,304 | 1,444 | $2,309 | 6.1% | $2,087 |
| 2018 | 22,928 | 21,155 | 1,773 | 7.7% | 1,243 | 1,559 | $2,445 | 5.9% | $2,256 |
| 2019 | 24,325 | 22,501 | 1,824 | 7.5% | 1,397 | 1,346 | $2,461 | 0.7% | $2,276 |
| Q2 2020 | 24,509 | 22,694 | 1,815 | 7.4% | 0 | -26 | $2,475 | -0.1% | $2,292 |
| 2009 - 2019 Average | 16,815 | 15,489 | 1,326 | 7.9% | 1,242 | 1,211 | $2,050 | 2.9% | $1,887 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate for Class A properties in the submarket is 7.4%; the vacancy rate has decreased by 140 bps from 2014.
- Asking rent currently averages $2,475/Unit and has increased by 23.6% from 2014.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Class A inventory in the submarket has increased by 53.6% from 2014, while the occupied stock has increased by 55.9%.
- Between 2014 and 2019, completions have averaged 1,729 Units annually and reached a peak of 2,304 Units in 2017.
- Between 2014 and 2019, absorption figures reached a peak of 2,011 Units in 2016 and a low of 1,346 Units in 2019.
- Between 2014 and 2019, gross revenue for Class A properties in the submarket averaged $2,072/Unit and has increased by 17.4%.

## New and Proposed Construction

The following charts summarize the properties that have been completed in the Dallasmetro area.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

The following table summarizes properties that are under construction, planned, and/or proposed in the Dallas metro area.

**Dallas Multifamily Construction by Phase and Subtype**

| Multifamily Subproperty | Under Construction | | Planned Construction | | Proposed Construction | |
|---|---|---|---|---|---|---|
| Type | Properties | Units | Properties | Units | Properties | Units |
| Apartment | 65 | 20,387 | 162 | 60,910 | 23 | 17,348 |
| Condominiums | 5 | 543 | 23 | 3,985 | 1 | 1,600 |
| Subsidized/Low Income | 3 | 255 | 5 | 698 | 10 | 1,035 |
| Mixed Income | 3 | 904 | 4 | 733 | 2 | 429 |
| Townhomes | 17 | 1,039 | 45 | 3,236 | 3 | 529 |
| Other | 1 | 80 | 2 | 119 | 0 | 0 |
| N/A | 1 | 775 | 2 | 2,648 | 9 | 7,040 |
| Totals | 95 | 23,983 | 243 | 72,329 | 48 | 27,981 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

**DallasMultifamily Construction Insights**

- There are 95 properties under construction, 243 properties in the planned construction phase, and 48 properties in the proposed construction phase in the metro area.
- Apartment properties within the under-construction phase have an average size of 314 units and range in size between 22 units and 835 units.
- Apartment properties within the planned construction phase have an average size of 376 units and range in size between 24 units and 2,500 units.
- Apartment properties within the proposed construction phase have an average size of 754 units and range in size between 48 units and 4,000 units.
- Of the 23,983 units under construction, 85.0% are Apartment properties, 2.3% are Condominium properties, and 4.3% are Townhome properties.
- Of the 72,329 units planned for construction, 84.2% are Apartment properties, 5.5% are Condominium properties, and 4.5% are Townhome properties.
- Of the 27,981 units proposed for construction, 62.0% are Apartment properties, 5.7% are Condominium properties, and 1.9% are Townhome properties.

The following table summarizes properties that are under construction, planned, and/or proposed in the Central Dallas submarket.

**Central Dallas Submarket Construction by Phase and Subtype**

| Multifamily Subproperty | Under Construction | | Planned Construction | | Proposed Construction | |
|---|---|---|---|---|---|---|
| Type | Properties | Units | Properties | Units | Properties | Units |
| Apartment | 8 | 2,219 | 14 | 4,398 | 1 | 337 |
| Condominiums | 1 | 48 | 3 | 237 | 0 | 0 |
| Subsidized/Low Income | 0 | 0 | 0 | 0 | 0 | 0 |
| Mixed Income | 1 | 416 | 1 | 230 | 0 | 0 |
| Townhomes | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 |
| N/A | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 10 | 2,683 | 18 | 4,865 | 1 | 337 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

## Multifamily Market Outlook and Conclusions

Relevant vacancy rate indications are summarized as follows:

| Vacancy Rate Indications | |
|---|---|
| Market Segment | Vacancy Rates |
| Dallas Metro Area | 6.2% |
| Dallas Metro Area Class A | 7.3% |
| Central Dallas Submarket Area | 7.5% |
| Central Dallas Submarket Area Class A | 7.4% |

Based on the key metro and submarket area trends, construction outlook, and the performance of competing properties **prior to March 2020**, IRR expected the mix of property fundamentals and economic conditions in the DFW metro area to have a positive impact on the subject property's performance in the near-term.

With that said, the outlook and any conclusions must consider current and likely future market conditions due to COVID-19. The following section addresses how the market, and economic values, are being impacted by this emerging pandemic. The conclusion provides a framework for how the valuation addresses this emerging issue.

## Office Market Analysis

As referenced previously, the data presented in the following section is based on historical reporting and pre-COVID-19. At the conclusion of this section, market factors impacting current economic trends will be analyzed as to what extent they may impact property valuation assumptions.

### Metro Area Overview

The subject is located in the Dallas metro area as defined by REIS. Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all classes of space are presented in the ensuing table.

**Dallas Office Market Trends and Forecasts**

| Year | Inventory (SF) | Occupied (SF) | Vacancy (SF) | Vacancy (%) | Completions (SF) | Absorption (SF) | Effective Rent ($/SF) | Effective Rental Rate (% Change) | Gross Revenue ($/SF) | % Office Employment |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | 153,425,000 | 116,423,000 | 37,002,000 | 24.1% | 1,582,000 | -1,623,000 | $15.18 | -7.8% | $14.74 | 33.4% |
| 2010 | 152,342,000 | 115,531,000 | 36,811,000 | 24.2% | 362,000 | -892,000 | $14.82 | -2.4% | $14.56 | 33.8% |
| 2011 | 152,481,000 | 117,075,000 | 35,406,000 | 23.2% | 16,000 | 1,544,000 | $15.02 | 1.3% | $14.93 | 33.8% |
| 2012 | 152,747,000 | 117,651,000 | 35,096,000 | 23.0% | 328,000 | 576,000 | $15.42 | 2.7% | $15.36 | 34.0% |
| 2013 | 152,933,000 | 118,438,000 | 34,495,000 | 22.6% | 569,000 | 787,000 | $15.89 | 3.0% | $15.91 | 34.2% |
| 2014 | 155,472,000 | 120,802,000 | 34,670,000 | 22.3% | 2,539,000 | 2,364,000 | $16.87 | 6.2% | $16.96 | 34.3% |
| 2015 | 158,995,000 | 124,314,000 | 34,681,000 | 21.8% | 3,041,000 | 3,512,000 | $17.58 | 4.2% | $17.77 | 34.2% |
| 2016 | 164,115,000 | 129,361,000 | 34,754,000 | 21.2% | 4,536,000 | 5,047,000 | $18.44 | 4.9% | $18.76 | 34.2% |
| 2017 | 169,234,000 | 132,963,000 | 36,271,000 | 21.4% | 2,983,000 | 3,602,000 | $19.07 | 3.4% | $19.31 | 34.3% |
| 2018 | 173,445,000 | 134,107,000 | 39,338,000 | 22.7% | 2,674,000 | 1,144,000 | $19.62 | 2.9% | $19.61 | 34.4% |
| 2019 | 176,983,000 | 136,410,000 | 40,573,000 | 22.9% | 3,665,000 | 2,303,000 | $20.26 | 3.3% | $20.18 | 34.5% |
| Q2 2020 | 176,983,000 | 136,295,000 | 40,688,000 | 23.0% | 0 | -43,000 | $20.24 | -0.6% | $20.20 | 36.1% |
| 2020 | 179,229,000 | 133,945,000 | 45,284,000 | 25.3% | 2,246,000 | -2,465,000 | $18.64 | -8.0% | $18.89 | 35.5% |
| 2021 | 181,803,000 | 135,544,000 | 46,259,000 | 25.4% | 2,574,000 | 1,599,000 | $18.44 | -1.1% | $18.83 | 35.5% |
| 2022 | 182,826,000 | 137,792,000 | 45,034,000 | 24.6% | 1,023,000 | 2,248,000 | $18.79 | 1.9% | $19.40 | 35.6% |
| 2023 | 184,433,000 | 139,646,000 | 44,787,000 | 24.3% | 1,607,000 | 1,854,000 | $19.34 | 2.9% | $19.97 | 35.7% |
| 2024 | 185,590,000 | 141,581,000 | 44,009,000 | 23.7% | 1,157,000 | 1,935,000 | $19.91 | 2.9% | $20.60 | 35.8% |
| 2009 - 2019 Average | 160,197,455 | 123,915,909 | 36,281,545 | 22.7% | 2,026,818 | 1,669,455 | $17.11 | 2.0% | $17.10 | 34.1% |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.

### Dallas Metro Trends and Forecasts




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate in the metro area is 23.0%; the vacancy rate has increased by 70 bps from 2014.
- Four-year forecasts project a 23.7% vacancy rate in the metro area, representing an increase of 70 bps by year-end 2024.
- Effective rent averages $20.24/SF in the metro area; future rent values are expected to increase by 1.6% to $19.91/SF by year-end 2024.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The inventory in the metro area has increased by 13.8% from 2014, while the occupied stock has increased by 12.8%.
- Between 2014 and 2019, completions averaged 3,239,667 SF annually and reached a peak of 4,536,000 SF in 2016.
- Between 2014 and 2019, absorption figures reached a peak of 5,047,000 SF in 2016 and a low of 1,144,000 SF in 2018.
- 36.1% of the labor force in the metro area work in office properties and this employment rate has increased by 0.12% between 2014 and 2019.

## Class A Office Overview

The subject is a Class A property as defined by REIS. Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for all Class A space in the Dallas metro area are presented in the following table.

**Dallas Office Class A Market Trends**

| Year | Inventory (SF) | Occupied (SF) | Vacancy (SF) | Vacancy (%) | Completions (SF) | Absorption (SF) | Asking Rent ($/SF) | Asking Rental Rate (% Change) | Gross Revenue ($/SF) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 88,514,000 | 68,052,000 | 20,462,000 | 23.1% | 1,520,000 | 211,000 | $21.98 | -3.3% | $16.90 |
| 2010 | 88,804,000 | 68,988,000 | 19,816,000 | 22.3% | 362,000 | 936,000 | $21.68 | -1.4% | $16.84 |
| 2011 | 88,805,000 | 70,224,000 | 18,581,000 | 20.9% | 16,000 | 1,236,000 | $21.99 | 1.4% | $17.39 |
| 2012 | 89,071,000 | 70,727,000 | 18,344,000 | 20.6% | 328,000 | 503,000 | $22.60 | 2.8% | $17.95 |
| 2013 | 89,433,000 | 71,215,000 | 18,218,000 | 20.4% | 569,000 | 488,000 | $23.33 | 3.2% | $18.58 |
| 2014 | 91,972,000 | 73,349,000 | 18,623,000 | 20.2% | 2,539,000 | 2,134,000 | $24.84 | 6.5% | $19.81 |
| 2015 | 94,848,000 | 76,452,000 | 18,396,000 | 19.4% | 3,041,000 | 3,103,000 | $25.83 | 4.0% | $20.82 |
| 2016 | 99,381,000 | 80,361,000 | 19,020,000 | 19.1% | 3,992,000 | 3,909,000 | $26.95 | 4.3% | $21.79 |
| 2017 | 104,479,000 | 84,169,000 | 20,310,000 | 19.4% | 2,983,000 | 3,808,000 | $27.78 | 3.1% | $22.38 |
| 2018 | 108,717,000 | 86,870,000 | 21,847,000 | 20.1% | 2,651,000 | 2,701,000 | $28.66 | 3.2% | $22.90 |
| 2019 | 112,095,000 | 89,675,000 | 22,420,000 | 20.0% | 3,378,000 | 2,805,000 | $29.52 | 3.0% | $23.62 |
| Q2 2020 | 112,095,000 | 89,653,000 | 22,442,000 | 20.0% | 0 | -36,000 | $29.59 | -0.2% | $23.67 |
| 2009 - 2019 Average | 96,010,818 | 76,371,091 | 19,639,727 | 20.5% | 1,943,545 | 1,984,909 | $25.01 | 2.4% | $19.91 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.

### Class A Office Trends and Insights




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy rate for Class A properties in the metro area is 20.0%; the vacancy rate has decreased by 20 bps from 2014.
- Asking rent currently averages $29.59/SF and has increased by 19.1% from 2014.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Class A metro area inventory has increased by 21.9% from 2014, while the occupied stock has increased by 22.2%.
- Between 2014 and 2019, completions have averaged 3,097,333 SF annually and reached a peak of 3,992,000 SF in 2016.
- Between 2014 and 2019, absorption figures reached a peak of 3,909,000 SF in 2016 and a low of 2,134,000 SF in 2014.
- Between 2014 and 2019, gross revenue for Class A properties in the metro area averaged $21.89/SF and has increased by 19.2%.

## Submarket Overview

The subject is located in the Uptown submarket. In order to evaluate the market appeal of the subject's submarket in comparison to others in the Dallas metro area, we compare key supply and demand indicators for all space types in the ensuing table.

**Dallas Office Submarket Comparison**

| Submarket | Inventory (Buildings) | Inventory (SF) | Asking Rent ($/SF) | Vacancy (%) | Free Rent (mos) | Tenant Improvements ($) |
|---|---|---|---|---|---|---|
| Addsn/Crltn/FBrnch | 228 | 28,243,000 | $25.60 | 22.4% | 1.30 | $27.47 |
| Irving | 125 | 15,325,000 | $23.12 | 21.8% | 2.60 | $31.87 |
| LBJ/NC Expy | 54 | 8,253,000 | $20.85 | 22.3% | 3.90 | $32.26 |
| South Dallas | 32 | 1,354,000 | $18.16 | 16.0% | 1.20 | $20.62 |
| Dallas CBD | 55 | 26,449,000 | $26.19 | 29.4% | 2.90 | $27.66 |
| Far East Dallas | 17 | 799,000 | $18.89 | 22.7% | 1.40 | $20.91 |
| Uptown | 59 | 10,521,000 | $38.43 | 16.3% | 3.20 | $34.97 |
| Oaklawn | 21 | 1,624,000 | $28.84 | 21.4% | 3.10 | $35.99 |
| Richardson | 79 | 7,564,000 | $18.29 | 23.2% | 4.00 | $27.54 |
| Stemmons Fwy/L Field | 54 | 8,866,000 | $18.42 | 31.0% | 2.10 | $24.68 |
| Plano/Allen | 257 | 31,961,000 | $29.06 | 24.4% | 3.10 | $28.41 |
| North Dallas | 36 | 2,720,000 | $19.90 | 25.4% | 1.60 | $35.65 |
| Las Colinas | 38 | 7,808,000 | $32.09 | 15.8% | 2.00 | $35.09 |
| Preston Center | 24 | 3,126,000 | $32.38 | 11.2% | 2.90 | $33.61 |
| Flwr Md/Lewv/Denton | 68 | 4,634,000 | $20.35 | 19.2% | 3.00 | $18.24 |
| E Dallas/Nr NC Exy | 49 | 7,254,000 | $27.65 | 15.4% | 3.50 | $31.73 |
| NC Expy/NE Dallas | 60 | 5,525,000 | $23.29 | 19.1% | 1.90 | $27.40 |
| W LBJ Freeway | 24 | 4,957,000 | $30.31 | 26.6% | 2.90 | $30.25 |
| Market Averages/Totals | 1,280 | 176,983,000 | $25.10 | 23.0% | 2.59 | $29.13 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

**Uptown Submarket Comparison**

- The submarket contains 4.6% of the metro building inventory and 5.9% of the metro unit inventory.
- The submarket's asking rent is $38.43/SF, which is greater than the metro average of $25.10/SF.
- The submarket's vacancy rate is 16.30%, which is less than the metro average of 23.00%.
- Tenant Improvement average $34.97/SF in the submarket compared to $29.13/SF for the overall metro area.
- Average free rent in the subject property's submarket is greater than the free rent for the metro area.

In comparison with other submarkets in the region, the Uptown submarket is rated as follows:

| Submarket Attribute Ratings | |
|---|---|
| Market Size/Stature | Average |
| Market Demand | Stable |
| Vacancy Trends | Stable |
| Threat of New Supply | Average |
| Rental Trends | Stable |

**Uptown Submarket Trends and Forecasts**

Supply and demand indicators for all classes of space in the Uptown submarket are displayed in the following table.

**Uptown Office Submarket Trends and Forecasts**

| Year | Inventory (SF) | Occupied (SF) | Vacancy (SF) | Vacancy (%) | Completions (SF) | Absorption (SF) | Effective Rent ($/SF) | Effective Rental Rate (% Change) | Gross Revenue ($/SF) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 8,138,000 | 6,803,000 | 1,335,000 | 16.4% | 309,000 | -345,000 | $22.30 | -11.3% | $24.03 |
| 2010 | 8,500,000 | 6,698,000 | 1,802,000 | 21.2% | 362,000 | -105,000 | $21.89 | -1.8% | $22.54 |
| 2011 | 8,500,000 | 6,774,000 | 1,726,000 | 20.3% | 0 | 76,000 | $22.51 | 2.8% | $23.49 |
| 2012 | 8,500,000 | 7,064,000 | 1,436,000 | 16.9% | 0 | 290,000 | $23.17 | 2.9% | $25.15 |
| 2013 | 8,500,000 | 7,259,000 | 1,241,000 | 14.6% | 0 | 195,000 | $23.65 | 2.1% | $26.41 |
| 2014 | 8,500,000 | 7,242,000 | 1,258,000 | 14.8% | 0 | -17,000 | $25.26 | 6.8% | $28.40 |
| 2015 | 8,667,000 | 7,445,000 | 1,222,000 | 14.1% | 167,000 | 203,000 | $25.88 | 2.5% | $29.27 |
| 2016 | 9,336,000 | 7,824,000 | 1,512,000 | 16.2% | 669,000 | 379,000 | $26.61 | 2.8% | $29.33 |
| 2017 | 9,336,000 | 7,936,000 | 1,400,000 | 15.0% | 0 | 112,000 | $27.61 | 3.8% | $30.81 |
| 2018 | 10,300,000 | 8,374,000 | 1,926,000 | 18.7% | 964,000 | 438,000 | $28.35 | 2.7% | $30.42 |
| 2019 | 10,521,000 | 8,543,000 | 1,978,000 | 18.8% | 221,000 | 169,000 | $29.06 | 2.5% | $31.18 |
| Q2 2020 | 10,521,000 | 8,803,000 | 1,718,000 | 16.3% | 0 | 60,000 | $29.00 | -0.2% | $32.15 |
| 2020 | 10,521,000 | 8,535,000 | 1,986,000 | 18.9% | 0 | -8,000 | $26.42 | -9.1% | $30.09 |
| 2021 | 11,184,000 | 8,930,000 | 2,254,000 | 20.2% | 663,000 | 395,000 | $26.08 | -1.3% | $29.58 |
| 2022 | 11,469,000 | 9,058,000 | 2,411,000 | 21.0% | 285,000 | 128,000 | $26.59 | 2.0% | $29.85 |
| 2023 | 12,139,000 | 9,500,000 | 2,639,000 | 21.7% | 670,000 | 442,000 | $27.38 | 3.0% | $30.27 |
| 2024 | 12,222,000 | 9,603,000 | 2,619,000 | 21.4% | 83,000 | 103,000 | $28.35 | 3.5% | $31.09 |
| 2009 - 2019 Average | 8,981,636 | 7,451,091 | 1,530,545 | 17.0% | 244,727 | 126,818 | $25.12 | 1.4% | $27.37 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.




Source: REIS, Inc.; compiled by Integra Realty Resources, Inc.

- The current vacancy rate in the submarket is 16.3%; the vacancy rate has increased by 400 bps from 2014.
- Four-year forecasts project a 21.4% vacancy rate in the submarket, representing an increase of 510 bps by year-end 2024.
- Effective rent averages $29.00/SF in the submarket; future rent values are expected to increase by 2.2% to $28.35/SF by year-end 2024.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Current inventory level of 10,521,000 SF is expected to increase by 16.2% through year-end 2024.
- The inventory in the submarket has increased by 23.8% from 2014, while the occupied stock has increased by 18.0%.
- Between 2014 and 2019, completions averaged 336,833 SF annually and reached a peak of 964,000 SF in 2018.
- Between 2014 and 2019, absorption figures reached a peak of 438,000 SF in 2018 and a low of -17,000 SF in 2014.

### Class A Uptown Submarket Trends and Insights

Supply and demand indicators, including inventory levels, absorption, vacancy, and rental rates for Class A space in the submarket are presented in the ensuing table.

**Uptown Office Class A Submarket Trends**

| Year | Inventory (SF) | Occupied (SF) | Vacancy (SF) | Vacancy (%) | Completions (SF) | Absorption (SF) | Asking Rent ($/SF) | Asking Rental Rate (% Change) | Gross Revenue ($/SF) |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | 5,879,000 | 4,983,000 | 896,000 | 15.20% | 309,000 | 48,000 | $31.40 | -6.90% | $26.61 |
| 2010 | 6,241,000 | 5,017,000 | 1,224,000 | 19.60% | 362,000 | 34,000 | $31.21 | -0.60% | $25.09 |
| 2011 | 6,241,000 | 5,152,000 | 1,089,000 | 17.40% | 0 | 135,000 | $32.33 | 3.60% | $26.69 |
| 2012 | 6,241,000 | 5,354,000 | 887,000 | 14.20% | 0 | 202,000 | $33.03 | 2.20% | $28.34 |
| 2013 | 6,241,000 | 5,533,000 | 708,000 | 11.30% | 0 | 179,000 | $33.71 | 2.10% | $29.89 |
| 2014 | 6,241,000 | 5,584,000 | 657,000 | 10.50% | 0 | 51,000 | $36.57 | 8.50% | $32.72 |
| 2015 | 6,408,000 | 5,796,000 | 612,000 | 9.60% | 167,000 | 212,000 | $37.31 | 2.00% | $33.75 |
| 2016 | 7,077,000 | 6,196,000 | 881,000 | 12.40% | 669,000 | 400,000 | $38.01 | 1.90% | $33.28 |
| 2017 | 7,077,000 | 6,258,000 | 819,000 | 11.60% | 0 | 62,000 | $39.28 | 3.30% | $34.73 |
| 2018 | 8,041,000 | 6,698,000 | 1,343,000 | 16.70% | 964,000 | 440,000 | $40.57 | 3.30% | $33.79 |
| 2019 | 8,262,000 | 6,955,000 | 1,307,000 | 15.80% | 221,000 | 257,000 | $41.50 | 2.30% | $34.93 |
| Q2 2020 | 8,262,000 | 7,229,000 | 1,033,000 | 12.50% | 0 | 72,000 | $41.46 | 0.30% | $36.28 |
| 2009 - 2019 Average | 6,722,636 | 5,775,091 | 947,545 | 14.03% | 244,727 | 183,636 | $35.90 | 1.97% | $30.89 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved. Compiled by Integra Realty Resources, Inc.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- The current vacancy for Class A properties in the submarket area is 12.5%; the vacancy rate has increased by 200 bps from 2014.
- Asking rent currently averages $41.46/SF and has increased by 13.4% from 2014.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

- Class A submarket inventory has increased by 32.4% from 2014, while the occupied stock has increased by 29.5%.
- Between 2014 and 2019, completions have averaged 336,833 SF annually and reached a peak of 964,000 SF in 2018.
- Between 2014 and 2019, absorption figures reached a peak of 440,000 SF in 2018 and a low of 51,000 SF in 2014.
- Between 2014 and 2019, gross revenue for Class A properties in the submarket area averaged $33.87/SF and has increased by 3.5%.

## New and Proposed Construction

The following charts summarize the properties that have been completed in the Dallasmetro area.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.




Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

The following table summarizes properties that are under construction, planned, and/or proposed in the Dallasmetro area.

**Dallas Office Construction by Phase and Subtype**

| | Under Construction | | Planned Construction | | Proposed Construction | |
|---|---|---|---|---|---|---|
| Office Subproperty Type | Properties | Sq. Ft. | Properties | Sq. Ft. | Properties | Sq. Ft. |
| Office | 31 | 4,211,120 | 204 | 55,409,538 | 36 | 19,117,652 |
| Medical Office | 5 | 92,510 | 57 | 3,155,375 | 7 | 130,000 |
| Office--Owner Occ. | 6 | 1,205,904 | 14 | 2,849,949 | 1 | 32,812 |
| Office Condominiums | 0 | 0 | 0 | 0 | 1 | 20,000 |
| Totals | 42 | 5,509,534 | 275 | 61,414,862 | 45 | 19,300,464 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

**Dallas Office Construction Insights**

- There are 42 properties under construction, 275 properties in the planned construction phase, and 45 properties in the proposed construction phase in the metro area.
- Office properties within the under construction phase have an average size of 135,843 SF and range in size between 7,718 SF and 600,000 SF.
- Office properties within the planned construction phase have an average size of 271,615 SF and range in size between 6,000 SF and 3,700,000 SF.
- Office properties within the proposed construction phase have an average size of 531,046 SF and range in size between 25,260 SF and 4,250,000 SF.
- Of the 5,509,534 SF under construction, 76.43% are Office properties, 1.68% are Medical Office properties, and 21.89% are Office-Owner Occupied properties.
- Of the 61,414,862 SF planned for construction, 90.22% are Office properties, 5.14% are Medical Office properties, and 4.64% are Office-Owner Occupied properties.
- Of the 19,300,464 SF proposed for construction, 99.05% are Office properties, 0.67% are Medical Office properties, and 0.17% are Office-Owner Occupied properties.

The following table summarizes properties that are under construction, planned, and/or proposed in the Uptown submarket.

**Uptown Submarket Construction by Phase and Subtype**

| | Under Construction | | Planned Construction | | Proposed Construction | |
|---|---|---|---|---|---|---|
| Office Subproperty Type | Properties | Sq. Ft. | Properties | Sq. Ft. | Properties | Sq. Ft. |
| Office | 2 | 676,214 | 13 | 5,711,897 | 4 | 1,451,000 |
| Medical Office | 0 | 0 | 0 | 0 | 0 | 0 |
| Office--Owner Occ. | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Condominiums | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 2 | 676,214 | 13 | 5,711,897 | 4 | 1,451,000 |

Source: ©Reis Services, LLC 2020. Reprinted with the permission of Reis Services, LLC. All rights reserved.

## Office Market Outlook and Conclusions

Based on the key metro and submarket area trends, construction outlook, and the performance of competing properties **prior to March 2020**, IRR expected the mix of property fundamentals and economic conditions in the DFW metro area to have a positive impact on the subject property's performance in the near-term.

With that said, the outlook and any conclusions must consider current and likely future market conditions due to COVID-19. The following section addresses how the market, and economic values, are being impacted by this emerging pandemic. The conclusion provides a framework for how the valuation addresses this emerging issue.

## Lodging Market Analysis

### National Trends

A review and comparison of the hospitality industry overall is a useful tool to understanding the direction the lodging industry is likely to take in the near and intermediate term. We utilize the 2020 CBRE Hospitality Viewpoint, the HOST Study and Hotel Review and Smith Travel Research.

**EXECTUIVE SUMMARY:**

- The U.S. hotel industry has seen 10 consecutive weeks of occupancy gains, but a recent uptick in COVID-19 cases threatens to derail the progress.
- Demand has outpaced near-term expectations for six weeks but only pulled forward the recovery by a month and doesn't change our long-term outlook for a full recovery in hotel occupancy.
- Our forecasts show that RevPAR will decline 52% this year, and occupancies will average just 41% - well below last year's record of 66%.
- Given the expected quick rebound in economic growth and historic resiliency of travel demand, we forecast a strong hotel revenue recovery in 2021 and 2022, and that RevPAR could recover to pre-recession levels by mid-2023.

JULY 2020 CBRE Econometric Advisors © 2020 CBRE, Inc. | 1

## Historical U.S. Lodging Statistics

A summary of historical lodging statistics through year-end 2019 for the United States provided by HOST Study and Hotel Review and Smith Travel Research are presented as follows. It should be noted, HOST data for 2020 is not yet made available and may be unreliable considering the effects of COVID-19 on the hospitality industry.

**United States Lodging Market Performance**

| | Occupancy | | ADR | | RevPAR | | Supply | Demand | Room Revenue |
|---|---|---|---|---|---|---|---|---|---|
| Year | This Year | Change | This Year | Change | This Year | Change | % Change | % Change | % Change |
| 2003 | 59.2% | 0.3% | $82.66 | 0.2% | $48.91 | 0.4% | 1.0% | 1.3% | 1.5% |
| 2004 | 61.3% | 3.5% | $86.18 | 4.3% | $52.79 | 8.0% | 0.4% | 4.0% | 8.4% |
| 2005 | 63.0% | 2.8% | $91.02 | 5.6% | $57.35 | 8.6% | -0.1% | 2.8% | 8.6% |
| 2006 | 63.1% | 0.2% | $97.80 | 7.4% | $61.74 | 7.7% | 0.2% | 0.4% | 7.9% |
| 2007 | 62.8% | -0.5% | $104.30 | 6.6% | $65.51 | 6.1% | 1.2% | 0.7% | 7.4% |
| 2008 | 59.8% | -4.8% | $107.38 | 3.0% | $64.21 | -2.0% | 2.4% | -2.5% | 0.3% |
| 2009 | 54.6% | -8.8% | $98.06 | -8.7% | $53.49 | -16.7% | 2.8% | -6.2% | -14.3% |
| 2010 | 57.5% | 5.4% | $98.05 | 0.0% | $56.40 | 5.4% | 1.7% | 7.2% | 7.2% |
| 2011 | 60.0% | 4.3% | $101.71 | 3.7% | $61.03 | 8.2% | 0.5% | 4.8% | 8.7% |
| 2012 | 61.4% | 2.5% | $106.10 | 4.2% | $65.17 | 6.8% | 0.5% | 3.0% | 7.3% |
| 2013 | 62.3% | 1.5% | $110.35 | 3.9% | $68.69 | 5.4% | 0.7% | 2.2% | 6.2% |
| 2014 | 64.4% | 3.6% | $115.32 | 4.6% | $74.28 | 8.3% | 0.9% | 4.5% | 9.2% |
| 2015 | 65.4% | 1.5% | $120.30 | 4.7% | $78.68 | 6.3% | 1.1% | 2.9% | 7.4% |
| 2016 | 65.4% | 0.1% | $124.13 | 3.1% | $81.15 | 3.1% | 1.6% | 1.7% | 4.8% |
| 2017 | 65.9% | 0.8% | $126.77 | 2.1% | $83.53 | 2.9% | 1.8% | 2.7% | 4.9% |
| 2018 | 66.1% | 0.4% | $129.97 | 2.5% | $85.96 | 2.9% | 2.0% | 2.5% | 5.0% |
| 2019 | 66.1% | 0.0% | $131.21 | 1.0% | $86.76 | 0.9% | 2.0% | 2.0% | 3.0% |

Source: HOST Study and Hotel Review, Smith Travel Research

As illustrated above, positive trends from 2010 have continued throughout 2019. The national occupancy rate in 2010 was 57.5%, which increased every year thereafter, to 66.1% through year-end 2018, marking the eighth year of growth in a row after three years of declines (2007-2009). However, occupancy stabilized in 2019 with no growth or decline. The market paused a bit from 2011 to 2013, with a slower rate of occupancy growth of 2.50% from 2011 to 2012, and 1.5% from 2012 to 2013.

ADR growth however posted another year of strong gains from 2011 to 2012, with a 4.2% overall increase, followed by a 3.9% increase from 2012 to 2013. Increases in both occupancy and ADR from 2011 to 2013 resulted in increases in RevPAR of 6.8% from 2011 to 2012 and 5.4% from 2012 to 2013. As illustrated above, supply growth has remained stable, bolstering the continuing lodging market recovery.

The year-end ADR in 2010 was $98.05, which increased to $131.21 through 2019. The annual increases in ADR from 2010 to 2019 are notable considering it also corresponds with steady increases in occupancy, albeit ADR remained flat from 2009 and 2010 ($98.06 vs. $98.05) as hotel owners and operators sought to increase their occupancy and maintain market share at the expense of ADR. In terms of RevPAR, the 2019 figure of $86.76 represents an approximately 35% increase from the 2010 level of $56.40.

The reported 2019 occupancy remained relatively unchanged from year-end 2016 levels; however, ADR increased 5.4%, to $131.21 from the year-end 2016 figure of $124.13. Overall, hotel fundamentals remained positive through 2019, with an overall increase in RevPAR of 6.5% from year-end 2016. In addition, demand growth outpaced supply, resulting in a 3.0% increase in room revenue from year end 2018 to year end 2019.

## Regional and State Trends

The subject is in the West South-Central Region, as defined by HOST and Smith Travel Research. The West South-Central Region includes the states of Arkansas, Louisiana, Oklahoma, and Texas.




**States in the West South Central Region**

| | Occupancy | | | | | Average Daily Rate | | | | | RevPar | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Segment | 2019 | 2018 | Change | 2017 | Change | 2019 | 2018 | Change | 2017 | Change | 2019 | 2018 | Change | 2017 | Change |
| United States | 66.1% | 66.1% | 0.0% | 65.9% | 0.4% | $131.21 | $129.97 | 1.0% | $126.77 | 2.5% | $86.76 | $85.96 | 0.9% | $83.53 | 2.9% |
| West South Central | 62.7% | 62.7% | 0.1% | 62.5% | 0.3% | $101.88 | $102.56 | -0.7% | $100.36 | 2.2% | $63.92 | $64.26 | -0.5% | $62.69 | 2.5% |
| State | | | | | | | | | | | | | | | |
| Arkansas | 53.8% | 52.6% | 2.4% | 53.4% | -1.5% | $83.81 | $82.55 | 1.5% | $81.66 | 1.1% | $45.12 | $43.42 | 3.9% | $43.63 | -0.5% |
| Louisiana | 61.4% | 61.4% | 0.0% | 61.1% | 0.4% | $112.28 | $112.77 | -0.4% | $111.44 | 1.2% | $68.97 | $69.25 | -0.4% | $68.13 | 1.6% |
| Oklahoma | 56.2% | 57.3% | -1.9% | 55.0% | 4.2% | $80.16 | $79.60 | 0.7% | $78.95 | 0.8% | $45.07 | $45.60 | -1.2% | $43.42 | 5.0% |
| Texas | 65.0% | 64.8% | 0.2% | 64.9% | -0.1% | $104.30 | $105.37 | -1.0% | $102.58 | 2.7% | $67.74 | $68.29 | -0.8% | $66.56 | 2.6% |

Source: Hotel Review, Smith Travel Research

As of the yearend 2019 figures, the West South Central (WSC) Region posted metrics as follows:

a. In terms of occupancy, the WSC region reported an occupancy percentage of 62.7% as of yearend 2019, a slight decrease from 2017 reported occupancy of 65.9%. As of 2019, the WSC region had an occupancy percentage that was approximately 95% of the US average occupancy rate of 66.1%.

b. In terms of ADR, the WSC region reported a 2019 figure of $101.88 which was a slight decrease of 0.7% from the 2018 reported ADR of $102.56. As of 2019, the WSC region reported an ADR that is approximately 78% of the U.S. average of $131.21.

c. In terms of RevPAR, the WSC region reported a 2019 figure of $64.92 which was a slight decrease over 2018 reported RevPAR of $64.26. As of 2019, the WSC region had a RevPAR that was approximately 74% of the U.S. average of $86.76.

In terms of year-over-year growth, Arkansas and Oklahoma lagged other states within the WSC region for all lodging metrics.

As illustrated below, the Dallas MSA outperformed the State of Texas overall; as well as, leading the overall performance of the West South Central.

**Dallas Market**

| | Occupancy | | | | | Average Daily Rate | | | | | RevPar | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Segment | 2019 | 2018 | Change | 2017 | Change | 2019 | 2018 | Change | 2017 | Change | 2019 | 2018 | Change | 2017 | Change |
| United States | 66.1% | 66.1% | 0.0% | 65.9% | 0.4% | $131.21 | $129.97 | 1.0% | $126.77 | 2.5% | $86.76 | $85.96 | 0.9% | $83.53 | 2.9% |
| West South Central | 62.7% | 62.7% | 0.1% | 62.5% | 0.3% | $101.88 | $102.56 | -0.7% | $100.36 | 2.2% | $63.92 | $64.26 | -0.5% | $62.69 | 2.5% |
| Texas | 65.0% | 64.8% | 0.2% | 64.9% | -0.1% | $104.30 | $105.37 | -1.0% | $102.58 | 2.7% | $67.74 | $68.29 | -0.8% | $66.56 | 2.6% |
| Dallas, TX | 67.6% | 68.1% | -0.7% | 69.5% | -2.0% | $109.14 | $108.62 | 0.5% | $106.02 | 2.5% | $73.79 | $73.98 | -0.3% | $73.66 | 0.4% |

Source: Hotel Review, Smith Travel Research

## COVID-19 Impact on Current Valuations

Transaction indicators are the best measure of any impact on values due to COVID-19. Given the unique nature and recency of this event, minimal activity is evident from which to draw benchmark comparisons based on transactional data. In the absence of transaction data, market and property specific empirical data can be gleaned to assist in estimating current value. In this initial phase of the pandemic, early emerging trends include:




All or some of the above may be shorter-term issues, but others may linger and have a lasting impact on valuations in the commercial real estate (CRE) sector along a continuum of time.

At this juncture, the global question facing market participants is: “How long does this crisis last and how deep will its impact become?” At a minimum, Q2 economic results will prove dismal based upon Shelter-in-Place and Stay-at-Home Executive Orders for most of the U.S. states largely in place into late June. At the direction of State Governors all states have begun a phased “reopening”.

Based on discussions and interviews with a wide range of market participants, a variety of factors and concerns are prevalent in the market that will likely have a negative impact broadly on CRE values, depending on property type and region. Essential Service Providers have and will be less impacted (distribution facilities, medical facilities, grocery service) as the performance of these sectors is expected to continue.

However, the broader market will experience a myriad of issues based on survey respondents including:

| Uncertainty | Lender Concerns | Publicly Traded Securities | Return Requirements |
|---|---|---|---|
| • Restricted access to capital<br>• Unemployment concerns (increasing to 15% in Q2)<br>• GDP decline (-30% in Q2)<br>• Duration of crisis | • DSCR are impacted based on changes in rental revenue and collections<br>• Loan covenants could trigger due to changes in near-term value<br>• Borrowers are concerned about their tenants' ability to pay rent<br>• Borrowers are concerned about their ability to keep their loans current<br>• Lenders are also concerned about the need for loan modifications or work outs | • Stock indexes were down approximately 25% to 30% but have since rebounded<br>• REIT pricing was down approximately 25% but have since rebounded<br>• Crude oil was down approximately 40% but has since partially rebounded | • Interest rates may stay in the 4% - 4.5% range, despite the Federal Reserve's reduction efforts. Banks tightly manage their capital reserves and ratios, and therefore are requiring higher spreads for current risk profile<br>• Durability of Cash Flow forces (new) equity investors to reprice risk. Standby (available, uncommitted) equity now has to be patient until a clearer "path forward" emerges<br>• Impact on cap rates would be upward |

Each of the above observations provides empirical evidence that the market has shifted downward and real estate values will likewise be impacted, but to what degree is not certain.

Few experts or economists at this point are willing to state a threshold duration at which point everything will return to normal quickly, versus a duration of limited economic activity that spirals into worldwide recession. At the moment, the prevailing hope of the world is that science miraculously manufactures a cure, while in the meantime, social activity has slowed worldwide.

**Integra Current Valuation Framework (June 15 - present)**

The preceding property market analysis focuses on recent historic trends before the physical and social impacts of the COVID-19 pandemic were revealed in the U.S. in early March 2020. The property market analysis was current through Q4-2019 with trends and indications for solid growth by most all market indicators. Many current market participants believe the commercial real estate (CRE) markets will return to trend - the lingering question, "How long will it take?" remains uncertain.

What we do know with reasonable certainty:

- At a minimum, Q2 economic performance will be dismal.
- Shelter-in-Place and Stay-at-Home executive orders and phased reopening's will have a profound impact on GDP with rising unemployment damaging forward economic performance for six months at a minimum.
- The Federal Reserve's attempt to lower nominal rates was thwarted by lenders setting floors on spreads. Congress subsequently approved a $2 Trillion stimulus package on March 27, 2020. This provided some economic relief, but businesses, owners, investors, and bankers need to support payroll retention and an aggressive program of economic goodwill throughout all sectors of the economy.

Everything forward beyond those three known factors remains subject to considerable risk/uncertainty. Our recent surveys of market participants indicate a focus in the following areas impacting value:

- Impacts could (should) vary by property type, class, and location
- Cost of capital (both debt and equity) is increasing, but at different rates for different asset classes
- Declines in property operations/forecasts (NOI) vary in duration based on property type, class; location, and tenant durability under potential recessionary pressures
- Increases in cap rates (and normalized yields) will vary by property type, class and location as will the underlying assumptions on stabilized or periodic cash flow
- Marketing times for most assets will increase. To a large extent, deal flow was halted based on the sheer physical constraints imposed on property showings/due diligence, etc. under distancing restrictions. As these restrictions are lifted, the market is showing signs of activity, some pent up demand and increased interest, although commercial property deal flow remains muted.

**Impact by Property Type, Class & Location**

Below is a graph prepared by Greenstreet Advisors plotting the sensitivity (and risk) associated with various property types with the negative impact on value being greater for those assets with greater sensitivity. Those assets relating to essential business operations (grocery, medical, distribution) are less affected than for example lodging and malls where social distancing is more difficult.




**Cost of Capital/Liquidity**

The cost of capital, both for debt and equity, had been at near historic lows pre crisis. As lenders are coming to grips with the severity of the economic outlook, many have pulled back while others have reacted by raising interest rates, lowering loan to values, or a combination of both. There are clearly some lenders who are "out" while others remain in the market. Fewer options are available in the

market and those options are more expensive today. The rise in cost varies notably by property type with agency lenders and HUD determined to provide liquidity to the multi-family market, while at the other end of the spectrum, financing a hotel is challenging and land financing is nonexistent. Assets focused on essential business operations (e.g., grocery or last mile industrial) remain in favor as do net leased assets with recession-resistant business profiles.

Equity is less clear at the moment. While large pools of capital were being raised through 2019 and into Q1-2020, the strategy has suddenly shifted. Equity is available, but will be deployed with stricter underwriting criteria and more cautious income growth and exit assumptions.

**Declines in Property Operations/Forecasts**

The lodging, retail, student housing and senior sectors are generally viewed as expecting to suffer the greatest in the short term. Once again, this varies by location and type. Restaurant retail is generally viewed as having greatest risk but is expected to rebound quickly as pent-up demand is evident as everyone can now leave their homes. Grocery retail is currently performing well with big box stores setting record sales per square foot.

Radical changes in the employment picture will begin to affect the housing sector, both single-family and apartments. Apartments will not be immune or “safe” from lost rent, varying by type and location depending on the tenant base employment and its ability to weather a 6 to 12-month contraction.

Rent projections are being held flat in modeling cash flows going forward with the length of time dependent on the asset type.

Depending upon whether values are based on yield capitalization (DCF) or direct capitalization, care must be given to provide “stabilized” forecasts to capitalize; and to normalize yield levels for projecting variable year yield cap.

**Premiums on Capitalization Rates**

While many deals have fallen out of contract, other deals are still closing. Some are closing at their pre-crisis contract price levels, while many deals are being re-traded in the market with discounts influenced by property type, location and buyer/seller motivations.

As the transaction market solidifies, the impact on capitalization rates will become more clear. Some market participants believe the answer to market value lies in capitalization rates while others believe rates are not moving, but net operating income in the short run is being impacted. Once again, the answers vary by property type and location.

With a rise in the cost of capital (debt and equity), valuation theory suggests a rise in capitalization rates. A 100 basis point upward movement in interest rates for example, combined with a modest rise in equity returns, can move capitalization rates up over 100 basis points. This analysis is tempered, however with the understanding that it is difficult to settle on the inputs given the wide range of data in the market. In addition, care must be taken not to “double hit” the analysis by modeling significantly lower net income via lower performance projections and at the same time raising the return requirements.

### Normalization of Yields

All yield capitalization is based on forward forecasting of property performance to generate a current cash flow, and future forecasted reversion. Therefore, the timeframe for the market to reach a point of pricing transparency to "return to par" is the critical assumption in the yield cap.

The longer or less likely the assumptions are, the higher the near-term yields. Valuation theory and past downward economic cycles suggest a shortening of the holding period and a normalization of "overall yield" applied over the shorter holding period.

As the transaction market solidifies, the impact on investment rates and relationship of assumption risk to market risk will become clearer.

### Marketing and Exposure Time

At the present time, there is consensus of declining market demand in CRE transactions, due to market conditions ensuing from COVID-19. It is natural to assume that exposure time on properties either for sale or lease, will likely be extended. Comparing pre-COVID-19 exposure periods (perhaps the best) to the banking crisis of 2008/2009 (perhaps the worst) can glean some differences that could extrapolate to exposure time going forward, i.e. from peak to trough.

| Sector | Months on Market March 2008-09 | Months on Market March 2018-19 | Change in Months | % Change Peak to Trough |
|---|---|---|---|---|
| Office | 29.6 | 14.8 | 14.8 | 100% |
| Retail | 15 | 11.4 | 3.6 | 32% |
| Industrial | 19.6 | 6.7 | 12.9 | 192% |
| Average | 21.4 | 11.0 | 10.4 | 95% |

*Source: Costar – data presented in Months*

Days on the market increased substantially in the last economic crisis of 2008-2009, with an average of 21 months on market for major property classes. The trailing 12 months preceding the COVID-19 crisis, average days on the market were 11 months.

Based on this historical perspective, marketing time could potentially double from current levels. This would have to be tempered recognizing that the depth and duration of this current economic crisis is tied to a health crisis and may have a conclusion more closely tied to its resolution.

### Market Sentiment/Participant Interviews

While transaction data is limited, we look to market participants (developers, investors, lenders, brokers, other appraisers) as a leading indicator of where the market is currently, and where they believe the market is heading. Following is a summary of key interviews undertaken in November of 2020:

**Market Participant Survey**

| | Respondent | Commentary |
|---|---|---|
| Category<br>Role/Title<br>Company | Broker<br>Agent<br>Davidson and Bogel | I am seeing strong demand for properties in and around the Dallas CBD. The demand is for both improved properties and vacant tracts of land. |
| Category<br>Role/Title<br>Company | Broker/Property Owner<br>President<br>J. Elmer Turner Co. | Activity in the market has been strong. I have been working with a large number of buyers currently for vacant land for all uses. Although numerous contracts were droppe at the beginning of the pandemic, I have seen new buyers enter the market and pick up the dropped deals at similar price points. |
| Category<br>Role/Title<br>Company | Broker<br>Owner<br>Newt Walker Co. | Dallas is doing better than most and is holding its own. |

## Conclusion

This heightened uncertainty forms the basis of defined risk. Considering the subject's relative sensitivity to the COVID-19 risks as of the effective date of the valuation, Integra rates the relative risks of the subject property as of the effective date as follows:

| Risk Analysis | |
|---|---|
| Property Type Sensitivity to Risk | Low/highly desired area for commercial use land |
| Property Location Sensitivity to Risk | Low/highly desired area for commercial use land |
| Cost of Capital Impact/Risk | Low/highly desired area for commercial use land |
| Property Operations Risk | N/A |

# Property Analysis

## Land Description and Analysis

### Location

The property is located on the western corner of Turtle Creek Boulevard and Dickason Avenue

### Land Area

The following table summarizes the subject's land area.

**Land Area Summary**

| Tax ID | SF | Acres |
|---|---|---|
| 001031000A0040000 | 107,711 | 2.4730 |

Source: Engineering Report

### Shape and Dimensions

The site is slightly irregular in shape. Site utility based on shape and dimensions is average.

### Topography

The site is generally level and at street grade. The topography does not result in any particular development limitations.

### Drainage

No particular drainage problems were observed or disclosed at the time of field inspection. This appraisal assumes that there are not any unusual drainage issues that would affect the development of the subject.

### Flood Hazard Status

The following table provides flood hazard information.

**Flood Hazard Status**

| | |
|---|---|
| Community Panel Number | 48113C0345J |
| Date | August 23, 2001 |
| Zone | X |
| Description | Outside of 500-year floodplain |
| Insurance Required? | No |

## Environmental Hazards

An environmental assessment report was not provided for review, and during our inspection, we did not observe any obvious signs of contamination on or near the subject. However, environmental issues are beyond our scope of expertise. It is assumed that the property is not adversely affected by environmental hazards.

## Ground Stability

A soils report was not provided for our review. Based on our inspection of the subject and observation of development on nearby sites, there are no apparent ground stability problems. However, we are not experts in soils analysis. We assume that the subject's soil bearing capacity is sufficient to support a variety of uses, including those permitted by zoning.

## Streets, Access and Frontage

Details pertaining to street access and frontage are provided in the following table.

**Streets, Access and Frontage**

| Street | Turtle Creek | Dickason Avenue | Gillespie Avenue |
|---|---|---|---|
| Frontage Feet | 195± | 410± | 100± |
| Paving | Asphalt | Asphalt | Asphalt |
| Curbs | Yes | Yes | Yes |
| Sidewalks | Yes | Yes | Yes |
| Lanes | 2 way, 3 lanes each way | 2 way, 1 lane each way | 2 way, 1 lane each way |
| Direction of Traffic | North/South | East/West | East/West |
| Condition | Average | Average | Average |
| Traffic Levels | Moderate | Low | Low |
| Signals/Traffic Control | Turn lane | None | None |
| Access/Curb Cuts | Yes | Yes | Yes |
| Visibility | Above average | Average | Average |

## Utilities

The availability of utilities to the subject is summarized in the following table.

**Utilities**

| Service | Provider |
|---|---|
| Water | City of Dallas |
| Sewer | City of Dallas |

## Zoning

The subject is zoned Planned Development 193 (PD-193), Subdistrict 147, O-2 Office Subdistrict, by City of Dallas. Planned Development 193 (PD-193), Subdistrict 147 is intended for high density commercial development. The base zoning for the site is O-2 Office with a maximum allowed density of 4.75 FAR or

The following table summarizes our understanding and interpretation of the zoning requirements that affect the subject.

**Zoning Summary**

| | |
|---|---|
| Zoning Jurisdiction | City of Dallas |
| Zoning Designation | Planned Development 193 (PD-193), Subdistrict 147 |
| Description | O-2 Office Subdistrict |
| Legally Conforming? | Appears to be legally conforming |
| Zoning Change Likely? | No |
| Permitted Uses | Office/commercial uses and special hotel project |

| Category | Zoning Requirement |
|---|---|
| Minimum Lot Area | N/A |
| Minimum Street Frontage (Feet) | N/A |
| Minimum Lot Width (Feet) | N/A |
| Minimum Lot Depth (Feet) | N/A |
| Minimum Setbacks (Feet) | 20' and 10' |
| Maximum Building Height | 325' |
| Maximum Site Coverage | 60% |
| Maximum Density | 180 Hotel Guestrooms and 85 multi-family |
| Maximum Floor Area Ratio | 5.25 |
| Parking Requirement | Varies |

Source:

We are not experts in the interpretation of zoning ordinances. An appropriately qualified land use attorney should be engaged if a determination of compliance is required.

## Other Land Use Regulations

We are not aware of any other land use regulations that would affect the property.

## Easements, Encroachments and Restrictions

We were not provided a current title report to review. We are not aware of any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## Conclusion of Site Analysis

Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses including those permitted by zoning. Uses permitted by zoning include office/commercial uses and special hotel project. We are not aware of any other particular restrictions on development.


DICKASON AVENUE
TURTLE CREEK BLVD.
GILLESPIE AVENUE






































## Survey


DICKASON AVENUE
(40' PUBLIC RIGHT-OF-WAY)
TURTLE CREEK BLVD.
(VARIABLE WIDTH RIGHT-OF-WAY)
GILLESPIE
AVENUE
(VARIABLE WIDTH RIGHT-OF-WAY)
LOT 4, BLOCK A/1031
TURTLE CREEK OFFICE
ADDITION
(VOL. 2003162, PG. 48)
TURTLE CREEK
DICKASON, LTD
(INST. NO. 201700210495)
THREE STORY
CONCRETE
BUILDING
2999 TURTLE CREEK BLVD.
2.473 ACRES
(107,711 SQ. FT.)
ONE STORY
CONCRETE
BUILDING
STORAGE AREA
LOT 1A, BLOCK A/1031
3425 GILLESPIE ADDITION
(VOL. 85152, PG. 5422)
LOT 3, BLOCK A/1031
SUMMERS/CEDAR
SPRINGS OFFICE TOWER
(VOL. 85099, PG. 2535)
S 45°37'36" W
31.72'
N 45°40'24" W
9.46'
S 45°40'24" E
4.90'
Δ=3°36'26"
R=499.22'
L=31.43'
T=15.72'
CB=S 32°28'23" W
CD=31.42'
Δ=4°01'12"
R=380.38'
L=26.69'
T=13.35'
CB=S 22°28'13" W
CD=26.68'
Δ=4°17'09"
R=358.10'
L=26.79'
T=13.40'
CB=S 22°36'12" W
CD=26.78'
N 45°23'59" W 65.97'
161.32'
L1
L2

## First Floor of Existing Building



## Second Floor of Existing Building



## Tax Plat


GE CEDAR SPRINGS PHASE 1
1035
A/1035
1030
A/1030
1031
SALE ST
3424 GILLESPIE
1A
GE CEDAR SPRINGS PHASE 1
DICKASON AVE
TURTLE CREEK OFFICE
4
A/1031
1031
3
GILLESPIE ST
2-B
A/1027
MANSION RESIDENCE
1-A
JAMES A SYLVESTER - 1383
JOHN GRIGSBY - 0495
TURTLE CREEK BLVD
993
A/993
1A
TCO
A/992
5

## Real Estate Taxes

The Dallas Central Appraisal District does assessment on a countywide basis. Because assessed value is typical the result of a mass appraisal process based more on statistical probability than individual property characteristics, it should be noted that there is frequently a difference between assessed value and market value for an individual property. The tax rates are set in October of each year. The tax rates for 2019 for the taxing authorities are calculated to be 2.712875%.

Real estate taxes and assessments for the current tax year are shown in the following table.

**Taxes and Assessments - 2020**

| | Assessed Value | | | Taxes and Assessments | | |
|---|---|---|---|---|---|---|
| | | | | | Ad Valorem | |
| Tax ID | Land | Improvements | Total | Tax Rate | Taxes | Total |
| 001031000A0040000 | $11,355,960 | $1,096,790 | $12,452,750 | 2.712875% | $337,828 | $337,828 |

The subject is assessed for 11,355,960, or $115.61 per square foot of land. Based on the concluded market value of the subject, the assessed value appears low. However, this is typical of competing properties as well.

Texas is a non-disclosure state with a mandate to assess property at 100% of market value. Some Appraisal Districts are more successful at achieving the mandate than others. In Texas counties with little or no transaction activity, values can lag the market. However, there is no limit on increases in the event of a re-assessment. Property owners in Texas may protest ad valorem assessments using the one of two tests, Market Value or "Equal Appraisal". Market Value is self-explanatory. "Equal Appraisal" means there is a burden on the Appraisal District to ensure mass appraisal methods produce consistent results from property to property. To measure equality, the Appraisal Review Board will consider the assessed values of competing properties in the district. The process involves generation of a "ratio study" in which, after appropriate adjustments, the "median value" is the conclusion of "Equal Appraisal". It is unlikely that there would be a county-wide re-assessment; however, should the subject sell, it is probable that there will be some increase.

# Highest and Best Use

## Process

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as vacant, and as improved. By definition, the highest and best use must be:

- Physically possible
- Legally permissible under the zoning regulations and other restrictions that apply to the site
- Financially feasible
- Maximally productive, i.e., capable of producing the highest value from among the permissible, possible, and financially feasible uses

## Highest and Best Use As Vacant

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Legally Permissible

The site is zoned Planned Development 193 (PD-193), Subdistrict 147, O-2 Office Subdistrict. Permitted uses include office/commercial uses and special hotel project. To our knowledge, there are no legal restrictions such as easements or deed restrictions that would effectively limit the use of the property. Given prevailing land use patterns in the area, only mixed-use development is given further consideration in determining the highest and best use of the site as vacant.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for mixed-use development in the subject's area. It appears that a newly developed mixed-use development on the site would have a value commensurate with its cost. Therefore, mixed-use development is considered to be financially feasible.

### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than mixed-use development . Accordingly, it is our opinion that mixed-use development , developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

### Conclusion

Development of the site for mixed-use development is the only use that meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as vacant.

## As Improved

The subject represents an existing single tenant office building containing 28,907 square feet situated on 2.473 acres or 107,711 square feet of land which represents a very low building to land ratio for the neighborhood. In addition, the existing improvements are of a very high quality. The property is zoned to allow for development of a total of 565,472 square feet of building (5.25 FAR). Thus, the highest and best use of the site is for high density development. In fact, the current owner has designed the site to be redeveloped with a combination high-rise luxury hotel/residential condominium project and incorporate the existing office building into the new project.

## Most Probable Buyer

Taking into account the functional utility of the site and area development trends, the probable buyer is a developer/investor.

# Valuation

## Valuation Methodology

Appraisers usually consider three approaches to estimating the market value of real property. These are the cost approach, sales comparison approach and the income capitalization approach.

The **cost approach** assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new and represent the highest and best use of the land or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties.

The **sales comparison approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data. The sales comparison approach is less reliable in an inactive market or when estimating the value of properties for which no directly comparable sales data is available. The sales comparison approach is often relied upon for owner-user properties.

The **income capitalization approach** reflects the market's perception of a relationship between a property's potential income and its market value. This approach converts the anticipated net income from ownership of a property into a value indication through capitalization. The primary methods are direct capitalization and discounted cash flow analysis, with one or both methods applied, as appropriate. This approach is widely used in appraising income-producing properties.

Reconciliation of the various indications into a conclusion of value is based on an evaluation of the quantity and quality of available data in each approach and the applicability of each approach to the property type.

The methodology employed in this assignment is summarized as follows:

**Approaches to Value**

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | Not Utilized |
| Sales Comparison Approach | Applicable | Utilized |
| Income Capitalization Approach | Not Applicable | Not Utilized |

## Sales Comparison Approach

To develop an opinion of the subject's land value, as vacant and available to be developed to its highest and best use, we utilize the sales comparison approach. This approach develops an indication of value by researching, verifying, and analyzing sales of similar properties. Our sales research focused on transactions within the following parameters:

- Location: CBD and Surrounding Areas
- Size: Any
- Use: High Density Commercial and/or Residential
- Transaction Date: January 2018 to Present

For this analysis, we use price per building square foot as the appropriate unit of comparison because market participants typically compare sale prices and property values on this basis. The sales most relevant to analyzing the subject's land value are summarized in the following table:

**Summary of Comparable Land Sales**

| No. | Name/Address | Sale Date; Status | Effective Sale Price | SF; Acres | Bldg. SF; FAR | Zoning | $/SF Bldg. | $/SF Land |
|---|---|---|---|---|---|---|---|---|
| 1 | Office site in Uptown<br>Southern corner of Harry Hines Boulevard<br>Dallas<br>Dallas County<br>TX | Oct-18<br>Closed | $12,350,000 | 30,056<br>0.69 | 292,041<br>9.72 | Planned Development 193 | $42.29 | $410.89 |
| | *Comments: This site is being developed with a 25-story, Class AA, office building known as "The Link" which will contain 292,041 square feet of space. Completion is scheduled for late 2021. We have adjusted the effective sales price to include estimated demolition costs.* | | | | | | | |
| 2 | Apartment site in Uptown<br>Northern corner of Maple Avenue and Mahon Street<br>Dallas<br>Dallas County<br>TX | Nov-18<br>Closed | $18,145,658 | 45,738<br>1.05 | 335,000<br>7.32 | Planned Development 193 | $54.17 | $396.73 |
| | *Comments: The site was purchased for development of a 12-story, 146 unit, apartment project (335,000 SF) . The site is located across the street from landmark "The Crescent" complex in the Uptown area.* | | | | | | | |
| 3 | Redevelopment site in Deep Ellum<br>Northwest corner of Malcolm X Boulevard<br>Dallas<br>Dallas County<br>TX | Dec-19<br>Closed | $32,000,000 | 118,570<br>2.72 | 474,276<br>4.00 | Planned Development Tract A | $67.47 | $269.88 |
| | *Comments: The subject is currently improved with a 72,021 square foot office building and surface parking that is currently vacant. The current owner purchased the property with the expectation of demolishing the existing improvements and constructing a 474,276 square foot Class A office building. The property is zoned PD 289 (A), Planned Development Tract A, which permits a maximum F.A.R. of 4:1 density.* | | | | | | | |
| 4 | Commercial Land in Dallas, TX<br>Northeast corner of Maple Avenue and McKinney Avenue<br>Dallas<br>Dallas County<br>TX | Aug-20<br>Closed | $20,176,992 | 50,442<br>1.16 | 380,000<br>7.53 | Planned Development 225 | $53.10 | $400.00 |
| | *Comments: The site is a part of a larger development project totaling 2.0828 acres. The assembled site is proposed to be developed with a 27-story office/retail building. The development project includes 670,000 square feet of offices and 15,000 square feet of retail and underground parking. This tract is currently improved with a Truluck's Restaurant with a 20-year lease. The new project will have a new Truluck's restaurant on the ground floor to replace the existing building/restaurant.* | | | | | | | |
| | **Subject**<br>MO 2999 TC Acquisitions, LLC Property<br>Dallas, TX | | | 107,711<br>2.47 | 565,472<br>5.25 | O-2 Office Subdistrict | | |

## Comparable Land Sales Map





Sale 1
Office site in Uptown



Sale 2
Apartment site in Uptown



Sale 3
Redevelopment site in Deep Ellum



Sale 4
Commercial Land in Dallas, TX

## Adjustment Factors

The sales are compared to the subject and adjusted to account for material differences that affect value. Adjustments are considered for the following factors, in the sequence shown below.

| Adjustment Factors | |
|---|---|
| Effective Sale Price | Accounts for atypical economics of a transaction, such as demolition cost, expenditures by the buyer at time of purchase, or other similar factors. Usually applied directly to sale price on a lump sum basis. |
| Real Property Rights | Fee simple, leased fee, leasehold, partial interest, etc. |
| Financing Terms | Seller financing, or assumption of existing financing, at non-market terms. |
| Conditions of Sale | Extraordinary motivation of buyer or seller, assemblage, forced sale, related parties transaction. |
| Market Conditions | Changes in the economic environment over time that affect the appreciation and depreciation of real estate. |
| Location | Market or submarket area influences on sale price; surrounding land use influences. |
| Access/Exposure | Convenience to transportation facilities; ease of site access; visibility from main thoroughfares; traffic counts. |
| Size | Inverse relationship that often exists between parcel size and unit value. |
| Shape and Topography | Primary physical factors that affect the utility of a site for its highest and best use. |
| Zoning | Government regulations that affect the types and intensities of uses allowable on a site. |
| Entitlements | The specific level of governmental approvals attained pertaining to development of a site. |

When considering market conditions, we note that the sales took place from October 2018 to August 2020. Market conditions up through the introduction of COVID-19 conditions have been generally strengthening. The adjustment grid accounts for this trend with upward adjustments over this period through March 2020.

## Analysis and Adjustment of Sales

Our analysis of the comparable sales is described in the following paragraphs.

**Land Sale 1** is a 0.69 acre parcel located at the southern corner of Harry Hines Boulevard and Olive Street in Dallas with development potential for 292,041 square feet of building area. The property sold in October 2018 for $12,000,000. Adjusting for demolition costs, the effective sale price is $12,350,000, or $42.29 per building square foot.

Upward adjustments are indicated for market conditions (8%), location (20%), and zoning (50%). Overall, a substantial upward adjustment is indicated.

**Land Sale 2** is a 1.05 acre parcel located at the northern corner of Maple Avenue and Mahon Street in Dallas with development potential for 335,000 square feet of building area. The property sold in November 2018 for $18,145,658, or $54.17 per building square foot.

Upward adjustments are indicated for market conditions (8%), location (5%), and zoning (25%). Overall, a substantial upward adjustment is indicated.

**Land Sale 3** is a 2.72 acre parcel located at the northwest corner of Malcolm X Boulevard and Indiana Street in Dallas with development potential for 474,276 square feet of building area. The property sold in December 2019 for $32,000,000, or $67.47 per building square foot.

Upward adjustments are indicated for market conditions (1%) and location (10%). Overall, an upward adjustment is indicated.

**Land Sale 4** is a 1.16 acre parcel located at the northeast corner of Maple Avenue and McKinney Avenue in Dallas with development potential for 380,000 square feet of building area. The property sold in August 2020 for $20,176,992, or $53.10 per building square foot.

Upward adjustments are indicated for conditions of sale (10%) and zoning (25%). Overall, a substantial upward adjustment is indicated.

The following table summarizes the adjustments we make to the comparable sales.

**Land Sales Adjustment Grid**

| | Subject | Comparable 1 | Comparable 2 | Comparable 3 | Comparable 4 |
|---|---|---|---|---|---|
| Name | MO 2999 TC Acquisitions, LLC Property | Office site in Uptown | Apartment site in Uptown | Redevelopment site in Deep Ellum | Commercial Land in Dallas, TX |
| Address | Western corner of Turtle Creek Boulevard and Dickason Avenue | Southern corner of Harry Hines Boulevard and Olive Street | Northern corner of Maple Avenue and Mahon Street | Northwest corner of Malcolm X Boulevard and Indiana Street | Northeast corner of Maple Avenue and McKinney Avenue |
| City | Dallas | Dallas | Dallas | Dallas | Dallas |
| County | Dallas | Dallas | Dallas | Dallas | Dallas |
| State | Texas | TX | TX | TX | TX |
| Sale Date | | Oct-18 | Nov-18 | Dec-19 | Aug-20 |
| Sale Status | | Closed | Closed | Closed | Closed |
| Sale Price | | $12,000,000 | $18,145,658 | $32,000,000 | $20,176,992 |
| Conditions of Sale Adjustment | | $350,000 | $0 | $0 | $0 |
| Effective Sale Price | | $12,350,000 | $18,145,658 | $32,000,000 | $20,176,992 |
| Acres | 2.4730 | 0.6900 | 1.0500 | 2.7220 | 1.1580 |
| Building Square Feet | 565,472 | 292,041 | 335,000 | 474,276 | 380,000 |
| FAR | 5.25 | 9.72 | 7.32 | 4.00 | 7.55 |
| **Price per Building Square Foot** | | **$42.29** | **$54.17** | **$67.47** | **$53.10** |
| Property Rights | | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| % Adjustment | | – | – | – | – |
| Financing Terms | | Cash to seller | Cash to seller | Cash to seller | Cash to seller |
| % Adjustment | | – | – | – | – |
| Conditions of Sale | | | | | |
| % Adjustment | | See Above | – | – | 10% |
| Market Conditions | 3/1/2020 | Oct-18 | Nov-18 | Dec-19 | Aug-20 |
| Annual % Adjustment | 6% | 8% | 8% | 1% | – |
| **Cumulative Adjusted Price** | | **$45.67** | **$58.50** | **$68.15** | **$58.41** |
| Location | | 20% | 5% | 10% | – |
| Access/Exposure | | – | – | – | – |
| Size | | – | – | – | – |
| Shape and Topography | | – | – | – | – |
| Zoning | | 50% | 25% | – | 25% |
| Net $ Adjustment | | $31.97 | $17.55 | $6.81 | $14.60 |
| Net % Adjustment | | 70% | 30% | 10% | 25% |
| **Final Adjusted Price** | | **$77.64** | **$76.05** | **$74.96** | **$73.01** |
| Overall Adjustment | | 84% | 40% | 11% | 38% |

| | |
|---|---|
| **Range of Adjusted Prices** | **$73.01 - $77.64** |
| **Average** | **$75.42** |
| **Indicated Value** | **$75.50** |

## Land Value Conclusion

Prior to adjustments, the sales reflect a range of $42.29 - $67.47 per building square foot. After adjustment, the range is narrowed to $73.01 - $77.64 per building square foot, with an average of $75.42 per building square foot. To arrive at an indication of value, we place equal emphasis on all sales. As previously discussed, the overall site is currently improved with a 28,907 square-foot single-tenant office building of very high-quality construction and finish out which is to be incorporated into the proposed development. Although these improvements were not considered in this valuation of the underlying land, it is the appraisers' opinion that these improvements do contribute additional value to the site, as if vacant. However, due to time constraints of this assignment, we have provided a "not less than value" of the subject property.

Based on the preceding analysis, we reach a land value conclusion as follows:

| Land Value Conclusion | |
|---|---|
| Indicated Value per Building Square Foot | $75.50 |
| Building Square Feet | 565,472 |
| Indicated Value | $42,693,136 |
| Rounded | $42,690,000 |

## Reconciliation and Conclusion of Value

As discussed previously, we use only the sales comparison approach in developing an opinion of value for the subject. The cost and income approaches are not applicable and are not used.

Based on the preceding valuation analysis and subject to the definitions, assumptions, and limiting conditions expressed in the report, our value opinion follows:

**Value Conclusion**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| "Not Less Than" Market Value | Fee Simple | November 3, 2020 | $42,690,000 |

**Extraordinary Assumptions and Hypothetical Conditions**

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. Based on the building plans supplied by JMJ Development, the subject site is planned for a building size of 565,472 square feet. Our value is based on this development potenital. If the information supplied is significantly different than our assumption, our assignment results may be affected.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. As discussed, due to time restraints, we have only valued the land area of the subject and provided a "Not Less Than" Market Value.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

As of the date of value, the economy (globally, nationally, and locally) was in a state of rapid transition with a widespread expectation of the imminent onset of a significant recession. The outbreak of COVID-19 (coronavirus disease of 2019) in China was declared a global pandemic by the World Health Organization (WHO) on March 11, 2020. Some market deterioration had occurred shortly before this date, but the declaration by the WHO soon led to municipal and statewide orders to "shelter in place," causing widespread closures of businesses and a massive disruption to general commerce. The status of economic conditions is changing rapidly, creating great uncertainty in the markets. The value expressed herein represents our opinion based on the best available data reflective as of the date of value. While values are always subject to change over time, we caution the reader that in the current economic climate, market volatility creates the potential for a more significant change in value over a relatively short period of time.

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Exposure time is always presumed to precede the effective date of the appraisal. Based on our review of recent sales transactions for similar properties and our analysis of supply and demand in the local market, it is our opinion that the probable exposure time for the subject at the concluded market value stated previously is 6-12 months.

## Marketing Time

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. As we foresee no significant changes in market conditions in the near term, it is our opinion that a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, we estimate the subject's marketing period at 6-12 months.

# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.
5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice as well as applicable state appraisal regulations.
9. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
11. Ernest Gatewood made a personal inspection of the property that is the subject of this report. Jimmy H. Jackson, MAI, has not personally inspected the subject.
12. Significant real property appraisal assistance was provided by Joe Ponder, Appraiser Trainee, License #1342016 and Garrett Cook, Appraiser Trainee, License #1342407 who have not signed this certification.
13. We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.
14. As of the date of this report, Jimmy H. Jackson, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

15. As of the date of this report, Ernest Gatewood has completed the Standards and Ethics Education Requirements for Candidates/Practicing Affiliates of the Appraisal Institute.

| | |
|---|---|
| Ernest Gatewood | Jimmy H. Jackson, MAI |
| Senior Director | Executive Director |
| Certified General Real Estate Appraiser | Certified General Real Estate Appraiser |
| Texas Certificate #TX 1324355 G | Texas Certificate #TX 1324004 G |
| Telephone: (972) 725-7755 | Telephone: (972) 725-7724 |
| Email: egatewood@irr.com | Email: jhjackson@irr.com |

# Assumptions and Limiting Conditions

This appraisal and any other work product related to this engagement are limited by the following standard assumptions, except as otherwise noted in the report:

1. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions. The property is under responsible ownership and competent management and is available for its highest and best use.
2. There are no existing judgments or pending or threatened litigation that could affect the value of the property.
3. There are no hidden or undisclosed conditions of the land or of the improvements that would render the property more or less valuable. Furthermore, there is no asbestos in the property.
4. The revenue stamps placed on any deed referenced herein to indicate the sale price are in correct relation to the actual dollar amount of the transaction.
5. The property is in compliance with all applicable building, environmental, zoning, and other federal, state and local laws, regulations and codes.
6. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

This appraisal and any other work product related to this engagement are subject to the following limiting conditions, except as otherwise noted in the report:

1. An appraisal is inherently subjective and represents our opinion as to the value of the property appraised.
2. The conclusions stated in our appraisal apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events.
3. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.
4. No environmental impact studies were either requested or made in conjunction with this appraisal, and we reserve the right to revise or rescind any of the value opinions based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the appraisal assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.
5. Unless otherwise agreed to in writing, we are not required to give testimony, respond to any subpoena or attend any court, governmental or other hearing with reference to the property without compensation relative to such additional employment.

6. We have made no survey of the property and assume no responsibility in connection with such matters. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be correct.

7. No opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

8. We accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, legal descriptions and other legal matters such as legal title, geologic considerations such as soils and seismic stability; and civil, mechanical, electrical, structural and other engineering and environmental matters. Such considerations may also include determinations of compliance with zoning and other federal, state, and local laws, regulations and codes.

9. The distribution of the total valuation in the report between land and improvements applies only under the reported highest and best use of the property. The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. The appraisal report shall be considered only in its entirety. No part of the appraisal report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the persons signing the report.

11. Information, estimates and opinions contained in the report and obtained from third-party sources are assumed to be reliable and have not been independently verified.

12. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

13. If the property is subject to one or more leases, any estimate of residual value contained in the appraisal may be particularly affected by significant changes in the condition of the economy, of the real estate industry, or of the appraised property at the time these leases expire or otherwise terminate.

14. Unless otherwise stated in the report, no consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

15. The current purchasing power of the dollar is the basis for the values stated in the appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

16. The values found herein are subject to these and to any other assumptions or conditions set forth in the body of this report but which may have been omitted from this list of Assumptions and Limiting Conditions.

17. The analyses contained in the report necessarily incorporate numerous estimates and assumptions regarding property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our analysis will vary from our estimates, and the variations may be material.

18. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. We claim no expertise in ADA issues, and render no opinion regarding compliance of the subject with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.

19. The appraisal report is prepared for the exclusive benefit of you, your subsidiaries and/or affiliates. It may not be used or relied upon by any other party. All parties who use or rely upon any information in the report without our written consent do so at their own risk.

20. No studies have been provided to us indicating the presence or absence of hazardous materials on the subject property or in the improvements, and our valuation is predicated upon the assumption that the subject property is free and clear of any environment hazards including, without limitation, hazardous wastes, toxic substances and mold. No representations or warranties are made regarding the environmental condition of the subject property. IRR - Dallas, Integra Realty Resources, Inc., and their respective officers, owners, managers, directors, agents, subcontractors or employees (the "Integra Parties"), shall not be responsible for any such environmental conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because we are not experts in the field of environmental conditions, the appraisal report cannot be considered as an environmental assessment of the subject property.

21. The persons signing the report may have reviewed available flood maps and may have noted in the appraisal report whether the subject property is located in an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property, and the value conclusion is predicated on the assumption that wetlands are non-existent or minimal.

22. We are not a building or environmental inspector. The Integra Parties do not guarantee that the subject property is free of defects or environmental problems. Mold may be present in the subject property and a professional inspection is recommended.

23. The appraisal report and value conclusions for an appraisal assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

24. **IRR - Dallas is an independently owned and operated company. The parties hereto agree that Integra shall not be liable for any claim arising out of or relating to any appraisal report or any information or opinions contained therein as such appraisal report is the sole and exclusive responsibility of IRR - Dallas. In addition, it is expressly agreed that in any action which may be brought against the Integra Parties arising out of, relating to, or in any way pertaining to the engagement letter, the appraisal reports or any related work product, the Integra Parties shall not be responsible or liable for any incidental or consequential damages or losses, unless the appraisal was fraudulent or prepared with intentional misconduct. It is further expressly agreed that the collective liability of the Integra Parties in any such action shall not exceed the fees paid for the preparation of the assignment (unless the appraisal was fraudulent or prepared with intentional misconduct). It is expressly agreed that the fees charged herein are in reliance upon the foregoing limitations of liability.**

25. IRR - Dallas is an independently owned and operated company, which has prepared the appraisal for the specific intended use stated elsewhere in the report. The use of the appraisal report by anyone other than the Client is prohibited except as otherwise provided. Accordingly, the appraisal report is addressed to and shall be solely for the Client's use and benefit unless we provide our prior written consent. We expressly reserve the unrestricted right to withhold our consent to your disclosure of the appraisal report or any other work product related to the engagement (or any part thereof including, without limitation, conclusions of value and our identity), to any third parties. Stated again for clarification, unless our prior written consent is obtained, no third party may rely on the appraisal report (even if their reliance was foreseeable).

26. The conclusions of this report are estimates based on known current trends and reasonably foreseeable future occurrences. These estimates are based partly on property information, data obtained in public records, interviews, existing trends, buyer-seller decision criteria in the current market, and research conducted by third parties, and such data are not always completely reliable. The Integra Parties are not responsible for these and other future occurrences that could not have reasonably been foreseen on the effective date of this assignment. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. While we are of the opinion that our findings are reasonable based on current market conditions, we do not represent that these estimates will actually be achieved, as they are subject to considerable risk and uncertainty. Moreover, we assume competent and effective management and marketing for the duration of the projected holding period of this property.

27. All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraph, several events may occur that could substantially alter the outcome of our estimates such as, but not limited to changes in the economy, interest rates, and capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc. It is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

28. The appraisal is also subject to the following:

### Extraordinary Assumptions and Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

1. Based on the building plans supplied by JMJ Development, the subject site is planned for a building size of 565,472 square feet. Our value is based on this development potenital. If the information supplied is significantly different than our assumption, our assignment results may be affected.

The value conclusions are based on the following hypothetical conditions. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. As discussed, due to time restraints, we have only valued the land area of the subject and provided a "Not Less Than" Market Value.

The use of any extraordinary assumption or hypothetical condition may have affected the assignment results.

# Addendum A

# Appraiser Qualifications

# Jimmy H. Jackson, MAI

**Integra Realty Resources**
**Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T (972) 881-7191
F (972) 733-1403

**Integra Realty Resources**
**Lubbock/West Texas**

6309 Indiana Avenue, Suite D
Lubbock, TX 79413

T (806) 656-3058

**Integra Realty Resources**
**Oklahoma City**

14 NE 13th Street
Oklahoma City, Oklahoma, 73104

T (405) 422-0718

irr.com

## Experience

Executive Director with the Dallas, Lubbock/West Texas and Oklahoma City offices of Integra Realty Resources, a full-service real estate consulting and appraisal firm.

Jimmy H. Jackson, MAI has over 35 years of experience as a commercial appraiser as well as years of experience as a seasoned real estate investor. Prior to joining Integra Realty Resources, Jackson was one of the founding partners of JPP Capital Advisors as well as is one of the original two founding partners of Jackson Claborn, Inc. (JCI), a real estate consulting/valuation firm that was established in 1992. JCI grew to have one of the largest staffs of commercial and residential appraisers in the Southwest and has performed valuation and consulting on a vast number of commercial property types across Texas as well as the United States. Mr. Jackson holds the MAI designation and has been involved in the analysis of virtually all types of commercial and residential properties. Mr. Jackson’s experience includes consultation and valuation of a wide array of property types including apartment developments, industrial facilities, retail developments, office buildings, single-family subdivisions, single-family residences, condominiums, hotels, golf courses, mixed-use developments, special-use projects and vacant land. In addition to typical real estate valuations and consultations, Mr. Jackson has experience in state and federal courts as an expert witness. Testimony has involved such varied issues as bankruptcy, taxation and condemnation. Mr. Jackson has also been involved in numerous real estate developments and personal real estate investments which includes land acquisition & development, ground-up office build-to-suit development, garden apartment development, student housing development, and single-family lot development.

A major philanthropic achievement for Mr. Jackson was consulting with and influencing family members to provide the start-up expertise as well as the seed funding in 1994 for the formation of The Parent Project for Muscular Dystrophy/PPMD (www.parentprojectmd.org). The PPMD organization has developed into a worldwide non-profit centered to provide research funds for children suffering from Duchenne Muscular Dystrophy. Since inception, the PPMD organization has directly funded more than $50 million in direct research and assisted and helped leverage more than $500 million of other research related to other genetic diseases through government grants and other private funding sources. In 2008, Mr. Jackson received a Humanitarian Award from Texas Gov. Rick Perry for charitable work with National Jewish Hospital in Denver. Mr. Jackson currently serves as a national trustee for the hospital which is the #1 respiratory care hospital in the world.

Mr. Jackson graduated from Texas Tech University in 1984 with a B.B.A. in Finance with a Real Estate Emphasis. Mr. Jackson has served on numerous professional boards, including serving on the Ethics and Counseling Panel of the North Texas Chapter of the Appraisal Institute as well as serving on the Board of Directors as well as being Chair and Co-Chair of the Public Relations Committee.

As a college student, Mr. Jackson was a member of Phi Delta Theta social fraternity and the Texas Tech Finance Association. Mr. Jackson currently serves on the Advisory Board for the Jerry Rawls College of Business Administration (COBA) at Texas Tech University. Mr. Jackson has also served as a guest lecturer on real estate entrepreneurship to upper-level COBA students at Texas Tech over the years. Mr. Jackson and his wife Cherylon Harman Jackson (1984/Finance COBA/Texas Tech University) reside in Plano, Texas and are active members of Parkway Hills Baptist Church in Plano, Texas.

**jhjackson@irr.com - (972) 725-7724**

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Basic Core Real Estate Appraisal Services:**

Feasibility Studies, Absorption Studies & Demographic Studies
Highest & Best Use Studies for All Property Types
3rd Party Appraisal Reviews
Detrimental Conditions Valuation & Consulting
Encroachment Analysis
Land Use Studies & Planning/Zoning Studies
Litigation/Litigation Support
In-Depth Market Analysis for All Property Types
Tax Assessment & Mass Appraisal Analysis
Fair & Equitable Appraisal Analysis
Right of Way Analysis Appraisals
Mediation, Arbitration, & Dispute Resolution
Portfolio Valuation & Analysis
Retrospective Valuation Opinions

**Appraisal of All Property Types including The Following:**

**Residential**
High-Rise Condominium and Garden-Style Multi-Family and Townhome Projects
High-End Residential Property
Historical Residential Property
All types of Single-Family Appraisals (Conventional, Relocation, Unique / Historical Property)

**Land**
Acreage (Commercial Mixed-Use)
Subdivided Land (Mixed-Use, Commercial and Industrial)
Standard Single-Family Subdivision Lot development appraisals
PID/MUD Single-Family Subdivision Lot development appraisals

**Commercial, Office & Retail**
Branch Banks / Financial Building
Convenience Stores / Service Stations
Convention Center / Hotel / Resort /Motel
Office Building (High Rise, over three stories)
Office Building (Low Rise, three stories or less)
Parking Facility (Lot or Garage)
Retail (Single Tenant or Free Standing)
Shopping Center (Local, Strip, Neighborhood, Community, Etc.)
Shopping Center (Power Center, Outlet Center, Lifestyle, Etc.)
Shopping Center (Super Regional, Regional Mall)

jhjackson@irr.com - (972) 725-7724

**Integra Realty Resources**
**Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T (972) 881-7191
F (972) 733-1403

**Integra Realty Resources**
**Lubbock/West Texas**

6309 Indiana Avenue, Suite D
Lubbock, TX 79413

T (806) 656-3058

**Integra Realty Resources**
**Oklahoma City**

14 NE 13th Street
Oklahoma City, Oklahoma, 73104

T (405) 422-0718

irr.com

# Jimmy H. Jackson, MAI

## Experience (Cont'd)

**Industrial**
Industrial (Heavy (Manufacturing)
Industrial (Small Office Warehouse / Mfg.)
Industrial Light (Distribution, Storage)

**Special Purpose**
Automobile Dealerships
Church Facilities
Collegiate Student Housing
Self-Serve and Full-Service Car Wash Facilities
Self-Storage Facilities

## Professional Activities & Affiliations

Appraisal Institute, Member (MAI) Appraisal Institute

## Licenses

Texas, Certified General Real Estate Appraiser, TX 1324004 G, Expires November 2020
Oklahoma, Certified General Real Estate Appraiser, 13279CGA, Expires September 2023

## Education

Mr. Jackson is a graduate of Texas Tech University where he received a Bachelor of Business Administration in Finance with a Real Estate Emphasis.

## Miscellaneous

Member of Region 8 Ethics and Counseling Regional Panel (1992-1995)
Chair - Public Relations North Texas Chapter (2003, 2004)
Co-Chair - Public Relations North Texas Chapter (2005)
Board Member - North Texas Chapter (2005-2007)

**jhjackson@irr.com - (972) 725-7724**

**Integra Realty Resources**
**Dallas**

1100 Mira Vista Boulevard
Suite 300
Plano, TX 75093

T (972) 881-7191
F (972) 733-1403

**Integra Realty Resources**
**Lubbock/West Texas**

6309 Indiana Avenue, Suite D
Lubbock, TX 79413

T (806) 656-3058

**Integra Realty Resources**
**Oklahoma City**

14 NE 13th Street
Oklahoma City, Oklahoma, 73104

T (405) 422-0718

irr.com

# Texas Appraiser Licensing and Certification Board

P.O. Box 12188 Austin, Texas 78711-2188

## Certified General Real Estate Appraiser

Number: TX 1324004 G

Issued: 11/28/2018 Expires: 11/30/2020

Appraiser: JIMMY HUEL JACKSON

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Texas Occupations Code, Chapter 1103, is authorized to use this title, Certified General Real Estate Appraiser.

Douglas E. Oldmixon
Commissioner

# Ernest Gatewood

**Integra Realty Resources**
**Dallas**

1100 Mira Vista Boulevard
Plano, TX 75093

T (972) 881-7191
F (972) 733-1403

irr.com

## Experience

Senior Director PID/MUD/SF Lot Development Valuation Specialist with the Dallas office of Integra Realty Resources DFW, a full-service real estate consulting and appraisal firm.

Mr. Gatewood has been in the appraisal field for almost 40 years. This extensive experience has formed a knowledge of the Texas real estate market as well as select areas throughout the entire United States. This experience has formed an understanding of the dynamics of market forces in both increasing, as well as declining markets. Gatewood began his appraisal career in 1980 at Crosson Dannis, Inc. where he spent 10 years specializing in master planned communities. Mr. Gatewood's appraisals were utilized in the funding of Legacy Business Park in Plano, Texas as well as Stonebridge Ranch in McKinney, Texas. In 1991, Mr. Gatewood joined Heartland (Seattle, Washington) as Acquisitions Director for Texas. In this role, Mr. Gatewood was key to the development of several single-family subdivisions, a property type which he still specializes into this day. From 1992 until 2017, Mr. Gatewood represented Jackson Claborn, Inc. as the Vice President of the Commercial Division where he has helped manage the production of the commercial appraisal practice which has enhanced JCI's strong commitment to client services.

Mr. Gatewood has experience in appraising commercial, industrial, multifamily, and investment grade real property and related tangible assets to provide opinions of value for purposes of mortgage lending, sale or purchase, financial reporting, federal tax, capital lease testing, litigation support, allocation of purchase price, estate tax planning/settlement, ad valorem taxation, property exchange, internal planning, and partial taking/just compensation by eminent domain agencies.

Property types include vacant land, agricultural land, rights of way (road and pipeline), shopping centers, single tenant retail buildings, CBD and suburban office projects, air rights, truck terminals, light industrial facilities, heavy manufacturing plants, corporate headquarters, hospitals, surgery centers, medical office buildings, self storage facilities, religious facilities, hotels, mixed-use developments, apartment projects, convenience stores, and, single-family subdivision analyses.

## Licenses

Texas, Certified General, TX 1324355 G, Expires December 2020

## Education

Richland Junior College, Dallas, Texas
The University of North Texas, Denton, Texas

## Miscellaneous

An affiliate of the Appraisal Institute

**egatewood@irr.com - (972) 725-7755**

**Texas Appraiser Licensing and Certification Board**
P.O. Box 12188 Austin, Texas 78711-2188
**Certified General Real Estate Appraiser**

Number: **TX 1324355 G**
Issued: **12/21/2018** Expires: **12/31/2020**
Appraiser: **ERNEST ELVA GATEWOOD III**

Having provided satisfactory evidence of the qualifications required by the Texas Appraiser Licensing and Certification Act, Texas Occupations Code, Chapter 1103, is authorized to use this title, Certified General Real Estate Appraiser.

Douglas E. Oldmixon
Commissioner

# About IRR

Integra Realty Resources, Inc. (IRR) provides world-class commercial real estate valuation, counseling, and advisory services. Routinely ranked among leading property valuation and consulting firms, we are now the largest independent firm in our industry in the United States, with local offices coast to coast and in the Caribbean.

IRR offices are led by MAI-designated Senior Managing Directors, industry leaders who have over 25 years, on average, of commercial real estate experience in their local markets. This experience, coupled with our understanding of how national trends affect the local markets, empowers our clients with the unique knowledge, access, and historical perspective they need to make the most informed decisions.

Many of the nation's top financial institutions, developers, corporations, law firms, and government agencies rely on our professional real estate opinions to best understand the value, use, and feasibility of real estate in their market.

*Local Expertise...Nationally!*

**irr.com**

irr®

# Addendum B

# Definitions

# Definitions

The source of the following definitions is the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), unless otherwise noted.

**As Is Market Value**
The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.

**Disposition Value**
The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. An adequate marketing effort will be made during the exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

**Effective Date**
1. The date on which the appraisal or review opinion applies.
2. In a lease document, the date upon which the lease goes into effect.

**Entitlement**
In the context of ownership, use, or development of real estate, governmental approval for annexation, zoning, utility extensions, number of lots, total floor area, construction permits, and occupancy or use permits.

**Entrepreneurial Incentive**
The amount an entrepreneur expects to receive for his or her contribution to a project. Entrepreneurial incentive may be distinguished from entrepreneurial profit (often called *developer's profit*) in that it is

the expectation of future profit as opposed to the profit actually earned on a development or improvement. The amount of entrepreneurial incentive required for a project represents the economic reward sufficient to motivate an entrepreneur to accept the risk of the project and to invest the time and money necessary in seeing the project through to completion.

**Entrepreneurial Profit**

1. A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses.

2. In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Exposure Time**

1. The time a property remains on the market.

2. The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market.

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**Floor Area Ratio (FAR)**

The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

**Highest and Best Use**

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (ISV)

3. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions)

**Investment Value**

1. The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.
2. The value of an asset to the owner or a prospective owner for individual investment or operational objectives.

**Lease**

A contract in which rights to use and occupy land, space, or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

**Leased Fee Interest**

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Leasehold Interest**

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

**Liquidation Value**

The most probable price that a specified interest in real property should bring under the following conditions:

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms.

**Marketing Time**
An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Value**
The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- buyer and seller are typically motivated;
- both parties are well informed or well advised, and acting in what they consider their own best interests;
- a reasonable time is allowed for exposure in the open market;
- payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[h]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

**Prospective Opinion of Value**
A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

# Addendum C

# Property Information

## DESCRIPTION OF PROPERTY SURVEYED

*Being a tract of land situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas*

Dallas Central Appraisal District

Home | Find Property | Contact Us

# Commercial Account #001031000A0040000

Location Owner Legal Desc Value Improvements Land Exemptions Estimated Taxes Building Footprint History

## Location (Current 2021)

**Address:** 2999 TURTLE CREEK BLVD
**Market Area:** 0
**Mapsco:** 45-B (DALLAS)

DCAD Property Map

View Photo

2020 Appraisal Notice

Electronic Documents (ENS)

Print Homestead Exemption Form

## Owner (Current 2021)

MO 2999TC LLC
1755 WITTINGTON PL STE 340
DALLAS, TEXAS 752341930

## Multi-Owner (Current 2021)

| Owner Name | Ownership % |
|---|---|
| MO 2999TC LLC | 100% |

## Legal Desc (Current 2021)

**1:** TURTLE CREEK OFFICE
**2:** BLK A/1031 LOT 4 ACS 2.3701
**3:**
**4:** INT201900253449 DD09202019 CO-DC
**5:** 1031 00A 00400 6DA1031 00A
**Deed Transfer Date:** 9/23/2019

## Value

| 2020 Certified Values | |
|---|---|
| **Improvement:**<br>**Land:**<br>**Market Value:** | $1,096,790<br>+ $11,355,960<br>=$12,452,750 |
| **Tax Agent:** OKPA E EDWARD II | |
| **Revaluation Year:** | 2020 |
| **Previous Revaluation Year:** | 2019 |

## ARB Hearing

Hearing Info: S 09/17/2020 10:45 AM

## Improvements (Current 2021)

| # | Desc: OFFICE BUILDING | Total Area: 25,528 sqft | Year Built: 2004 |
|---|---|---|---|
| 1 | **Construction** | **Depreciation** | **Appraisal Method** |
| | **Construction:** B-REINFORCED CONCRETE FRAME<br>**Foundation (Area):** CONCRETE SLAB (12,764 sqft ) | **Physical:** 7%<br>**Functional:** + 0% | INCOME |

| | | | |
|---|---|---|---|
| | Net Lease Area : 29,177 sqft<br># Stories: 2<br># Units: 0<br>Basement (Area): UNASSIGNED<br>Heat: CENTRAL HEAT<br>A/C: CENTRAL A/C | External: + 0%<br>Total: = 7%<br>Quality: EXCELLENT<br>Condition: EXCELLENT | |

| # | Desc: PARKING GARAGE | Total Area: 23,288 sqft | Year Built: 2004 |
|---|---|---|---|
| | **Construction** | **Depreciation** | **Appraisal Method** |
| 2 | Construction: B-REINFORCED CONCRETE FRAME<br>Foundation (Area): CONCRETE SLAB (23,288 sqft )<br>Net Lease Area : 0 sqft<br># Stories: 1<br># Units: 0<br>Basement (Area): UNASSIGNED<br>Heat: NONE<br>A/C: NONE | Physical: 18%<br>Functional: + 0%<br>External: + 0%<br>Total: = 18%<br>Quality: GOOD<br>Condition: GOOD | INCOME |

| # | Desc: OFFICE BUILDING | Total Area: 3,649 sqft | Year Built: 2007 |
|---|---|---|---|
| | **Construction** | **Depreciation** | **Appraisal Method** |
| 3 | Construction: C-MASONRY, BLOCK, TILT-WALL<br>Foundation (Area): CONCRETE SLAB (3,649 sqft )<br>Net Lease Area : 0 sqft<br># Stories: 1<br># Units: 0<br>Basement (Area): NONE<br>Heat: CENTRAL HEAT<br>A/C: CENTRAL A/C | Physical: 8%<br>Functional: + 0%<br>External: + 0%<br>Total: = 8%<br>Quality: EXCELLENT<br>Condition: EXCELLENT | INCOME |

Land (2020 Certified Values)

| # | State Code | Zoning | Frontage (ft) | Depth (ft) | Area | Pricing Method | Unit Price | Market Adjustment | Adjusted Price | Ag Land |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 | UNASSIGNED | PLANNED DEVELOPMENT DISTRICT | 0 | 0 | 103,236.0000 SQUARE FEET | STANDARD | $110.00 | 0% | $11,355,960 | N |

* All Exemption information reflects 2020 Certified Values. *

Exemptions (2020 Certified Values)

No Exemptions

Estimated Taxes (2020 Certified Values)

| | City | School | County and School Equalization | College | Hospital | Special District |
|---|---|---|---|---|---|---|
| Taxing Jurisdiction | DALLAS | DALLAS ISD | DALLAS COUNTY | DALLAS CO COMMUNITY COLLEGE | PARKLAND HOSPITAL | UNASSIGNED |
| Tax Rate per $100 | $0.7763 | $1.296735 | $0.24974 | $0.124 | $0.2661 | N/A |
| Taxable Value | $12,452,750 | $12,452,750 | $12,452,750 | $12,452,750 | $12,452,750 | $0 |
| Estimated Taxes | $96,670.70 | $161,479.17 | $31,099.50 | $15,441.41 | $33,136.77 | N/A |
| Tax Ceiling | | | | | N/A | N/A |
| | | | | | Total Estimated Taxes: | $337,827.54 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an **official tax bill** from the appropriate agency when they are prepared. Please note that if there is an Over65 or Disabled Person **Tax Ceiling** displayed above, **it is NOT reflected** in the Total Estimated Taxes calculation provided. Taxes are collected by the agency sending you the **official** tax bill. To see a listing of agencies that collect taxes for your property. **Click Here**

The estimated taxes are provided as a courtesy and should not be relied upon in making financial or other decisions. The Dallas Central Appraisal District (DCAD) does not control the tax rate nor the amount of the taxes, as that is the responsibility of each Taxing Jurisdiction. Questions about your taxes should be directed to the appropriate taxing jurisdiction. We cannot assist you in these matters. These tax estimates are calculated by using the most current certified taxable value multiplied by the most current tax rate. **It does not take into account other special or unique tax scenarios, like a tax ceiling, etc.**. If you wish to calculate taxes yourself, you may use the Tax Calculator to assist you.

Building Footprint (Current 2021)




History



GE CEDAR SPRINGS PHASE 1
1035
A/1035
A/992
DICKASON AVE
SALE ST
GILLESPIE ST
3424 GILLESPIE
1A
TURTLE CREEK OFFICE
4
A/1031
1031
3
2-B
A/1027
MANSION RESIDENCE
1-A
JAMES A SYLVESTER - 1383
JOHN GRIGSBY - 0495
TURTLE CREEK BLVD
993
A/993
TCO


PD 193
(PDS 135)
PD 193
(PDS 147)
PD
193
PD 193
(PDS 136)
H/29
PD
374
PD 193
(PDS 61)


EXISTING BLDG
F.F.= 460.00
PROP. BLDG
F.F. = 461.60
S 34°57'00" W
110.95'
N 44°42'00" W 260.87'
N 44°43'35" W
N 44°56'59" E 195.95'
N 44°35'47" W 100.16'
S 46°18'00" W
46.73'
N 45°00'00" W
8.49'
GENERATOR
LOT 1A, BLOCK A/1031
3424 GILLESPIE ADDITION
(VOL. 85152, PG. 5422)
(ZONING PD-193-02)
LOT 3, BLOCK A/1031
SUMMERS/CEDAR SPRINGS
OFFICE TOWER
(VOL. 85099, 2535)
(ZONING PD-193-02)
CAUTION!!!!!
CONTACT:
LONE STAR GAS: 1-800-344-8377
SOUTHWESTERN BELL TELE.: 1-800-395-0440
TEXAS UTIL. ELECT. CO.: 1-800-233-2133
TEXAS ONE CALL 1-800-245-4545
48 HOURS PRIOR TO CONSTRUCTION


Ground Floor
Main Conference
Gloria Eulich
Executive Library
Fred Albrecht
Conference Reception
Real Estate Conference Room
Peggy Chandler
Real Estate Workroom
Betsy Tucker
North Gallery
Rotunda
South Gallery
Marble Conference Room
Women's
Men's
Louise Johns
Pittman Haymore
Lobby
Csongor Bibza
Cheryl Houston
Rebecca Krueger
John Hughes
Margaret Barnett
Library
Kitchen


Second Floor
2nd Floor Conference Room
Patsy Putnam
2nd Floor Lobby
Americana Room (2nd Floor Small Conf. Room)
Harold Lehrman
Brad Taylor
Russ McWilliams
Unisex RR
BGA Conference Room
Becky Williamson
Legal Workroom
Steve Harasym
Hannah Hughes
2nd Floor Kitchen/ Breakroom
Billy Longino
John Nowak
BGA Workroom
Women's
Men's
Andrew Kasik
Brad Martin
Edward Sullivan
Nita Melcher
John Boone
Bert Milam
Auditor Conference Room
Ana Maria Aguilera
Mike Willis
Patsy Briggs


Engineering
John Ergas 18
John Nowak 17
John Boone 16
Rebecca Krueger 15
OPEN 14
OPEN 13
Tom Palmeri 12
Patsy Putnam 11
Betsy Tucker 10
Storage
Brad Martin 19
Mike Willis 20
Cheryl Houston 21
Stairwell
Belmont Suburban 22
Pittman Haymore 23
Russ McWilliams 25
Becky Williamson 26
OPEN 27
Edward Sullivan 28
Darrin Williams 29
Security & Engineering
30 Pittman Haymore
31 OPEN
32 OPEN - Security
33 Steve Harasym
34 John Hughes
35 Margaret Harder
36 OPEN
37 Billy Longino
38 Brad Taylor
39 Larry Arnold
Garage Entry
Louise Johns 9
OPEN 8
Fred Albrecht 7
Stairwell
Andrew Kasik 6
OPEN 5
Bert Milam 4
Kennedy & Assoc 3
Patsy Briggs 2
Harold Lehrmann 1
46 Csongor Bibza
47 Belmont
45 OPEN
Gloria Eulich 44
Belmont 43
Elevator
Laundry Area
Computer Room
Mailroom
Electrical Room
Elevator
48 Peggy Chandler
49 Hannah Hughes
50 OPEN
Nita Melcher
51
OPEN 42
Ana Maria Aguilera 41
OPEN 40

# Addendum D

# Comparable Data

# Land Sale Profile

# Sale No. 1

## Location & Property Identification




| | |
|---|---|
| Property Name: | Office site in Uptown |
| Sub-Property Type: | Commercial, Office |
| Address: | Southern corner of Harry Hines Boulevard and Olive Street |
| City/State/Zip: | Dallas, TX 75201 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 2338949 |

## Sale Information

| | |
|---|---|
| Sale Price: | $12,000,000 |
| Effective Sale Price: | $12,350,000 |
| Sale Date: | 10/15/2018 |
| Sale Status: | Closed |
| $/Acre(Gross): | $17,898,551 |
| $/Land SF(Gross): | $410.89 |
| $/Acre(Usable): | $17,898,551 |
| $/Land SF(Usable): | $410.89 |
| $/Building SF: | $42.29 |
| Grantor/Seller: | Triton 2414 LLC |
| Grantee/Buyer: | KDP Akard Development Partners LP |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | 201800275105 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 02/25/2020 |
| Confirmation Source: | Grant Lake (214) 526-3626 |
| Verification Type: | Confirmed-Seller Broker |

## Sale Analysis

| | |
|---|---|
| Conditions of Sale Adj.: | $350,000.00 |
| Adjust. Comments: | We adjust for approximate demolition costs. |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | Lot 1, Block 2/360, Downtown JV Addition, Lot 3, 4, and part of ABND ROW, Block 360 / Tax #00036000020010000 #00000107908000000 |
| Acres (Usable/Gross): | 0.69/0.69 |
| Land-SF(Usable/Gross): | 30,056/30,056 |
| Usable/Gross Ratio: | 1.00 |
| Potential Building SF: | 292,041 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | Yes |
| Frontage Type: | 1 way, 2 lanes |
| Zoning Code: | PD 193 |
| Zoning Desc.: | Planned Development 193 |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Public Records |

## Comments

This site is being developed with a 25-story, Class AA, office building known as "The Link" which will contain 292,041 square feet of space. Completion is scheduled for late 2021. We have adjusted the effective sales price to

## Comments (Cont'd)

include estimated demolition costs.

# Land Sale Profile

# Sale No. 2

## Location & Property Identification

| | |
|---|---|
| Property Name: | Apartment site in Uptown |
| Sub-Property Type: | Residential, Multifamily |
| Address: | Northern corner of Maple Avenue and Mahon Street |
| City/State/Zip: | Dallas, TX 75201 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 2339075 |




| | |
|---|---|
| Legal/Tax/Parcel ID: | Lot 1A, 1A.1, Block 3/950, Old Warsaw, Lot 9A, Block 3/950, Mayborn Market / Tax #000950000301A0100 #000950000309A0000 #000950000301A0000 |
| Acres(Usable/Gross): | 1.05/1.05 |
| Land-SF(Usable/Gross): | 45,738/45,738 |
| Usable/Gross Ratio: | 1.00 |
| Potential Building SF: | 335,000 |
| No. of Units (Potential): | 146 |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | Yes |
| Frontage Type: | 1 way, 2 lanes |
| Zoning Code: | PD 193 |
| Zoning Desc.: | Planned Development 193 |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Public Records |

## Sale Information

| | |
|---|---|
| Sale Price: | $18,145,658 |
| Effective Sale Price: | $18,145,658 |
| Sale Date: | 11/14/2018 |
| Sale Status: | Closed |
| $/Acre(Gross): | $17,281,579 |
| $/Land SF(Gross): | $396.73 |
| $/Acre(Usable): | $17,281,579 |
| $/Land SF(Usable): | $396.73 |
| $/Building SF: | $54.17 |
| $/Unit: | $124,285 /Unit |
| Grantor/Seller: | 2620 Maple Avenue LLC |
| Grantee/Buyer: | 2620 Maple Owner LLC |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | 201800303026 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 02/25/2020 |
| Confirmation Source: | Jake Milner |
| Verification Type: | Confirmed-Seller Broker |

## Improvement and Site Data

## Comments

The site was purchased for development of a 12-story, 146 unit, apartment project (335,000 SF) . The site is located across the street from landmark "The Crescent" complex in the Uptown area.

# Land Sale Profile

# Sale No. 3

## Location & Property Identification

| | |
|---|---|
| Property Name: | Redevelopment site in Deep Ellum |
| Sub-Property Type: | Commercial |
| Address: | Northwest corner of Malcolm X Boulevard and Indiana Street |
| City/State/Zip: | Dallas, TX 75226 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 2522069 |



## Sale Information

| | |
|---|---|
| Sale Price: | $32,000,000 |
| Effective Sale Price: | $32,000,000 |
| Sale Date: | 12/20/2019 |
| Sale Status: | Closed |
| $/Acre(Gross): | $11,756,062 |
| $/Land SF(Gross): | $269.88 |
| $/Acre(Usable): | $11,756,062 |
| $/Land SF(Usable): | $269.88 |
| $/Building SF: | $67.47 |
| Grantor/Seller: | AP Deep Ellum 2 LLC |
| Grantee/Buyer: | 301 N Crowdus Street LP (Sterling Bay, LLC) |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | 201900343952 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 02/12/2020 |
| Confirmation Source: | Adam Conen (312) 202-3467 |
| Verification Type: | Confirmed-Buyer Broker |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | Lot 8B, Block E/486, Reel FX / Tax #000485000E08B0000 #000485000E08B0100 |
| Acres(Usable/Gross): | 2.72/2.72 |
| Land-SF(Usable/Gross): | 118,570/118,570 |
| Usable/Gross Ratio: | 1.00 |
| Potential Building SF: | 474,276 |
| Year Built: | 1954 |
| Property Class: | C |
| Construction Quality: | Average |
| Improvements Cond.: | Average |
| Exterior Walls: | Brick |
| No. of Buildings/Stories: | 1/2 |
| Fire Sprinkler Type: | Yes |
| Air-Conditioning Type: | Roof Central Mounted |
| Shape: | Rectangular |
| Topography: | Level |
| Corner Lot: | Yes |
| Frontage Type: | 2 way, 2 lanes each way |
| Zoning Code: | PD-289 (A) |
| Zoning Desc.: | Planned Development Tract A |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Bldg. Phy. Info. Source: | Engineering Report |
| Source of Land Info.: | Engineering Report |

# Land Sale Profile Sale No. 3

## Comments

The subject is currently improved with a 72,021 square foot office building and surface parking that is currently vacant. The current owner purchased the property with the expectation of demolishing the existing improvements and constructing a 474,276 square foot Class A office building. The property is zoned PD 289 (A), Planned Development Tract A, which permits a maximum F.A.R. of 4:1 density.

# Land Sale Profile

# Sale No. 4

## Location & Property Identification

| | |
|---|---|
| Property Name: | Commercial Land in Dallas, TX |
| Sub-Property Type: | Commercial |
| Address: | Northwest corner of Maple Avenue and McKinney Avenue |
| City/State/Zip: | Dallas, TX 75201 |
| County: | Dallas |
| Submarket: | Dallas |
| Market Orientation: | Urban |
| IRR Event ID: | 2522620 |




## Sale Information

| | |
|---|---|
| Sale Price: | $20,176,992 |
| Effective Sale Price: | $20,176,992 |
| Sale Date: | 08/24/2020 |
| Sale Status: | Closed |
| $/Acre(Gross): | $17,424,000 |
| $/Land SF(Gross): | $400.00 |
| $/Acre(Usable): | $17,424,000 |
| $/Land SF(Usable): | $400.00 |
| $/Building SF: | $53.10 |
| Grantor/Seller: | Elk Financial Inc |
| Grantee/Buyer: | 2401 McKinney LLC |
| Property Rights: | Fee Simple |
| Financing: | Cash to seller |
| Document Type: | Warranty Deed |
| Recording No.: | 202000228036 |
| Verified By: | Ernest Gatewood |
| Verification Date: | 11/04/2020 |
| Verification Type: | Secondary Verification |

## Improvement and Site Data

| | |
|---|---|
| Legal/Tax/Parcel ID: | Lot 1A, Block 1/949 James P Leake / Tax #000949000101A0000 |
| Acres(Usable/Gross): | 1.16/1.16 |
| Land-SF(Usable/Gross): | 50,442/50,442 |
| Usable/Gross Ratio: | 1.00 |
| Potential Building SF: | 380,000 |
| Shape: | Irregular |
| Topography: | Level |
| Corner Lot: | Yes |
| Frontage Type: | 2 way, 2 lanes each way |
| Zoning Code: | PD-225 |
| Zoning Desc.: | Planned Development 225 |
| Flood Plain: | No |
| Utilities: | Water Public, Sewer |
| Source of Land Info.: | Public Records |

## Comments

The site is a part of a larger development project totaling 2.0828 acres. The assembled site is proposed to be developed with a 27-story office/retail building. The development project includes 670,000 square feet of offices and 15,000 square feet of retail and underground parking. This tract is currently improved with a Truluck's Restaurant with a 20-year lease. The new project will have a new Truluck's restaurant on the ground floor. to replace the existing building/restaurant.

# EXHIBIT A-22

Date: Tue, 10 Dec 2019 2:52:00 AM (UTC)
Sent: Tue, 10 Dec 2019 2:52:24 AM (UTC)
Subject: RE: Turtle Creek Participation Agreement
From: Chris Sadick
To: Jim Glasgow <jglasgow@greenhollowcapital.com >; Vipin Nambiar <vnambiar@hncapitalpartners.com >;
CC: Scott Leitman <sleitman@greenhollowcapital.com >;

The RE Tax was $335k for 2018.

Carry = $25.5MM * 11% Coupon = $2.8MM

Added an additional $150k for misc. costs.

| **2999 Turtle Creek Existing Office** | |
|---|---|
| 28,940 | SF NRA |
| $70.00 | PSF TI/LC |
| **$2,025,800** | **Lease Up Cost** |
| | |
| $25,500,000 | A-Note |
| 11.00% | Coupon |
| **$2,805,000** | **Carry Cost** |
| | |
| **$345,050** | **Tax (3% increase)** |
| | |
| **$150,000** | **Foreclosure Costs** |
| | |
| **$150,000** | **Misc Carry Costs** |
| | |
| **$5,475,850** | **Estimated 12 month Carry** |

**From:** Jim Glasgow <jglasgow@greenhollowcapital.com >
**Sent:** Monday, December 9, 2019 9:25 PM
**To:** Vipin Nambiar <vnambiar@hncapitalpartners.com >
**Cc:** Scott Leitman <sleitman@greenhollowcapital.com >; Chris Sadick <csadick@hngreenhollow.com >
**Subject:** Re: Turtle Creek Participation Agreement

Vipin

I am thinking 12 months of carry at 10% $2.5mm for interest

RE Taxes Chris will confirm?

Foreclosure costs $150,000 conservative estimate

TI/LC $70 psf for 30,000 sf= $2.1mm

So $4.75mm for the additional 12 months although the TI/LC will be amortized over the lease term 5+ years.

Plus the Real Estate tax number?

Let me know if anyone has any thoughts ?

Sent from my iPhone
On Dec 9, 2019, at 7:01 PM, Vipin Nambiar <vnambiar@hncapitalpartners.com> wrote:

Hi Jim,
Did you all look into carry cost and lease up analysis we discussed?

Vipin

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Monday, December 9, 2019 2:11 PM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley < mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <michael.bailey@wickphillips.com>; Allie Winkle < allie.winkle@wickphillips.com>
**Subject:** Re: Turtle Creek Participation Agreement

Gentlemen,
I think we made good progress on the call, HN Green Hollow needs to close prior to December 16th, is there any reason a closing by the end of the week is not achievable? I have next steps as Jerry sending around a revised Participation Agreement, a combined call with zoning council to get comfortable with the zoning report, Madison sending us wire instructions and a settlement statement and a quick lien search. Anything else needed to close?

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Monday, December 9, 2019 10:34 AM
**To:** Isaac J. Brown <isaac.brown@wickphillips.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <michael.bailey@wickphillips.com>; Allie Winkle < allie.winkle@wickphillips.com>
**Subject:** RE: Turtle Creek Participation Agreement

Can we have a call later today or tomorrow to discuss the open issues with attorneys and business people?

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017

Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Friday, December 6, 2019 10:07 AM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <michael.bailey@wickphillips.com>; Allie Winkle < allie.winkle@wickphillips.com>
**Subject:** RE: Turtle Creek Participation Agreement

[EXTERNAL]

Jerry – thanks for providing the list. After discussion with our clients, our responses are set forth below in red. Let us know if you have any questions.

Regards,
**Isaac Brown**
**Associate** | Wick Phillips
**Direct**: 214.740.4037
**Mobile**: 281.732.0470
**Email:** Isaac.brown@wickphillips.com

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Thursday, December 5, 2019 11:35 AM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <mbailey@wickphillips.com>
**Subject:** RE: Turtle Creek Participation Agreement

After our call between counsel yesterday there appears to be some gating issues that we should all get on the phone and discuss before we turn the documents. The issues are as follows:

1. Axos (the Senior Lender) will not enter into a subordination agreement. What Axos will do is enter into a recognition agreement which will give junior participant the right to cure and purchase in the case of a Madison default with Axos. A recognition could work, but we need be totally clear that Axos is only secured in Madison's position in the loan subject to GHCP's full rights under the Participation Agreement, however finally negotiated. To be clear, regardless of the status of Madison's loan with Axos, GHCP's right to control a workout, and the obligation to hold the senior portion of the loan outstanding for 12 months post-foreclosure, must survive intact, with no requirement that the junior holder purchase the senior. I believe Jim and Scott are going to reach out to have a discussion on this point with your client.

2. Junior Participant cannot have complete discretion in the case of a default. Junior Participant will have full discretion to foreclose but cannot have absolute discretion to modify in the case of a workout. For example, it cannot decrease principal, accept a short payoff, change the interest rate, extend maturity, or vote on a bankruptcy plan. Our client is comfortable conceptually with GHCP having full discretion to foreclose, but that other modifications will require consent by both parties.

3. The junior participant must be obligated to cure borrower defaults to Madison. For example, it must pay Madison's interest payments at the Madison rate if the Borrower stops paying. Here are the rights that should be in place after a borrower default: (i) unilateral right to foreclose, with no obligation to bring Madison current prior to exercising the right, (ii) right to purchase the A position, or (iii) both parties consent to the structure of a proposed workout. It must make protective advances for real estate taxes. Either party should have the right to make protective advances with those advances priming the rest of the waterfall. If junior participant cures it will have right to all of the interest at the default rate. This works with respect to any cure GHCP makes.

4. We need to discuss post default communication with the borrower. Madison holds the loan so it will need to communicate in some respect. If GHCP doesn't foreclose they will appoint Madison as agent to deal with the Borrower on both parties behalf.

5. If Junior Participant is not curing, Madison must have the right to sell the loan. This will not work for our client.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>

**Sent:** Wednesday, December 4, 2019 9:37 AM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley < mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <mbailey@wickphillips.com>
**Subject:** Re: Turtle Creek Participation Agreement

[EXTERNAL]

excellent, thanks

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Wednesday, December 4, 2019 9:36 AM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen < mzegen@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Chris Sadick < csadick@hngreenhollow.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <mbailey@wickphillips.com>
**Subject:** RE: Turtle Creek Participation Agreement

I am having a call with your attorney's at 3:00 and we will then turn.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Wednesday, December 4, 2019 9:35 AM
**To:** Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen <mzegen@madisonrealtycapital.com>; Jim Glasgow < jglasgow@greenhollowcapital.com>; Chris Sadick <csadick@hngreenhollow.com>; Jerry Feuerstein < jfeuerstein@kandfllp.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <mbailey@wickphillips.com>
**Subject:** Re: Turtle Creek Participation Agreement

[EXTERNAL]

Good morning,
Madison team, when should we expect a mark up from you?

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Wednesday, November 27, 2019 8:04 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Marc Zegen <mzegen@madisonrealtycapital.com>; Jim Glasgow < jglasgow@greenhollowcapital.com>; Chris Sadick <csadick@hngreenhollow.com>; Jerry Feuerstein < jfeuerstein@kandfllp.com>
**Cc:** Greg Fijolek <greg.fijolek@wickphillips.com>; Michael Bailey <mbailey@wickphillips.com>
**Subject:** Turtle Creek Participation Agreement

All,

Attached is the draft Participation Agreement for the participation of the $32,500,000 loan from 2999 TURTLE CREEK LLC secured by the property on Turtle Creek. This agreement is being sent to our client simultaneously and thus remains subject to their review and comment in all respects.

Let us know if you have any questions.

Regards,
**Isaac Brown**
**Associate** | Wick Phillips
3131 McKinney Avenue | Suite 100 | Dallas, Texas 75204
**Direct**: 214.740.4037 | **Main**: 214.692.6200 | **Fax**: 214.692.6255
**Mobile**: 281.732.0470 | **Email**: isaac.brown@wickphillips.com

<image001.jpg>

# EXHIBIT A-23

**HNGH TURTLE CREEK LLC**
c/o HN Green Hollow Capital Partners LLC
600 5th Ave., 2nd Floor
New York, New York 10020

April 9, 2020

*VIA ELECTRONIC MAIL*
*VIA UPS OVERNIGHT and*
*FEDEX OVERNIGHT*

MO 2999TC, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Timothy Lynch Barton
13901 Midway Road, Suite 102-243
Dallas, Texas 75244
tbarton@jmjdevelopment.com

Re: Indebtedness (the "Indebtedness" and/or the "Loan") evidenced by that certain Secured Promissory Note (the "Note"), executed by MO 2999TC, LLC, a Delaware limited liability company ("Borrower"), dated September 20, 2019 in the original principal amount of $32,500,000.00 payable to the order of 2999 Turtle Creek LLC, a Delaware limited liability company ("Senior Participant"), said Note being secured by, among other things, that certain Deed of Trust, Security Agreement and Fixture Filing (the "Deed of Trust," together with the Note and any and all other documents and agreements entered into in connection therewith, the "Loan Documents"), dated of even date with the Note executed by Borrower to Michael B. Massey, Trustee, for the benefit of Senior Participant, filed in the Real Property Records of Dallas County, Texas, granting a first priority security interest in that certain real property identified therein (the "Property"), guaranteed by that certain Guaranty, dated as of September 20, 2019, by and between Timothy Lynch Barton, an individual ("Guarantor") and Senior Participant (the "Guaranty"), a portion of such interest in the Loan and Loan Documents being sold by Senior Participant to HNGH Turtle Creek, LLC, a Delaware limited liability company ("Lender") pursuant to that certain Participation Agreement, by and between Senior Participant and Lender, dated as of January 24, 2020 (the "Participation Agreement").

Ladies and Gentlemen:

Borrower and Guarantor have requested Lender to enter into certain discussions with representatives of the Borrower and Guarantor (the "Discussions") to explore the possibility of

restructuring the terms of the Loan pursuant to Lender's rights as set forth in the Participation Agreement.

The Loan is evidenced, *inter alia*, by the Loan Agreement and the Loan Documents, and is secured by the Property more particularly described in the Deed of Trust. All capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Loan Documents.

Borrower and Guarantor acknowledge they have received (i) the correspondence dated March 24, 2020 from Senior Participant to Borrower (the "First Notice") describing Borrower's Event of Default under the Loan Documents for failure to pay the real estate taxes due on the Property (the "Tax Default"), and (ii) the correspondence dated April 6, 2020 from Lender's counsel to Borrower regarding the Tax Default (the "Second Notice", and together with the First Notice, the "Default Correspondence").

Borrower and Guarantor have requested that Lender engage in Discussions with them concerning the Default Correspondence and other matters related to the Loan. Lender has agreed to engage in such Discussions, which shall include, for purposes of this letter agreement, meetings, conferences and written communications subject to the terms, conditions, and limitations set forth in this letter agreement.

1. The Discussions are voluntary in nature, are entered into in reliance upon the understandings set forth herein and may be terminated by written notice sent in accordance with this letter agreement by either Lender, Borrower, or Guarantor at any time without cause or prior notice and without liability of any kind. By way of illustration and not limitation, Lender may determine not to undertake further Discussions, or may terminate the Discussions, at any time and for any reason whatsoever without prior notice to the Borrower or Guarantor and without liability for such termination.

2. Borrower and Guarantor acknowledge and agree that the Tax Default exists under the Loan as described in the Default Correspondence. Borrower and Guarantor further acknowledge that the Maturity Date of the Loan is October 1, 2020, and hereby ratify and affirm all representations and warranties made under the Loan Documents.

3. Neither the Discussions nor any oral or written statements, memoranda, or letters of Lender, Borrower or Guarantor in connection therewith shall be binding upon any such Party. It is expressly agreed that any binding agreement between the parties hereto in connection with the Loan must be contained in a formal written agreement approved by Lender and signed by all Parties. It is acknowledged and agreed by the parties hereto that the Discussions are settlement negotiations and may not be used by any party for any purpose, including as an admission for evidentiary purposes.

4. Notwithstanding the Discussions, the Loan Documents are and shall remain in full force and effect without change unless and until modified by appropriate instruments executed by Lender. None of the Discussions or any other action taken or not taken by Lender before, during, or after the Discussions, including the acceptance of partial payment or performance by Borrower or Guarantor, shall be deemed a waiver of, limitation on, or forbearance from, any of the rights and remedies of Lender whether under the Loan Documents, pursuant to the Participation Agreement, pursuant to the Default Correspondence, at law, or in equity, it being the understanding and agreement of the parties

hereto that Lender may exercise any and all of such rights and remedies at any time and from time to time.

In agreeing to attend any meeting or undertake any Discussions, Lender is not explicitly or implicitly agreeing to forebear from taking any action pending such meeting or Discussions, including without limitation any action that may be appropriate pursuant to, or in connection with, the Default Correspondence. Lender expressly reserves all rights and remedies available under the Loan Documents, at law and in equity.

5. Borrower and Guarantor acknowledge that they have received written notice of Lender's junior participation in the Loan and agree that no discussions between Lender and Senior Participant can be used in a court of law as a claim of wrongdoing and acknowledges that each of Senior Participant and Lender have the right to have discussions and agreements concerning the Borrower and the Property.

6. Borrower and Guarantor acknowledge and agree that continuing throughout the pendency of the Discussions, Lender shall have the right, in its sole discretion pursuant to the terms of the Participation Agreement, to administer, enforce, and otherwise deal with the Loan, the Loan Documents, and the Default Correspondence, notwithstanding the Discussions, and notwithstanding the fact that there exist Defaults under the Loan as more fully described in the Default Correspondence.

7. By entering into the Discussions, Lender is making no promise or commitment to do anything or to refrain from exercising any or all available remedies under the Loan or the Default Correspondence, and Borrower and Guarantor may not rely on the Discussions continuing nor may they rely on the Discussions resulting in any outcome to restructure, forebear, or modify the obligations of the Borrower or Guarantor under the Loan Documents. Therefore, Borrower and Guarantor may, at their option, throughout the term of the Discussions, pursue alternative resolutions to the dispute, including the opportunity to repay the Loan in full through the refinancing or sale of the Property, subject, however, in all events to the terms, covenants, and conditions contained in the Loan Documents.

8. Borrower and Guarantor represent and warrant to Lender that in entering into this letter agreement, each of them has been advised by legal counsel and that each of them fully understands the terms hereof.

9. Borrower and Guarantor represent and warrant to Lender that neither of them have any claim or cause of action of any kind with respect to the Loan Documents or Obligations thereunder against Senior Participant or Lender.

10. Borrower represents that it is duly authorized to execute this letter agreement in accordance with its Limited Liability Company Agreement executed as of September 4th, 2019.

11. Borrower shall pay, as and when billed, all fees, costs, and expenses, including without limitation, reasonable attorneys' fees, appraisal fees, and engineering and environmental fees, reasonably incurred by Lender in connection with the negotiation of this letter agreement and for all sums incurred by Lender in connection with all matters contemplated by this letter agreement.

12. This letter agreement may be executed in counterparts which together shall constitute the entire agreement of the parties concerning the Discussions. Delivery of an executed counterpart of a signature page to this letter agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this letter agreement. All prior or contemporaneous understandings or representations made by Lender, Borrower or Guarantor concerning the agreements made herein shall be superseded hereby. This letter agreement shall become effective when executed and delivered by the Lender after Lender shall have received counterparts hereof that together bear the signatures of each and every party hereto.

13. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

14. By signing below and delivering this letter agreement, each of the parties acknowledges and agrees to the terms of this binding letter agreement. Please execute this agreement in the space provided below and return it to the undersigned no later than April 13, 2020.

[SIGNATURE PAGE FOLLOWS]

Sincerely,

**HNGH TURTLE CREEK, LLC**,
a Delaware limited liability company

By: HN Green Hollow Capital Partners LLC,
its Authorized Signatory

By: ______________________________
Name: James Glasgow
Title: Manager

Accepted and agreed to this April ___, 2020,

**MO 2999TC LLC,**
a Delaware limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

______________________________
**TIMOTHY LYNCH BARTON**, Guarantor

# EXHIBIT A-24

# 2999TC Acquisitions, LLC

13901 Midway Road, Suite 102-243
Dallas, Texas 75244

**VIA ELECTRONIC MAIL and FEDEX**

April 10, 2020

2999 Turtle Creek LLC
c/o Madison Capital
520 Madison Avenue, Suite 3501
New York, NY 10022
Attention: Shoshanna Carmel

Kriss & Feuerstein LLP
360 Lexington Ave., Suite 1200
New York, New York
Attention: Jerold Feuerstein
jfeuerstein@kandfllp.com

Dear Ladies and Gentlemen:

Reference is hereby made to: (i) that certain Secured Promissory Note, dated as of September 16, 2019, in the principal amount of $32,500,000.00 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), by 2999TC Acquisitions, LLC f/k/a MO 2999TC, LLC, a Delaware limited liability company ("Borrower" or "we" or "us") in favor of 2999 Turtle Creek LLC, a Delaware limited liability company (the "Lender" or "you"), (ii) that certain Deed of Trust, Security Agreement and Fixture Filings, dated as of September 16, 2019, made by Borrower in favor of Michael B. Massey, as trustee for the benefit of the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Deed of Trust"), (iii) the notice from Lender, dated January 29, 2020 (the "Notice of Participation"), regarding the entering into of a Participation Agreement, dated as of January 24, 2020, between the Lender and HNGH Turtle Creek, LLC, a Delaware limited liability company ("HNGH") and (iv) that certain letter regarding real estate taxes, dated as of March 24, 2020, delivered by the Lender to the Borrower (the "Letter"). Capitalized terms used but not otherwise defined herein shall have the respective meanings given to such terms in the Note or the Deed of Trust, as applicable.

As you are aware, the Letter contends that an Event of Default has occurred and is continuing under the Loan Documents as a result of the Borrower's failure to pay certain real estate taxes on the Property due on February 1, 2020 (the "Designated Event of Default"). The Letter further states that the Lender intended to consider seeking its rights and remedies under the Loan Documents if the Designated Event of Default were not cured by April 1, 2020. We were therefore shocked and concerned to have received the letter from HNGH on April 6, 2020 through its counsel, Michael Bailey, at Wick Phillips, informing us that HNGH was paying the taxes related to the Designated Event of Default, making demands of Borrower under the terms of the Participation Agreement, and threatening foreclosure proceedings under the Deed of Trust.

We question why and under what legal theory HNGH is pursuing secured lender remedies against us. You are our Lender. Because Borrower is not a party to the Participation Agreement, we have no contractual privity with HNGH, and we note that, while we acknowledge receipt of the Notice of

Participation, we are not a party to the Participation Agreement referenced therein. The Notice of Participation only states that HNGH has the right to communication with the Borrower and nothing else. In fact, such notice states that "borrower shall continue to coordinate directly with Lender in accordance with the Loan Documents with respect to the servicing and administration of the Loan." As a result, HNGH has no authority or legal standing to declare any events of default under the Loan Documents or pursue any remedies of the Lender against the Borrower. Furthermore, we call to your attention Section 28 of the Note, which states:

> "This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought."

We also acknowledge that Section 40 of the Deed of Trust permits the Lender to enter into participation agreements. However, such agreements would not give rise to the authority being asserted by HNGH, and nothing in the Deed of Trust may be construed to permit the Lender to delegate the enforcement of its secured lender rights and remedies such that unaffiliated third parties could threaten us with legal action under the Loan Documents. To that end, Section 46 of the Deed of Trust states that:

> "This Deed of Trust, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Beneficiary, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought."

As you are aware, the City of Dallas has been under a mandatory Shelter in Place: Safer at Home order pursuant to Executive Order GA-14 of Texas Governor Greg Abbott and the orders of Dallas County Judge Clay Jenkins related to the COVID-19 pandemic. As such, our offices have been closed, and we are all working under new circumstances that have caused disruption to our normal operating procedures. We kindly request that you work with us towards an amicable solution to the current situation by providing us with a 120-day forbearance period, whereby you forbear the exercise of any secured lender remedies during that period, subject to the occurrence of certain other to-be-agreed upon events. As we are all bracing from the personal and economic impacts of the COVID-19 pandemic, we ask that you work with us through these troubling times to get to the next stage of our development. We have every confidence that we will be in compliance with the Loan Documents in short order, and in the spirit of cooperation, we ask that you inform HNGH of your status as our lienholder and secured party and direct HNGH to cease and desist any further direct communication with us. We entered into the Loan Documents with you as our Lender, and we want to work through this challenging moment with you as our Lender.

Very truly yours,

MO 2999TC, LLC

Tim Barton
President

Cc: Reed Smith LLP (via email)
811 Main Street, Suite 1700
Houston, Texas 77002
Attention: J. Eric Holland (eholland@reedsmith.com)

# EXHIBIT A-25

**2999TC Acquisitions, LLC**

13901 Midway Road, Suite 102-243
Dallas, Texas 75244

April 13, 2020

2999 Turtle Creek LLC
c/o Madison Capital
520 Madison Avenue, Suite 3501
New York, NY 10022
Attention: Shoshanna Carmel

Kriss & Feuerstein LLP
360 Lexington Ave., Suite 1200
New York, New York
Attention: Jerold Feuerstein

Dear Ladies and Gentlemen:

Reference is hereby made to: (i) that certain Secured Promissory Note, dated as of September 16, 2019, in the principal amount of $32,500,000.00 (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), by MO 2999TC, LLC, a Delaware limited liability company ("Borrower" or "we" or "us") in favor of 2999 Turtle Creek LLC, a Delaware limited liability company (the "Lender" or "you"), (ii) that certain Deed of Trust, Security Agreement and Fixture Filings, dated as of September 16, 2019, made by Borrower in favor of Michael B. Massey, as trustee for the benefit of the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Deed of Trust"), (iii) the notice, dated as of January 29, 2020 (the "Notice of Participation"), regarding the entering into of a Participation Agreement, dated as of January 24, 2020, between the Lender and HNGH Turtle Creek, LLC, a Delaware limited liability company ("HNGH"), (iv) our letter to you dated April 9, 2020 (the "Response") and (v) your letter to us dated April 13, 2020 (the "Madison Letter"). Capitalized terms used but not otherwise defined herein shall have the respective meanings given to such terms in the Note or the Deed of Trust, as applicable.

In the Madison Letter, you directed us to forward all communication through HNGH acting on your behalf. As we stated in our Response: you are our Lender. Again, as stated in our Response, we have no contractual privity with HNGH, and as such, we have no intention or obligation to engage with HNGH or communicate with HNGH with respect to any matter concerning the Loan Documents. You are attempting to change the notice requirements of the Note and the Deed of Trust without us having signed an agreement agreeing to such change. Furthermore, as we did in our Response, we again call to your attention Section 28 of the Note, which states:

> "This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought."

We also further reiterate from our Response that nothing in the Deed of Trust may be construed to permit the Lender to delegate the enforcement of its secured lender rights and remedies such that unaffiliated

third parties could threaten us with legal action under the Loan Documents. To that end, Section 46 of the Deed of Trust states that:

> This Deed of Trust, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Beneficiary, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought."

As per the two sections noted above, you may not unilaterally change the notice provisions of the Loan Documents without our written consent to do so.

As you are aware, by letter dated March 31, 2020, we requested a 120-day forbearance period related to our obligations under the Loan Documents due to the substantial business interruption and economic downturn in the capital markets that has been caused by the recent global outbreak of the novel coronavirus (COVID-19), which has been declared a national emergency in the United States, declared a pandemic by the World Health Organization and by the United States Center of Disease Control, and declared a Public Health Emergency by the City of Dallas.[1] In light of the impact of the COVID-19 pandemic and executive orders that have been entered in response to the pandemic, many lenders, financial institutions and creditors have been entering into forbearance agreements as the one we have requested. But we have not yet received a response from you regarding our forbearance request; so, we renew our request and once more ask that you work with us towards an amicable solution to the current situation by providing us with a 120-day forbearance period, whereby you forbear the exercise of any secured lender remedies during that period.

Finally, we again ask that you, as our Lender, inform HNGH of your status as our lienholder and secured party and direct HNGH to cease and desist any further direct communication with us and unauthorized actions in violation of the Loan Documents. We entered into the Loan Documents with you as our Lender, and we want to work through this challenging moment with you as our Lender. We will not be communicating on these matters with HNGH and we appreciate your efforts to work with us to comply with our Loan Documents

Absent a consensual resolution of the disputed issues, we reserve all rights against the Lender and HNGH.

Very truly yours,

Tim Barton
President
2999TC Acquisitions, LLC

---

[1] The City of Dallas is currently subject to orders restricting public gatherings and mandating business closures through May 20, 2020.

# EXHIBIT A-26

| | |
|---|---|
| Date: | Fri, 24 Jan 2020 10:01:30 PM (UTC) |
| Sent: | Fri, 24 Jan 2020 10:01:16 PM (UTC) |
| Subject: | RE: Madison / Turtle Creek - Participation Closing |
| From: | Vipin Nambiar <vnambiar@hncapitalpartners.com > |
| To: | Jim Glasgow <jglasgow@greenhollowcapital.com >; Scott Leitman <sleitman@greenhollowcapital.com >; Mark Gormley <mgormley@madisonrealtycapital.com >; |
| CC: | Jerry Feuerstein <jfeuerstein@kandfllp.com >; John C. Hayes <jhayes@kandfllp.com>; Isaac J. Brown <isaac.brown@wickphillips.com >; Josh Zegen <josh@madisonrealtycapital.com >; Michael Bailey <michael.bailey@wickphillips.com >; Greg Fijolek <greg.fijolek@wickphillips.com >; Chris Sadick <csadick@hngreenhollow.com >; Maria Di Toro <MDiToro@kandfllp.com >; |

Wire sent. Please acknowledge when received.

Vipin

HN CAPITAL PARTNERS

**Vipin Nambiar**
Managing Partner

1807 Ross Ave, Ste 440
Dallas, TX 75201
Phone: 214.978.8572
vnambiar@hncapitalpartners.com

**From:** Jim Glasgow <jglasgow@greenhollowcapital.com >
**Sent:** Friday, January 24, 2020 4:00 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com >
**Cc:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; John C. Hayes <jhayes@kandfllp.com>; Isaac J. Brown <isaac.brown@wickphillips.com >; Josh Zegen <josh@madisonrealtycapital.com >; Mark Gormley <mgormley@madisonrealtycapital.com >; Michael Bailey <michael.bailey@wickphillips.com >; Greg Fijolek <greg.fijolek@wickphillips.com >; Vipin Nambiar <vnambiar@hncapitalpartners.com >; Chris Sadick <csadick@hngreenhollow.com >; Maria Di Toro <MDiToro@kandfllp.com >
**Subject:** Re: Madison / Turtle Creek - Participation Closing

Thanks

Sent from my iPhone
On Jan 24, 2020, at 3:58 PM, Scott Leitman <sleitman@greenhollowcapital.com > wrote:

> confirmed with Mark
>
> Scott Leitman
> Principal
> HN Green Hollow Capital Partners LLC
> 347-705-8806

**From:** Jim Glasgow <jglasgow@greenhollowcapital.com>
**Sent:** Friday, January 24, 2020 4:54 PM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Scott Leitman <sleitman@greenhollowcapital.com>; John C. Hayes <jhayes@kandfllp.com>; Isaac J. Brown < isaac.brown@wickphillips.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley < mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek < greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick < csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

Scott please confirm the wiring instructions we have are good ?

Sent from my iPhone
On Jan 24, 2020, at 3:48 PM, Jerry Feuerstein <jfeuerstein@kandfllp.com> wrote:

To where are you wiring?

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Friday, January 24, 2020 4:47 PM
**To:** John C. Hayes <jhayes@kandfllp.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Jerry Feuerstein < jfeuerstein@kandfllp.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick < csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

[EXTERNAL]

in process as we speak...

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** John C. Hayes <jhayes@kandfllp.com>
**Sent:** Friday, January 24, 2020 4:45 PM
**To:** Isaac J. Brown <isaac.brown@wickphillips.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

Has a wire been initiated?

John C. Hayes, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4113
Direct Dial: 646-454-4113
Main Fax: 212-661-9397
email: jhayes@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Friday, January 24, 2020 4:23 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; John C. Hayes <jhayes@kandfllp.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

[EXTERNAL]

Works for me. Congrats everyone.

**Isaac Brown**
**Associate** | Wick Phillips
**Direct**: 214.740.4037
**Mobile**: 281.732.0470
**Email:** Isaac.brown@wickphillips.com

<image001.png>

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Friday, January 24, 2020 3:21 PM
**To:** John C. Hayes <jhayes@kandfllp.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing
**Importance:** High

isaac are we good to fund?

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** John C. Hayes <jhayes@kandfllp.com>
**Sent:** Friday, January 24, 2020 4:19 PM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Scott Leitman <sleitman@greenhollowcapital.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>; Maria Di Toro <MDiToro@kandfllp.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

Axos is signed off pending receipt of the executed Participation Agreement, evidence that we are closed, and delivery of GH's signature to the Axos Loan Agreement (which we are holding in escrow and will deliver). Axos will then circulate the revised fully executed Loan Agreement.

John C. Hayes, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4113
Direct Dial: 646-454-4113

Main Fax: 212-661-9397
email: jhayes@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Friday, January 24, 2020 4:02 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>
**Cc:** Jim Glasgow <jglasgow@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; John C. Hayes <jhayes@kandfllp.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

How late can you wire?

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

On Jan 24, 2020, at 3:53 PM, Scott Leitman <sleitman@greenhollowcapital.com> wrote:

[?]

[EXTERNAL]

any update on Axos?

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Friday, January 24, 2020 11:57 AM
**To:** Jim Glasgow <jglasgow@greenhollowcapital.com>
**Cc:** Isaac J. Brown <isaac.brown@wickphillips.com>; John C. Hayes <jhayes@kandfllp.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

Jim- I am pushing as much as I can. Our suggestion is that we finalize all that we can between us, you can fund to us in escrow and wait for the Axos signoff. Regardless of the signoff, Madison will agree that you GH can collect interest as of today.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

**From:** Jim Glasgow <jglasgow@greenhollowcapital.com>
**Sent:** Friday, January 24, 2020 11:27 AM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Isaac J. Brown <isaac.brown@wickphillips.com>; John C. Hayes <jhayes@kandfllp.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Josh Zegen <josh@madisonrealtycapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

[EXTERNAL]

Now we are entering ridiculous territory

Sent from my iPhone

On Jan 24, 2020, at 10:24 AM, Jerry Feuerstein <jfeuerstein@kandfllp.com> wrote:

Letting you know that Axos' counsel will not be available until late afternoon.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Friday, January 24, 2020 11:11 AM
**To:** John C. Hayes <jhayes@kandfllp.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>; Scott Leitman < sleitman@greenhollowcapital.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey < michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar < vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

[EXTERNAL]

Jerry – we are signed off on this draft. Please have Axos approve and address the other items on the list I circulated asap.

Thanks,
**Isaac Brown**
**Associate** | Wick Phillips
**Direct**: 214.740.4037
**Mobile**: 281.732.0470
**Email:** Isaac.brown@wickphillips.com

<image001.png>

**From:** John C. Hayes <jhayes@kandfllp.com>
**Sent:** Friday, January 24, 2020 9:27 AM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

Attached please find the revised Participation Agreement, blacklined against the last version circulated by Isaac. Please let us know if you have any remaining comments or questions.

Please note this remains subject to client review and approval.

Thank you,

John

John C. Hayes, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4113
Direct Dial: 646-454-4113
Main Fax: 212-661-9397
email: jhayes@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Friday, January 24, 2020 10:22 AM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

We are going to circulate a revised Participation Agreement shortly. When you sign off we will speak with Axos.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

NOTICE:

This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender at 212-661-2900 or by replying to this e-mail and delete the message and any attachment(s) from your system. Thank you.
IRS CIRCULAR 230 DISCLOSURE: To comply with IRS Regulations, we inform you that any discussion of U.S. federal tax issues in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, (i) to avoid any penalties imposed under the Internal Revenue Code, or (ii) to promote, market, or recommend to another party any transaction or matter addressed herein.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Friday, January 24, 2020 10:17 AM
**To:** Isaac J. Brown <isaac.brown@wickphillips.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

[EXTERNAL]

All, we need to get this closed
Madison i believe everything is in your court(and Axos)
please advise

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Thursday, January 23, 2020 10:05 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

Understood. Thanks Scott

**Isaac Brown**
**Associate** | Wick Phillips
**Direct:** 214.740.4037
**Mobile:** 281.732.0470
**Email:** Isaac.brown@wickphillips.com

<image001.png>

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Thursday, January 23, 2020 9:04 PM
**To:** Isaac J. Brown <isaac.brown@wickphillips.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

We will live with Madisons language

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Isaac J. Brown <isaac.brown@wickphillips.com>
**Sent:** Thursday, January 23, 2020 9:48 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** RE: Madison / Turtle Creek - Participation Closing

The crux of the issue is whether Madison can offer you a junior piece under any terms and then subsequently sell a junior piece on materially more favorable terms to someone else. That's the prior concept from the draft. Our ask was that the subsequent sale be on the same terms as the piece offered to us in material respects only.

Please confirm what concept should be in the Participation Agreement.

Thanks,

**Isaac Brown**
**Associate** | Wick Phillips
**Direct**: 214.740.4037
**Mobile**: 281.732.0470
**Email:** Isaac.brown@wickphillips.com

<image001.png>

---

**From:** Scott Leitman <sleitman@greenhollowcapital.com>
**Sent:** Thursday, January 23, 2020 8:42 PM
**To:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

Yes

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Jerry Feuerstein <jfeuerstein@kandfllp.com>
**Sent:** Thursday, January 23, 2020 9:40 PM
**To:** Scott Leitman <sleitman@greenhollowcapital.com>
**Cc:** Josh Zegen <josh@madisonrealtycapital.com>; Jim Glasgow <jglasgow@greenhollowcapital.com>; Isaac J. Brown <isaac.brown@wickphillips.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

Are you agreed to Madison's language on the ROFO? If so, we will finalize all of the documents and get Axos moving.

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Voice: 212-661-2900 ext. 4110
Direct Fax: 646-454-4150
Main Fax: 212-661-9397
email: jfeuerstein@kandfllp.com

On Jan 23, 2020, at 9:35 PM, Scott Leitman <sleitman@greenhollowcapital.com> wrote:

[EXTERNAL]

Jerry, please respond with the items on the list Issac provided, so that we can fund first thing tomorrow
Thank you

Scott Leitman

Principal

HN Green Hollow Capital Partners LLC

347-705-8806

---

**From:** Josh Zegen <josh@madisonrealtycapital.com>
**Sent:** Thursday, January 23, 2020 9:30 PM
**To:** Jim Glasgow <jglasgow@greenhollowcapital.com>
**Cc:** Isaac J. Brown <isaac.brown@wickphillips.com>; Jerry Feuerstein <jfeuerstein@kandfllp.com>; Mark Gormley <mgormley@madisonrealtycapital.com>; John C. Hayes <jhayes@kandfllp.com>; Michael Bailey <michael.bailey@wickphillips.com>; Greg Fijolek <greg.fijolek@wickphillips.com>; Scott Leitman <sleitman@greenhollowcapital.com>; Vipin Nambiar <vnambiar@hncapitalpartners.com>; Chris Sadick <csadick@hngreenhollow.com>
**Subject:** Re: Madison / Turtle Creek - Participation Closing

Jerry will finalize w axos tomorrow, only thing outstanding from our side is ROFO, as I mentioned, to the extent we upsize the loan to a construction loan and sell of a junior particpation you will have the first offer to buy that piece for 5 business days. I believe something like that was in the proposed docs. I don't think anything else is outstanding but will leave to counsel.

Sent from my iPhone

On Jan 23, 2020, at 9:19 PM, Jim Glasgow <jglasgow@greenhollowcapital.com> wrote:

Josh
According to Issac we have been unable to connect with your counsel or Axos. Can you push this along? Thanks

Jim

Sent from my iPhone

On Jan 23, 2020, at 3:53 PM, Josh Zegen <josh@madisonrealtycapital.com> wrote:

Jerry can we finalize this

Sent from my iPhone

On Jan 23, 2020, at 4:33 PM, Isaac J. Brown <isaac.brown@wickphillips.com> wrote:

?

WARNING: This email originated outside of Madison Realty Capital.

Jerry / Madison Team,

Re-sending this list given the push to close asap. I've pinged Axos's counsel today and will let you know if I hear back.

- Participation Agreement – I believe the only outstanding item is the ROFO. From what I understand, my client is only signing off on the concept in the attached – namely that any subsequent offer cannot be for less than what was offered to GHCP.
    - Note – I removed the reference to the Borrower default.
- Indemnification Agreement – Please confirm that this draft is final and **that you have the fund signature page, ready to release**.
- Consent – are you prepared to forward an executed copy attaching the Indemnification Agreement as an exhibit and confirming it is approved? I don't believe I ever saw a revised version.
- Axos – need confirmation that current draft is approved.
- Guaranty Form – will you re-send the final version so it can be attached?
- Signatures – I am in possession of GHCP's signatures, do you have Madison's?

Let me know if you have any questions or other outstanding issues. Looking forward to getting this one across the finish line.

Regards,

**Isaac Brown**
**Associate** | Wick Phillips
3131 McKinney Avenue | Suite 100 | Dallas, Texas 75204
**Direct**: 214.740.4037 | **Main**: 214.692.6200 | **Fax**: 214.692.6255
**Mobile**: 281.732.0470 | **Email**: isaac.brown@wickphillips.com

<image001.png>

<DOCS-#369640-v20-Participation_Agreement_-_Turtle_Creek.DOCX >
<Participation Agreement - Turtle Creek - Participation Agreement - Turtle

Creek.pdf>
<DOCS-#373119-v7-Indemnification_Agreement_-_Turtle_Creek.DOCX >
<RE_ Green Hollow _ Turtle Creek - Participation Documents.msg>

**Disclaimer**

This message may contain privileged and confidential information and is intended only for the addressee(s). If you are not the intended recipient, you are prohibited from copying, disclosing, distributing, or using this information. The sender does not waive any of its rights, privileges or other protections with respect to this information. Please notify the sender immediately if you received this message in error, delete the e-mail as well as any attachments, and destroy all hard copies.

This message is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument, as an official confirmation of any transaction or as giving investment advice.

All e-mail sent to or from this address are subject to retention and review by someone other than the addressee(s).

**Disclaimer**

This message may contain privileged and confidential information and is intended only for the addressee(s). If you are not the intended recipient, you are prohibited from copying, disclosing, distributing, or using this information. The sender does not waive any of its rights, privileges or other protections with respect to this information. Please notify the sender immediately if you received this message in error, delete the e-mail as well as any attachments, and destroy all hard copies.

This message is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any financial instrument, as an official confirmation of any transaction or as giving investment advice.

All e-mail sent to or from this address are subject to retention and review by someone other than the addressee(s).

# EXHIBIT A-27

**NOTICE OF LOAN SALE**

December 8th, 2020

*Via FedEx*
2999TC Acquisitions, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

Timothy Lynch Barton
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

Re: Secured Promissory Note dated as of September 20, 2019 (the "Note"), duly executed and delivered by 2999TC Acquisitions, LLC fka MO 2999TC, LLC ("Borrower") in favor of 2999 Turtle Creek LLC ("Assignor"), evidencing a loan in the principal amount of $32,500,000.00 (the "Loan"), and Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019 (the "Mortgage") duly executed and delivered by Borrower in favor of Assignor in the principal amount of $32,500,000.00, which instruments encumber the premises known as and located at 2999 Turtle Creek, Dallas, Texas 75219 (the "Property"), and Guaranty dated as of September 20, 2019, duly executed and delivered by Timothy Lynch Barton ("Guarantor") in favor of Assignor (the aforesaid instruments, and all other documents executed in connection therewith, are collectively referred to herein as the "Loan Documents")

To Whom It May Concern:

This letter shall serve as notice that HNGH Turtle Creek, LLC ("Assignee") has acquired all of the right, title and interest of Assignor in the Loan Documents by, among other things, executing an Assignment of Deed of Trust from Assignor to Assignee dated December 7, 2020.

Accordingly, please make all inquiries in connection with the Loan to Assignee at the address listed below:

HNGH TURTLE CREEK, LLC
600 5th Avenue, 2nd Floor
New York, New York 10020

Nothing herein shall be deemed or constitute a waiver or release of any of the terms or provisions of the Loan Documents or of any defaults thereunder, or constitute a waiver, release or an estoppel of by or against any of Assignee's rights or remedies under the Loan Documents, in law and/or in equity, all of which rights and remedies are specifically reserved.

Furthermore, no forbearance, delay or inaction in the declaration of an Event of Default (as defined in the Loan Documents) or consequential exercise of its rights and remedies under the Loan Documents, at law or at equity, and no continuing performance by Assignee or Borrower

under the Loan Documents: (a) shall constitute a modification or alteration of the terms, conditions or covenants of the Loan, all of which remain in full force and effect; (b) shall constitute a waiver, release or limitation of any of Assignee's rights or remedies, all of which are expressly reserved; or (c) shall relieve or release Borrower in any way from any of their respective obligations or agreements under the Loan Documents.

Sincerely yours,

2999 TURTLE CREEK LLC

By: ______________________________

Name: Joshua Zegen
Title: Authorized Signatory

HNGH TURTLE CREEK, LLC,
a Delaware limited liability company

By: HN Capital Partners, L.L.C.,
a Delaware limited liability company,
its Manager

By: ______________________________
Vipin Nambiar, Managing Member

under the Loan Documents: (a) shall constitute a modification or alteration of the terms, conditions or covenants of the Loan, all of which remain in full force and effect; (b) shall constitute a waiver, release or limitation of any of Assignee's rights or remedies, all of which are expressly reserved; or (c) shall relieve or release Borrower in any way from any of their respective obligations or agreements under the Loan Documents.

Sincerely yours,

2999 TURTLE CREEK LLC

By: ______________________________
Name:
Title:

HNGH TURTLE CREEK, LLC,
a Delaware limited liability company

By: HN Capital Partners, L.L.C.,
a Delaware limited liability company,
its Manager

By: ______________________________
Vipin Nambiar, Managing Member

# NOTICE OF LOAN SALE

December 8th, 2020

*Via FedEx*
2999TC Acquisitions, LLC
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

Timothy Lynch Barton
13901 Midway Road, Suite 102-243
Dallas, Texas 75244

Re: Secured Promissory Note dated as of September 20, 2019 (the "Note"), duly executed and delivered by 2999TC Acquisitions, LLC fka MO 2999TC, LLC ("Borrower") in favor of 2999 Turtle Creek LLC ("Assignor"), evidencing a loan in the principal amount of $32,500,000.00 (the "Loan"), and Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019 (the "Mortgage") duly executed and delivered by Borrower in favor of Assignor in the principal amount of $32,500,000.00, which instruments encumber the premises known as and located at 2999 Turtle Creek, Dallas, Texas 75219 (the "Property"), and Guaranty dated as of September 20, 2019, duly executed and delivered by Timothy Lynch Barton ("Guarantor") in favor of Assignor (the aforesaid instruments, and all other documents executed in connection therewith, are collectively referred to herein as the "Loan Documents")

To Whom It May Concern:

This letter shall serve as notice that HNGH Turtle Creek, LLC ("Assignee") has acquired all of the right, title and interest of Assignor in the Loan Documents by, among other things, executing an Assignment of Deed of Trust from Assignor to Assignee dated December 7, 2020.

Accordingly, please make all inquiries in connection with the Loan to Assignee at the address listed below:

HNGH TURTLE CREEK, LLC
600 5th Avenue, 2nd Floor
New York, New York 10020

Nothing herein shall be deemed or constitute a waiver or release of any of the terms or provisions of the Loan Documents or of any defaults thereunder, or constitute a waiver, release or an estoppel of by or against any of Assignee's rights or remedies under the Loan Documents, in law and/or in equity, all of which rights and remedies are specifically reserved.

Furthermore, no forbearance, delay or inaction in the declaration of an Event of Default (as defined in the Loan Documents) or consequential exercise of its rights and remedies under the Loan Documents, at law or at equity, and no continuing performance by Assignee or Borrower

under the Loan Documents: (a) shall constitute a modification or alteration of the terms, conditions or covenants of the Loan, all of which remain in full force and effect; (b) shall constitute a waiver, release or limitation of any of Assignee's rights or remedies, all of which are expressly reserved; or (c) shall relieve or release Borrower in any way from any of their respective obligations or agreements under the Loan Documents.

Sincerely yours,

2999 TURTLE CREEK LLC

By: ______________________

Name: Joshua Zegen
Title: Authorized Signatory

HNGH TURTLE CREEK, LLC,
a Delaware limited liability company

By: HN Capital Partners, L.L.C.,
a Delaware limited liability company,
its Manager

By: ______________________
Vipin Nambiar, Managing Member

under the Loan Documents: (a) shall constitute a modification or alteration of the terms, conditions or covenants of the Loan, all of which remain in full force and effect; (b) shall constitute a waiver, release or limitation of any of Assignee's rights or remedies, all of which are expressly reserved; or (c) shall relieve or release Borrower in any way from any of their respective obligations or agreements under the Loan Documents.

Sincerely yours,

2999 TURTLE CREEK LLC

By: ______________________________

Name:
Title:

HNGH TURTLE CREEK, LLC,
a Delaware limited liability company

By: HN Capital Partners, L.L.C.,
a Delaware limited liability company,
its Manager

By:______________________________
Vipin Nambiar, Managing Member

# EXHIBIT B

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. DC-20-05864-A

| | | |
|---|---|---|
| 2999TC ACQUISITIONS, L.L.C., f/k/a MO 2999TC, L.L.C., PLAINTIFF, | ) | IN THE DISTRICT COURT |
| VS. | ) | DALLAS COUNTY, TEXAS |
| HNGH TURTLE CREEK, L.L.C., WILLIAM L. HUTCHINSON, VIPIN NAMBIAR, HN GREEN HOLLOW CAPITAL PARTNERS, L.L.C., 2999 TURTLE CREEK, L.L.C., and MADISON REALTY CAPITAL, L.P., DEFENDANTS. | ) | 14TH JUDICIAL DISTRICT |

---

PLAINTIFF'S MOTION TO DETERMINE SECURITY

FOR INJUNCTIVE RELIEF

TESTIMONY OF VIPIN NAMBIAR

---

On the 5th day of November, 2020, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Eric V. Moyé, Judge Presiding, held via Zoom in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenotype machine.

DIANE L. ROBERT, CSR, RPR
TEXAS CSR NO. 2179
Expiration Date: 11/30/2021
Official Court Reporter of the 14th
Judicial District Court
Dallas County, Texas
600 Commerce Street, Dallas, Tx 75202
214-653-7298

APPEARANCES

REPRESENTING PLAINTIFF 2999TC ACQUISITIONS, L.L.C., f/k/a MO 2999TC, L.L.C.:

MR. ROYCE WEST
Texas Bar No. 21206800
royce.w@westllp.com
MR. CRAIG A. CAPUA
Texas Bar No. 03783950
craig.c@westllp.com
WEST ASSOCIATES, L.L.P.
320 South R.L. Thornton Freeway, Suite 300
Dallas, Texas 75203
Telephone: (214) 941-1881
Facsimile: (214) 941-1399

- and --

REPRESENTING DEFENDANT HNGH TURTLE CREEK, L.L.C., VIPIN NAMBIAR, WILLIAM L. HUTCHINSON, HN GREEN HOLLOW CAPITAL PARTNERS, L.L.C.:

MR. RUSTY J. O'KANE
Texas Bar No. 24088149
rusty.okane@wickphillips.com
MR. ZACHARY FARRAR
zachary.farrar@wickphillips.com
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

- and -

REPRESENTING DEFENDANT 2999 TURTLE CREEK, L.L.C:

MR. DOUGLAS WADE CARVELL
wcarvell@legaltexas.com
HOGE & GAMEROS
6116 N. Central Expressway
Suite 1400
Dallas, Texas 75206
Telephone: 214-765-6000

VOLUME 1

PLAINTIFF'S MOTION TO DETERMINE SECURITY

Testimony of Vipin Nambiar

August 3, 2020


| | PAGE | VOL. |
|---|---|---|
| Appearances .................................... | 4 | 1 |
| Proceedings .................................... | 4 | 1 |

| Vipin Venugopal Nambiar | Direct | Cross | V.Dire |
|---|---|---|---|
| By Mr. O'Kane | 5 v1 | | |
| By Mr. West | | 11 v1 | |

| | PAGE | VOL. |
|---|---|---|
| Reporter's Certificate .......................... | 15 | 1 |

P R O C E E D I N G S

(Requested excerpt as follows:)

THE COURT: Okay. Mr. O'Kane?

MR. O'KANE: Yes, Your Honor. I would call Vipin Nambiar.

THE COURT: Okay. Is he with us?

MR. O'KANE: He is going to log in here right now.

THE COURT: Good.

MR. O'KANE: Or momentarily, Judge.

Would you like to swear him in, Your Honor?

THE COURT: Is he with us?

MR. O'KANE: Oh, yes, sir, he's on.

THE COURT: Okay. Please raise your right hand, sir, and be sworn.

(Witness sworn.)

THE COURT: State your full name for the record, please.

THE WITNESS: Vipin Venugopal Nambiar.

THE COURT: Okay. Now, I can spell that, but I'm not sure my court reporter can, so will you spell that for her, please.

Spell your name, please.

THE WITNESS: I'm sorry; I'm getting some

feedback, Your Honor.

It's V-I-P-I-N V-E-N-U-G-O-P-A-L, last name is N-A-M-B-I-A-R.

THE COURT: Outstanding. Thank you very much, sir. That's exactly how I had spelled it.

Proceed with your questioning, Mr. O'Kane.

VIPIN VENUGOPAL NAMBIAR,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. O'KANE:

Q. Mr. Nambiar, what, if any, position do you hold with the Defendant HNGH Turtle Creek, L.L.C.?

THE WITNESS: Rusty, I'm getting -- I'm getting an echo. I'm going to log out and log back in, in just one second.

MR. O'KANE: Okay.

Sorry, Your Honor.

THE COURT: These are the issues you should have worked out before we got on this morning.

MR. O'KANE: We did. I apologize.

THE COURT: Well, obviously we did not. Hence my comment.

(Discussion off the record ensued.)

THE COURT: We're going to take about a five-minute break.

Work out your issues ASAP, please. Thank you.

MR. O'KANE: Can you hear okay, Vipin?

THE WITNESS: No, ma'am. I'm just on my laptop; I'm hearing the sound two times.

(Discussion off the record ensued.)

THE COURT: Are we ready to proceed, lady, gentlemen?

MR. O'KANE: Yes, Your Honor.

THE COURT: All right. Proceed with your examination, Mr. O'Kane.

MR. O'KANE: All right.

BY MR. O'KANE:

Q. Mr. Nambiar, where we left off, what is your position -- what position do you hold with HNGH Turtle Creek, L.L.C.?

A. I'm the manager of the L.L.C.

Q. And --

MR. WEST: I couldn't understand -- I couldn't understand the response.

A. I am the manager of the L.L.C.

Q. (BY MR. O'KANE) Does HNGH have any agreement with the borrower?

A. Not at all.

Q. What, if any, involvement did HNGH have with

the loan at issue?

THE COURT: How does that assist this Court in determining what the proper bond should be, Mr. O'Kane? I'm not following this line of questioning.

MR. O'KANE: The protective advances, Judge. I'll move forward to get to that point.

THE COURT: Please do.

Q. (BY MR. O'KANE) Does HNGH -- Is HNGH required to make any payments while the loan is in default?

A. Yes, we are. We acquired a subordinate Participation Agreement --

MR. WEST: Your Honor, objection --

(Audio distortion - multiple speakers).

MR. WEST: Objection, Your Honor.

THE COURT: Just a minute, just a minute.

What's the basis of the objection, Mr. West?

MR. WEST: Asked and answered. The question was very specific, "Are you required to make any payments", and he answered the question.

THE COURT: Please just answer the question that's posed to you; don't explain, sir.

Ask your question again, Counsel.

Q. (BY MR. O'KANE) Is HNGH required to make any payments while the loan is in default?

A. Yes.
Q. What is HNGH required to pay?
A. $245,000 a month.
Q. And why is HNGH --
MR. WEST: Rusty, --
I apologize, Your Honor. I can't understand the answer.
THE COURT: Okay. Sir, you're going to have to get a little bit closer to the microphone. Speak more slowly and a little by louder for us, if you don't mind.
THE WITNESS: Absolutely, Your Honor.
THE COURT: Who is -- I'm sorry. Who's joined us at 549-7658, please?
MR. O'KANE: That's Mr. --
THE WITNESS: That is me, Your Honor. My computer was creating a sound loop, so I muted that and dialed in with my phone.
THE COURT: All right.
Q. (BY MR. O'KANE) So, Vipin, if you wouldn't mind, just speak a little more clearly into your phone.
How much is HNGH required to pay?
A. Approximately $245,000 a month.
Q. And why does HNGH have to make those payments?
A. HNGH has a subordinate position as is customary

in structured finance when you have a first loss position, you keep the structure above you financially --

MR. WEST: Objection, nonresponsive --

A. -- and preserve your rights under the Participation Agreement.

MR. WEST: Your Honor, nonresponsive.

THE COURT: That objection is overruled.

Q. (BY MR. O'KANE) Mr. Nambiar, please continue.

A. By keeping the -- By making those payments and keeping the loan structure that, you know, structurally senior to HNGH, we preserve the rights that we have under the Participation.

Q. Are you making those payments to or on behalf of the borrower?

A. We are not. Those payments are strictly pursuant to the Participation Agreement.

Q. And are you required to make those payments while the appeal is pending?

A. We are.

Q. You're familiar with the BOVs?

A. I am.

Q. How do those -- What was the range of values on those BOVs?

A. I believe it was 27 million to $32 million.

Q. And what does that represent?

A. That represents current market conditions and the opinion of the broker, which in this case are nationally/internationally renown firms on what the lender might be able to receive if it ran foreclosure sale based on current market conditions.

Q. And has the current market condition in the Dallas real estate market changed in the last 12 months?

A. Specifically for the hospitality industry, which was the use of this particular property, conditions have changed dramatically. Hotel demand is down over 70 percent in Dallas. There's almost no financing available for the sale of hotels. It is the most -- one of the most distressed --

MR. WEST: Your Honor.

(Audio distortion - multiple speakers).

MR. WEST: Objection; narrative response.

THE COURT: Overruled.

MR. O'KANE: I don't have any other further questions, Judge.

THE COURT: Thank you very much.

Mr. West, questions of this witness?

MR. WEST: Yes, I do, Your Honor.

THE COURT: Proceed.

CROSS-EXAMINATION

BY MR. WEST:

Q. Mr. Vipin -- I'm sorry, Mr. Nambiar, correct?

A. Yes.

Q. How long -- How long have you been in the hotel industry?

A. About 17 years, Your -- sir.

Q. And you're currently the owner of the Virgin Hotel here in Dallas; is that correct?

(Clarification by the reporter.)

Q. The owner of the Virgin Hotel here in Dallas?

A. I am not the owner, Mr. West. I'm involved as an investor and asset manager. There are a series of investors that own the property.

Q. Okay. What is your -- What is your relation to the W Hotel? What is your participation in the W Hotel?

THE COURT: Counsel, how is that going to assist this Court in determining what the bond should be?

MR. WEST: Judge, in terms of helping to establish exactly what the hotel industry's occupancy is right now.

THE COURT: I don't know that the -- I don't know that the history of occupancy at this point is going to help me, Counsel.

MR. WEST: Okay. Very good.
Q. (BY MR. WEST) You indicated that you've been in the hotel industry as an investor for an extended period of time; is that correct?
A. Yes, sir.
Q. Okay. When you go to a lender do you normally use a BO- -- BOV, or do you normally use a certified appraisal?
A. They are two different issues. If a lender was making a loan, appraisals are common, but if our analyzing --
Q. The ques- --
(Audio distortion - multiple speakers).
A. -- feasibility of the project --
Q. The question -- The question was: If you go to a lender do you use a BOV or do you use an appraisal in order to get money? That's the question.
A. Well, the lenders always order an appraisal, but that is different than what you --
MR. WEST: Thank you very much.
A. -- in this --
(Audio distortion - multiple speakers).
MR. WEST: Thank you.
No further questions.
THE COURT: Thank you very much.

Mr. Carvell, any questions from you?
MR. CARVELL: No, Your Honor.
THE COURT: All right. Thank you very much.
You're excused, sir.
Any further testimony, Mr. O'Kane?
MR. O'KANE: No, Your Honor.
THE COURT: All right. Okay.
MR. WEST: Your Honor, one other -- one other question.
Q. (BY MR. WEST) Mr. Nambiar, you would agree with me that your Participation Agreement says that you may make the payments, it doesn't require that you make the payments; is that correct?
MR. O'KANE: He's already been excused; he left.
MR. WEST: Well, he --
THE COURT: Well, listen. Whether the agre- -- whether the agreements -- what the agreement says is what the agreement says, whether he agrees with you or not. So no blood, no foul.
MR. O'KANE: If the Court would like me to get him back I can.
THE COURT: No, I think the agreement will speak for itself and I'm sure, whether he agrees or not,

the agreement is what the agreement says.

I assume from Mr. West's question that the agreement says "may", it's not required. So whether he thinks -- then if -- That's all I need.

All right.

I will want to hear some argument now.

(End of requested excerpt.)

STATE OF TEXAS

COUNTY OF DALLAS

I, Diane L. Robert, Official Court Reporter in and for the 14th District Court of Dallas, Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all requested portions of evidence and other proceedings requested orally by counsel for the parties to be included in this excerpt of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

WITNESS MY OFFICIAL HAND, on this the 11th day of November, 2020.

By: /s/Diane L. Robert
Diane L. Robert, CSR
Texas CSR 2179
Official Court Reporter
14th District Court
Dallas County, Texas
600 Commerce Street
Dallas, Texas 75202
Telephone: 214.653.7298
Expiration: 11/30/2021
drobert@irareporting.com

# EXHIBIT C

**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **7754611** | Incorporation Date / Formation Date: | **12/16/2019** (mm/dd/yyyy) |
| Entity Name: | **HNGH TURTLE CREEK, LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **CAPITOL SERVICES, INC.** | | |
| Address: | **1675 S STATE ST STE B** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | **800-316-6660** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

View Search Results New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

# EXHIBIT D

**ELECTRONICALLY RECORDED 202000001928**
**01/03/2020 09:50:10 AM AL 1/5**

2999 TURTLE CREEK LLC,
a Delaware limited liability company,

Assignor,

to

AXOS BANK

Assignee

---

NOTICE OF COLLATERAL ASSIGNMENT OF DEED OF TRUST AND LOAN DOCUMENTS

---

Dated: As of December 31, 2019

Location: 2999 Turtle Creek
Dallas, Texa

County: Dallas

Prepared by, ~~and after recordation please return to:~~

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Attention: Erik F. Andersen, Esq.

Record and Return to:
First National Real
Estate Services, LLC
300 Rector Place, 4i
New York, NY 10280

**NOTICE OF COLLATERAL ASSIGNMENT OF DEED OF TRUST AND LOAN DOCUMENTS**

This NOTICE OF COLLATERAL ASSIGNMENT OF DEED OF TRUST AND LOAN DOCUMENTS (this "Notice") is entered into as of December 31, 2019 by and between **2999 TURTLE CREEK LLC,** a Delaware limited liability company ("Assignor"), whose address is c/o Madison Realty Capital, 520 Madison Avenue, Suite 3501, New York, New York 10022, for the benefit of **AXOS BANK** ("Assignee"), whose address is 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122.

W I T N E S S E T H :

WHEREAS, Assignor made a loan (as such loan has been amended, modified, extended, renewed, consolidated, reduced, spread or recast from time to time, the "Collaterally Assigned Loan") evidenced by the Collaterally Assigned Note (defined below) which is governed and further evidenced by that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of September 20, 2019, made by 2999TC Acquisitions, LLC, a Delaware limited liability company (f/k/a MO 2999TC, LLC, a Delaware limited liability company) (together with its successors and assigns, "Fee Owner"), as grantor, in favor of Michael B. Massey, as trustee, for the benefit of Assignor, which was recorded on September 23, 2019 in the Official Public Records, Dallas County, Texas, under Clerk's File No. 201900253450, as the same may from time to time be amended, restated, supplemented or otherwise modified (the "Collaterally Assigned Deed of Trust");

WHEREAS, Assignor is the current owner and holder of that certain Secured Promissory Note, dated as of September 20, 2019, in the original principal amount of Thirty-Two Million Five Hundred Thousand and No/100 Dollars ($32,500,000.00) made by Fee Owner, payable to the order of Assignor (the "Collaterally Assigned Note");

WHEREAS, the Collaterally Assigned Note is secured by, inter alia, the Collaterally Assigned Deed of Trust, covering the real property described on Exhibit A attached hereto and incorporated herein by reference (the "Land") and all improvements now or hereafter situated on the Land (the "Improvements") (the Land and the Improvements being herein referred to as the "Property");

WHEREAS, the Collaterally Assigned Note is also secured by, inter alia, that certain Assignment of Leases and Rents, dated as of September 20, 2019, made by Fee Owner, as assignor, in favor of Assignor, as assignee, recorded on September 23, 2019 in the Official Public Records, Dallas County, Texas, under Clerk's File No. 201900253451 (the "Collaterally Assigned ALR"), assigning to Assignor all rents, leases, income, revenues, issues, profits and proceeds which may arise from the operation or ownership of the Property;

WHEREAS, for purposes of this Notice, the Collaterally Assigned Note, the Collaterally Assigned Deed of Trust, the Collaterally Assigned ALR, together with the Collaterally Assigned Loan Documents described in the Loan Agreement (defined below) and all other documents, instruments, and agreements evidencing, securing or pertaining to the Collaterally Assigned Loan, are collectively referred to herein as the "Collaterally Assigned Documents";

WHEREAS, pursuant to the terms of that certain Loan and Security Agreement, dated as of the date hereof (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "Loan Agreement"; capitalized terms used but not defined herein shall have the meanings set forth in the Loan Agreement), between Assignor, as borrower, and Assignee, as lender, Assignor has obtained a loan in the amount of Seventeen Million Eight Hundred Fifty Thousand and No/100 Dollars ($17,850,000.00) (the "Loan") from Assignee which is evidenced by that certain Promissory Note, dated as of the date hereof (as the same may be issued, supplemented, amended, restated, renewed, replaced, substituted, modified or extended from time to time, the "Note"), made by Assignor payable to the order of Assignee in the original

principal amount of the Loan (for purposes of this Assignment, any and all of the documents, instruments, and agreements evidencing, securing or pertaining to the Note and Loan Agreement, are collectively referred to herein as the "Loan Documents"); and

WHEREAS, as set forth in the Loan Agreement, Assignor has collaterally assigned to Assignee all of Assignor's right, title and interest in and to the Collaterally Assigned Documents as security for the payment of the Loan.

NOW, THEREFORE, this Notice hereby serves as record notice that to secure Assignor's obligations under the Loan Documents, as set forth in the Loan Agreement, Assignor has collaterally TRANSFERRED, ASSIGNED, PLEDGED, SOLD, GRANTED and CONVEYED unto Assignee a first priority security interest in and to the Collaterally Assigned Documents, together with all rights, titles, liens, assignments and interests (including security interests) pertaining to or arising from or under the Collaterally Assigned Documents, including, but not limited to, the lien and security interest created in and evidenced by the Collaterally Assigned Deed of Trust securing the payment of the Collaterally Assigned Note, and together with all other documents, instruments and certificates or other writings executed or delivered to Assignor in connection with or pertaining to the transactions and indebtedness governed, secured or covered by the Collaterally Assigned Documents, together with all rights, titles, liens, assignments and interests (including security interests) pertaining thereto or arising therefrom or thereunder. In furtherance thereof, Assignee is entitled to exercise upon any Event of Default all rights of Assignor in the Collateral, and to do all things deemed necessary by Assignee to perfect the security interest and preserve, collect, enforce and protect the Collateral, including, but not limited to, transferring title into the name of Assignee, or its nominee, or receipting for, settling, or otherwise realizing upon the Collateral. Without limiting the foregoing, Assignee may, in its discretion, endorse as Assignor's agent, the Collaterally Assigned Documents and any instruments or documents constituting or evidencing the Collateral, contact Fee Owner directly to verify, receive or collect the Collateral, take control of the Collaterally Assigned Documents and the Collateral and use cash Collateral. Assignee shall not be liable for any act or omission on the part of Assignee, its officers, agents or employees, except for gross negligence or willful misconduct on the part of Assignee or such parties as determined by a final non-appealable order of a court of competent jurisdiction, nor shall Assignee be responsible for depreciation in value of the Collateral or for preservation of rights against third parties.

Additionally, Assignor is only entitled to foreclose on the Property or take a deed-in-lieu thereof in accordance with the terms of the Loan Agreement which, among other things, requires as a condition thereto that Assignor grants, conveys and assigns to Assignee a first lien and security interest in and to the Property. Assignor has agreed to execute, procure and deliver any and all such documents and instruments as Assignee may require to evidence such first lien and security interest. The Loan Agreement contains further obligations and restrictions on Assignor at a foreclosure sale.

*[The balance of this page was intentionally left blank. Signature page follows.]*

EXECUTED as of the date first above written.

**ASSIGNOR:**

**2999 TURTLE CREEK LLC,**
a Delaware limited liability company

By: ______________________
Name: David Speiser
Title: Authorized Signatory

STATE OF NEW YORK )
ss.
COUNTY OF NEW YORK )

On the 26th day of December in the year 2019, before me, the undersigned, personally appeared David Speiser, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

______________________
Notary Public
My commission expires:

JIGANASA PARIKH-SILO
Notary Public, State of New York
No. 01PA6179443
Qualified in Richmond County
Certificate on file in New York County
Commission Expires 07/13/23

04/13/2020

EXHIBIT A

Description of Land

BEING a tract ofland situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas.

**Filed and Recorded**
**Official Public Records**
**John F. Warren, County Clerk**
**Dallas County, TEXAS**
**01/03/2020 09:50:10 AM**
**$42.00**
**202000001928**

# EXHIBIT E

**NOTICE OF CONFIDENTIALITY RIGHTS**: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED OF RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**ASSIGNMENT OF DEED OF TRUST AND ASSIGNMENT OF LEASES AND RENTS**

KNOW THAT

**2999 TURTLE CREEK LLC**
**520 Madison Avenue, Suite 3501**
**New York, New York 10022**

"**Assignor**",

in consideration of TEN and 00/100 DOLLARS ($10.00) and other valuable consideration paid by

**HNGH TURTLE CREEK, LLC**
**600 5th Avenue, 2nd Floor**
**New York, New York 10020**

"**Assignee**",

hereby assigns the unto the Assignee, without recourse to Assignor in any event, the deed of trust and assignment of leases and rents, as is more fully described on Schedule B, attached hereto and made a part hereof, against the property commonly known as 2999 Turtle Creek, Dallas, Texas 75219, as is more fully described on Schedule A, attached hereto and made a part hereof.

TOGETHER with the bonds or notes or obligations described in said deed of trust and assignment of leases and rents, and the monies due and to grow due thereon with the interest;

TO HAVE AND TO HOLD the same unto Assignee and to the successors, legal representatives and assigns of Assignee forever.

IT IS EXPRESSLY UNDERSTOOD AND AGREED that this Assignment is made without any recourse to, and without any covenant or warranty, express or implied, by the Assignor in any event whatsoever, except as otherwise provided in that certain Assignment and Assumption of Assigned Rights and Obligations dated on or about the date hereof by and between Assignee and the signatory hereto.

The word "assignor" or "assignee" shall be construed as if it read "assignors" or "assignees" whenever the sense of this instrument so requires.

IN WITNESS WHEREOF, the Assignor has duly executed this Assignment as of the 7th day of December, 2020.

**2999 TURTLE CREEK LLC**

By:________________________
Name: Joshua Zegen
Title: Authorized Signatory

STATE OF New York )
)ss:
COUNTY OF New York )

On the 2nd day of December in the year 2020, before me, the undersigned, personally appeared, Joshua Zegen, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

____________________
Notary Public

TOM KORDENBROCK
Notary Public, State of New York
No. 01KO6371148
Qualified in New York County
Commission Expires February 20, 2022

## SCHEDULE A

## PROPERTY DESCRIPTION

BEING a tract of land situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas.

## SCHEDULE B

## DEED OF TRUST SCHEDULE

Deed of Trust, Security Agreement and Fixture Filing dated as of September 20, 2019, by MO 2999TC, LLC in favor of Michael B. Massey, as Trustee for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253450,

Assignment of Leases and Rents dated as of September 20, 2019, by MO 2999TC, LLC for the benefit of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on September 23, 2019 as Instrument No. 201900253451,

As collaterally assigned by Notice of Collateral Assignment of Deed of Trust and Loan Documents dated as of December 31, 2019, by 2999 Turtle Creek LLC in favor of Axos Bank, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on ________________ as Instrument No. ____________________,

As collateral assignment was terminated by Termination of Notice of Collateral Assignment of Deed of Trust and Lona Documents dated as of _____________, by Axos Bank in favor of 2999 Turtle Creek LLC, recorded in the Office of the County Clerk for the County of Dallas, State of Texas, on _________________ as Instrument No. __________________.

**Dallas County**
**John F. Warren**
**Dallas County Clerk**

**Instrument Number:** 202000341904

eRecording - Real Property

Recorded On: December 08, 2020 11:12 AM

Number of Pages: 5

**" Examined and Charged as Follows: "**

Total Recording: $38.00

*********** THIS PAGE IS PART OF THE INSTRUMENT ***********
Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**File Information:**

| | |
|---|---|
| Document Number: | 202000341904 |
| Receipt Number: | 20201208000305 |
| Recorded Date/Time: | December 08, 2020 11:12 AM |
| User: | Hilga R |
| Station: | CC17 |

**Record and Return To:**
CSC Global

**STATE OF TEXAS**
**COUNTY OF DALLAS**

**I hereby certify that this Instrument was** FILED **In the File Number sequence on the date/time printed hereon, and was duly** RECORDED **in the Official Records of Dallas County, Texas.**

John F. Warren
Dallas County Clerk
Dallas County, TX

# EXHIBIT F

When Recorded, Return To:
Happy State Bank
Attn: Austin Nash
16633 North Dallas Parkway, Suite 350
Addison, Texas 75001

Loan No. 4000017910

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

# COLLATERAL TRANSFER OF NOTE AND LIEN

This Collateral Transfer of Note and Lien (this "Agreement") is dated as of December 4, 2020 (the "Effective Date"), by and between HNGH TURTLE CREEK, LLC, a Delaware limited liability company ("Grantor"), located at 2999 Turtle Creek Blvd., Dallas, Texas 75219, and HAPPY STATE BANK, a Texas banking association ("Secured Party"), located at One Hanover Park, 16633 North Dallas Parkway, Suite 350, Addison, Texas 75001.

## RECITALS

A. WHEREAS, Grantor has executed a Letter Loan Agreement, Promissory Note and other related documents dated as of the Effective Date, and as may be modified, renewed and extended (collectively, the "Loan Documents") to secure a loan ("Loan");

B. WHEREAS, Secured Party requires that, as a condition of the Loan, Grantor execute this Agreement, pledging certain Note(s) and Lien(s) as collateral for the Loan, as further described below.

## AGREEMENT

All of Grantor's interest in the Collateral Note and the Collateral Note Security (as defined below, including accessions) will be deemed collateral for the Loan ("Collateral"), as is further described in Sections 1 and 2 below:

1. Collateral Note. A Secured Promissory Note in the stated principal amount of $32,500,000.00, executed by MO 2999TC, LLC, a Delaware limited liability company ("Collateral Note Maker"), dated September 20, 2019. The current principal balance on the Collateral Note is $32,500,000.00.

2. Collateral Note Security. Deed of Trust, Security Agreement and Fixture Filing dated September 20, 2019 from Borrower in favor of the trustee identified therein and now in favor of Grantor and recorded as Document No. 201900253450 in the Official Public Records of Dallas County, Texas (the "Deed of Trust") which Deed of Trust created liens on, among other property, the real property situated in Dallas County, Texas and described as follows:

   BEING a tract of land situated in the James A. Sylvester Survey Abstract No. 1383, and the John Grisby Survey, Abstract No. 495, City of Dallas Block No. A/1031, Texas and being all of Lot 4, Block A/1031, of TURTLE CREEK OFFICE ADDITION, an Addition to the City of Dallas, Texas, according to the plat thereof recorded in Volume 2003162, Page 48, Deed Records, Dallas County, Texas.

   and commonly known as 2999 Turtle Creek Blvd., Dallas, Texas 75219; and Assignment of Leases and Rents dated September 20, 2019 executed by Collateral Note Maker now in favor of Grantor and recorded as Document No. 201900253451 in the Official Public Records of Dallas County, Texas.

3. Description of the Loan. Grantor has executed and delivered to Secured Party a Promissory Note, dated December 4, 2020 in the maximum stated principal amount stated therein, and as may be modified, renewed and extended.

4. Security Interest. Grantor grants to Secured Party a security interest in the Collateral and all its proceeds to secure the Loan and all renewals and extensions of the Loan. This security interest also secures all other present and future debts and liabilities of Grantor to Secured Party, including future advances.

5. Representations Warranties and Agreement of Grantor.

   A. **Grantor represents and warrants the following:**

i. Grantor owns the Collateral and has the authority to grant this security interest, free from any setoff, claim, restriction, security interest or encumbrance except liens for taxes not yet due and the lien that shall be released as of the Effective Date held by Axos Bank, as previously disclosed to the Secured Party.

ii. All information about Grantor's financial condition is or will be accurate when provided to Secured Party.

iii. Except as has been previously disclosed to Secured Party by Grantor, the Collateral Note has not been modified and is not in default.

iv. To the best knowledge of Grantor, there are no defenses or offsets to payment of the Collateral Note.

v. The lien of the Collateral Note Security is a first lien.

vi. The Collateral represents the valid, legally enforceable obligation of the Collateral Note Maker.

**B. Grantor agrees to:**

i. Defend the Collateral against all claims adverse to Secured Party's interest and keep the Collateral free from liens, security interests, and other claims.

ii. Pay all of Secured Party's expenses incurred to obtain, preserve, perfect, defend, and enforce this Agreement or the Collateral and to collect or enforce the Loan, provided that Secured Party will take reasonable steps to consult with Grantor in the incurrence of such enforcement costs. These expenses will bear interest from the date of advance at the highest rate allowed by law and are payable on demand at the place where the Loan is payable. These expenses and interest will become part of the Loan and will be secured by this Agreement.

iii. Sign any documents that Secured Party considers necessary to obtain, maintain, and perfect this security interest.

iv. Notify Secured Party immediately of any material change in the Collateral; change in Grantor's name, address, or location; change in any warranty or representation in this Agreement; change that may affect this security interest; and any event of default.

v. Maintain accurate records of the Collateral; furnish Secured Party any requested information related to the Collateral; and allow Secured Party to inspect and copy all records relating to the Collateral.

vi. Perform all obligations required under the Collateral Note Security.

vii. Preserve the liability of all obligors on the Collateral and preserve the priority of all security for the Collateral.

viii. On Secured Party's demand, deposit all payments received as proceeds of the Collateral in a special bank account designated by Secured Party, who alone will have power of withdrawal.

**C. Grantor agrees not to:**

i. Renew, extend or modify the Collateral Note or grant releases of any part of the property securing the Collateral Note except as otherwise consented to by the Secured Party.

ii. Modify any terms in the Collateral Note Security.

**D. Default and Remedies**

i. Defaults are:

a. failing to timely pay or perform any obligations under the Loan or Loan Documents, or any covenant, or liability in any written agreement between Grantor and Secured Party;

b. making any false warranty, covenant or representation in this Agreement to Secured Party;

c. having a receiver appointed for Grantor or any of the Collateral;

d. assigning the Collateral for the benefit of creditors;

e. to the extent permitted by law, having bankruptcy or insolvency proceedings commenced against or by any of the following parties: Grantor; any partnership of which Grantor is a general partner; or any maker, drawer, acceptor, endorser, guarantor, surety, accommodation party, or other person liable on or for any part of the Loan;

f. the dissolution of any of the following parties: Grantor; any partnership of which Grantor is a general partner; or any maker, drawer, acceptor, endorser, guarantor, surety, accommodation party, or other person liable on or for any part of the Loan.

ii. Secured Party may at any time:

a. take control of any proceeds of the Collateral;

b. release any Collateral in Secured Party's possession to any Grantor, temporarily or otherwise;

c. take control of proceeds of insurance on the Collateral Note Security and reduce any part of the Loan accordingly or permit Grantor to use such funds to repair or replace damaged or destroyed Collateral covered by insurance;

d. demand, collect, convert, redeem, settle, compromise, receipt for, realize on, sue for, and adjust the Collateral either in Secured Party's, Grantor's name, as Secured Party desires; or

e. exercise all other rights available to an owner of such Collateral.

iii. During the existence of any event of default, Secured Party may:

a. declare the unpaid principal and earned interest of the Loan immediately due in whole or part;

b. enforce the Loan; and

c. exercise any rights and remedies granted by law or this Agreement.

iv. Foreclosure of this security interest by suit does not limit Secured Party's remedies, including the right to sell the Collateral under the terms of this Agreement. Secured Party may exercise all remedies at the same or different times, and no remedy is a defense to any other. Secured Party's rights and remedies include all those granted by law or otherwise, in addition to those specified in this Agreement.

v. If the Collateral is sold after default, recitals in the bill of sale or transfer will be prima facie evidence of their truth and all prerequisites to the sale specified by this Agreement and by law will be presumed satisfied.

**E. Collateral Note/Enforcement of Power of Sale**

i. Grantor has endorsed and delivered the Collateral Note to Secured Party. Secured Party is the holder of the Collateral Note. Secured Party recognizes that Grantor has commenced foreclosure proceedings under the terms of the Collateral Note and Grantor hereby has Secured Party's express consent to continue such proceedings. On Grantor's foreclosure under the terms of the Collateral Note, Grantor will grant to Secured Party a first priority lien on the real property securing the Collateral Note. Notwithstanding the foregoing, if Grantor sells the property securing the Collateral Note on foreclosure for a cash price, the proceeds will be applied to the outstanding balance of the Loan, including all interest and fees, and will not become and/or remain the property of Grantor, but are by this Agreement irrevocably assigned and conveyed by Grantor to the Secured Party up to the outstanding balance of the Loan, including all interest and fees, together with accrued but unpaid interest and Secured Party's reasonable costs and expenses. Grantor shall only sell the real property securing the Collateral Note to a third party if the outstanding balance of the Loan, including all interest and fees, will be paid in full either from the proceeds of the sale or from a combination of the proceeds of the sale and Grantor's out-of-pocket funds.

ii. Grantor shall take commercially reasonable steps to keep Secured Party informed of all foreclosure actions taken by Grantor. Upon a foreclosure that does not result in a sale to a third party for a cash price, Grantor must provide a mortgagee's title insurance policy with only such exceptions as Secured Party approves and agrees to execute such additional security documents as Secured Party may require for the Loan.

iii. Grantor assigns, transfers, and conveys to Secured Party all amounts due on the Collateral Note. Collateral Note maker is directed to make payments on the Collateral Note in accordance with the Collateral Note payments provision above.

iv. Grantor indemnifies Secured Party from all claims made against or incurred by Secured Party from any action in connection with the Collateral Note or the Collateral Note Security documents.

**F. General**

i. This security interest will neither affect nor be affected by any other security for any of the Loan. Neither extensions of the Loan nor releases of any of the Collateral will affect the priority or validity of this security interest as to any third person.

ii. This Agreement binds, benefits, and may be enforced by the successors in interest of the parties, except as otherwise provided. Assignment of any part of the Loan and Secured Party's delivery of any part of the Collateral will fully discharge Secured Party from responsibility for that part of the Collateral.

iii. Secured Party's delay in exercising, partial exercise of, or failure to exercise any of its remedies or rights does not waive Secured Party's rights to subsequently exercise those remedies or rights. Secured Party's waiver of any default does not waive any further default by Grantor. Secured Party's waiver of any right in this Agreement or of any default is binding only if it is in writing. Secured Party may remedy any default without waiving it.

iv. This Agreement may be amended only by an instrument in writing signed by Secured Party and Grantor.

v. The unenforceability of any provision of this Agreement will not affect the enforceability or validity of any other provision.

vi. **This Agreement will be construed according to Texas law. This Agreement is to be performed in Tarrant County, Texas.**

vii. Interest on the Loan secured by this Agreement will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the Loan or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the Loan or, if the principal of the Loan has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the Loan.

viii. When the context requires, singular nouns and pronouns include the plural.

Executed as of the Effective Date.

**GRANTOR:**

HNGH TURTLE CREEK, LLC,
a Delaware limited liability company

By: HN Capital Partners, L.L.C.,
a Delaware limited liability company,
its Manager

By: [signature]
Vipin Nambiar, Managing Member

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

The foregoing instrument was acknowledged before me on December 3, 2020 by Vipin Nambiar, Managing Member of HN Capital Partners, L.L.C., a Delaware limited liability company, Manager of HNGH Turtle Creek, LLC, a Delaware limited liability company, on behalf of said limited liability companies.

GREG GARZA
Notary Public
STATE OF TEXAS
ID#130864929
My Comm. Exp. Oct. 17, 2024

[signature]
Notary Public, State of Texas

**SECURED PARTY:**

HAPPY STATE BANK,
a Texas banking association

By: ______________________
Julie Blakeley, Branch President

THE STATE OF TEXAS §
§
COUNTY OF Collin §

The foregoing instrument was acknowledged before me on December 2, 2020 by Julie Blakeley, Branch President of Happy State Bank, a Texas banking association.

______________________
Notary Public, State of Texas

LaTrece Miller
Notary Public, State of Texas
Notary ID #12567495-6
My Commission Expires 04-06-2024

**Dallas County**
**John F. Warren**
**Dallas County Clerk**

---

**Instrument Number:** 202000341906

eRecording - Real Property

Recorded On: December 08, 2020 11:12 AM

Number of Pages: 6

---

**" Examined and Charged as Follows: "**

Total Recording: $42.00

---

*********** THIS PAGE IS PART OF THE INSTRUMENT ***********

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**File Information:**

| | |
|---|---|
| Document Number: | 202000341906 |
| Receipt Number: | 20201208000305 |
| Recorded Date/Time: | December 08, 2020 11:12 AM |
| User: | Hilga R |
| Station: | CC17 |

**Record and Return To:**

CSC Global

---




**STATE OF TEXAS**
**COUNTY OF DALLAS**

**I hereby certify that this Instrument was** FILED **In the File Number sequence on the date/time printed hereon, and was duly** RECORDED **in the Official Records of Dallas County, Texas.**

John F. Warren
Dallas County Clerk
Dallas County, TX