**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **2999TC ACQUISITIONS, LLC f/k/a MO 2999TC, LLC, AND TIMOTHY L. BARTON** | § | |
| **Plaintiffs** | § | |
| **v.** | § | **Case No. 3:20-CV-3229** |
| **2999 TURTLE CREEK, LLC, HNGH TURTLE CREEK, LLC, HN GREEN HOLLOW CAPITAL PARTNERS, LLC, MADISON REALTY CAPITAL, LP, VIPIN NAMBIAR, JAMES G. GLASGOW, JR., MARC ZEGEN, AND JOSHUA ZEGEN** | § | |
| **Defendants.** | § | |

**PLAINTIFFS' RESPONSE TO GREEN HOLLOW DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

Plaintiffs 2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC, and Timothy L. Barton (together, "***Plaintiffs***") file this *Response* ("***Response***") *to Defendant HNGH Turtle Creek, LLC* ("***HNGH***"), *HN Green Hollow Capital Partners, LLC* ("***Green Hollow***"), *Vipin Nambiar* ("***Nambiar***"), *and James G. Glasgow's* ("***Glasgow***") (collectively, "***Green Hollow Defendants***") *Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)* (ECF No. 10) ("***Motion to Dismiss***"), and respectfully show the Court as follows:

## I. BACKGROUND

1. Plaintiffs filed their Original Complaint (Doc. 1) on October 22, 2020, alleging numerous claims against the Green Hollow Defendants, and Madison Capital Realty, LP ("***Madison***"), 2999 Turtle Creek, LLC ("***Turtle Creek***"), and two of Madison's principals, Joshua

Zegen and Marc Zegen (collectively, "***Madison Defendants***"), for numerous causes of action for, *inter alia*, Defendants' theft of trade secrets, fraud, tortious interference, and conspiracy related to Madison and Turtle Creek's bad-faith sale of a purported junior subordinate participation interest in Plaintiffs' loan and deed of trust ("***Loan***") on real property in Texas ("***Land***") related to the development of a luxury hotel and branded residence ("***Project***").

2. On November 25, 2020, the Green Hollow Defendants filed a Motion to Dismiss (Doc. 10) related to Plaintiffs' Original Complaint under Federal Rule of Civil Procedure 12(b)(6). Counsel for Plaintiffs and Defendants jointly agreed to extend Plaintiffs' deadline to respond to the Motion to Dismiss to December 30, 2020 (Doc. 16).

3. Because Rule 15(a)(1)(B) allows for amendment as a matter of course following a motion under Rule 12(b) within the same 21-day deadline as the deadline to respond to an opposed motion under Local Rule 7.1(e), Plaintiffs mistakenly believed that the deadline to file an amended complaint would likewise be acceptable through the extended deadline of December 30. Accordingly, to address and clarify certain misstatements and improper allegations of pleading defects in Defendants' Motion to Dismiss, and to raise new issues that occurred since the filing of the Original Complaint (based on Defendants' continuing actions in the underlying dispute), Plaintiffs filed their First Amended Complaint on December 28, 2020 (Doc. 30), which the Court struck for failure to seek leave (Doc. 31).

4. Plaintiffs' Motion for Leave to File their First Amended Complaint (Doc. 32) is now pending before the Court, which has not been decided as of the date of this Response. Plaintiffs have therefore addressed the Motion to Dismiss based on the Original Complaint with supplemental references to the Amended Complaint where applicable.

## II. ARGUMENTS & AUTHORITIES

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In analyzing a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Chauvin v. State Farm Fire & Casualty Co.*, 495 F.3d 232, 237 (5th Cir. 2007). The pleading standard of Rule 8 requires plausible factual support for the allegations within the complaint but does not require "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). When a complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face, it is satisfactory for pleading purposes. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendants have challenged the sufficiency of Plaintiffs' pleadings related to their various claims against the Green Hollow Defendants, including federal and state trade-secret claims, fraud, tortious interference, conspiracy, breach of contract, and declaratory judgment claims. For the reasons stated herein, Plaintiffs' complaint has plausibly stated each and every one of these claims, and Defendants' Motion should be denied in its entirety.

### A. Plaintiffs' Original Complaint Plausibly Pleads a Federal Trade Secret Claim.

The DTSA permits an "owner of a trade secret that is misappropriated" to "bring a civil action under this subsection if the trade secret is related to a product of service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). To make a federal claim under the DTSA, a plaintiff must plausibly allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. *See id*; *Twombly*, 550 U.S. at 570.

Here, the Green Hollow Defendants do not challenge the "interstate commerce" element, which is therefore not at issue, but incorrectly argue that Plaintiffs have failed to plead a "trade secret" and "misappropriation." For the reasons below, Defendants' Motion should be denied.

**i. Plaintiffs have sufficiently pleaded a "trade secret."**

Under the DTSA, a trade secret includes (1) all forms and types of financial, business, and economic information (2) "that the owner has taken reasonable measures to keep secret," and (3) "that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Plaintiffs' pleadings include supported factual allegations for each of these criteria.

**(1) <u>Financial, business, and economic information.</u>**

Plaintiff's Original Complaint describes the general categories of financial, business, and economic information that the Green Hollow Defendants misappropriated. In reference to Plaintiff Barton's meeting with Defendant Glasgow, acting individually and on behalf of Green Hollow, the Complaint describes the type of information that Plaintiff Barton disclosed to Glasgow, including "construction drawings, plans, contractor bids, the contract terms with [the international hotel brand with whom Plaintiffs had contracted], balance sheets, pro formas, and projected returns," along with specific information about Plaintiffs' capital structure and the amount of debt Plaintiffs had incurred to purchase the Land. *See* Compl. ¶ 25.[1]

Similarly, with regard to Plaintiff Barton's meeting with Defendant Nambiar, acting individually and (unknown to Barton at the time) on behalf of HNGH, the Complaint describes the financial, business, and economic information disclosed, including but not limited to financial

[1] *See* Pls.' Am. Compl. ¶ 27, providing additional detail regarding for the capital structure for the development project as context for it status as a trade secret within the real-estate development industry.

projections for the Project, the total amount of capital 2999TC intended to raise, the identity of Lender, the amounts of capital Lender and Madison expected to contribute to the Project, and the amount of debt Barton obligated himself to acquire the Land. *See* Compl. ¶ 34.[2] And again, in its claim for relief, the Complaint states:

> Plaintiffs 2999TC and Barton are the owners of trade secrets related to the Project, including but not limited to, financial projections for the Project, the total amount of capital Plaintiffs intended to raise, the amount of capital Lender and Madison expected to contribute to the Project, the amount of debt the Project would incur and which Plaintiffs had already incurred, including and especially the amount Plaintiff Barton had personally leveraged, the identity of the Project's Investors, contractor bids, the terms of the [international hotel] contract, and designs and plans for the entire development ("***Trade Secrets***").

Compl. ¶ 61.[3] Because federal courts do not require highly specific pleadings for trade secret claims, *see Vest Safety Med. Servs. v. Arbor Envtl., LLC*, No. H-20-0812, 2020 U.S. Dist. LEXIS 124453, at *11 (S.D. Tex. July 15, 2020), these facts as alleged within the Complaint are sufficient to plausibly describe the type of financial, business, and economic information that constitutes a "trade secret" under the DTSA. *See* 18 U.S.C. § 1839(3).

**(2) <u>Reasonable measures to keep secret.</u>**

Plaintiffs' Original Complaint describes the reasonable measures that Plaintiffs took to keep the information secret. Federal courts have made clear that a holder of a trade secret "may divulge his information to a limited extent without destroying its status as a trade secret" in situations where disclosure is "limited" and "communicated to further economic interests." *Eemso, Inc. v. Compex Technologies, Inc.*, No. 3:05-CV-0897-P, at *13 (N.D. Tex. Aug. 31, 2006). Neither a confidential relationship nor a written confidentiality agreement are necessary to establish "reasonable measures." *See id.* (holding that proof of whether disclosure is "limited" is

---

[2] *See* Pls.' Am. Compl. ¶ 37.
[3] *See* Pls.' Am. Compl. ¶ 67.

a multi-factor determination and does not expressly require proof of a confidential relationship); *Hollomon v. O. Mustad Sons (Usa), Inc.*, 196 F. Supp. 2d 450, 459 (E.D. Tex. 2002) ("an express contractual provision is not required to establish a duty of confidentiality").

Here, before disclosing the trade secrets to the Green Hollow Defendants, Barton sought verbal agreements from Glasgow and Nambiar as a condition of disclosure. With regard to Barton's meeting with Glasgow, where Glasgow pretended to be an interested equity investor, the Complaint clearly pleads that Barton only disclosed this information conditioned upon Glasgow's verbal confidentiality agreement and Barton's belief that disclosure would further the economic interests of the Project by recruit a new investor:

> As a result, however, before, during, and after the pitch, Barton made clear that the information being presented was confidential and not to be used to compete with the Project. Glasgow verbally assented to this "gentlemen's agreement" to keep confidential all information disclosed at the meeting.

Comp. ¶¶ 24. The Complaint makes clear that, absent this gentlemen's agreement—a common synonym for a verbal agreement—and his belief that Glasgow was a bona fide investor, Barton would not have disclosed this information. *Id.* at ¶¶ 23-25.[4]

Likewise, with regard to Nambiar's sham investment meeting with Barton, the Complaint states:

> Before, during, and after the meeting, Barton informed Nambiar that the information about the Project was confidential and proprietary and that Nambiar would need to execute a confidentiality agreement and term sheet that would outline the terms of his investment in the Project. Nambiar was informed that the term sheet would include a specific confidentiality and non-disclosure provision, which would formalize the existing oral agreement to keep all information regarding the Project confidential, and would restrict Nambiar from attempting to compete with the Project. Nambiar agreed to keep the information confidential and not to use any information to compete with the Project. Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential. He certainly

[4] *See* Pls.' Am. Compl. ¶¶ 26-27, providing additional context for the meeting, Glasgow's misrepresentations, and the verbal agreement.

> would not have disclosed all of this confidential information had he known about Nambiar's affiliation with Glasgow or HNGH or their intention to purchase the B Note.

Pls.' Am. Compl. ¶ 35.[5] The fact that the agreement was never reduced to writing is immaterial because "**Nambiar agreed** to keep the information confidential and not to use any information to compete with the Project." *See id.* (emphasis added).

In their Motion, Defendants appear to admit the existence of the verbal agreement but in "catch me if you can" fashion, merely take issue with the timing and oral nature of the agreements. Defendants point to no case where a trade secret was dismissed at the pleading stage for lack of a *written* agreement where a *verbal* confidentiality agreement was alleged.[6] This is simply a question of fact for the jury to decide. Defendants seek to convert their Motion to Dismiss into a summary judgment motion, asking the Court to weigh the sufficiency of the evidence instead of the sufficiency of the pleadings. For pleading purposes, Plaintiffs have properly alleged the reasonable measures used to maintain secrecy.

Moreover, the Green Hollow Defendants' argument that Plaintiffs' unredacted pleadings somehow defeat trade secret protection is nonsensical. Information such as Plaintiffs' capital structure and identity of the third-party investors has already been misused by Defendants to such an extent that the value has been destroyed, which is the entire reason for this lawsuit. Other information, such as "construction drawings, plans, contractor bids, the contract terms with the

---

[5] *See* Pls. Am. Compl. ¶¶ 36-38, including additional details about Plaintiff Barton's meeting with Nambiar, Nambiar's specific misrepresentations, and verbal agreement.

[6] The Green Hollow Defendants cite two cases which purport to stand for this proposition but which are distinguishable. First, the New York case of *Mason v. AmTrust Fin. Servs.* (No. 19-CV-8364, 2020 WL 1330688, at *2–3 (S.D.N.Y. Mar. 23, 2020)) deals with the evaluation of evidence in a summary judgment hearing as part of a larger multi-factor analysis and certainly does not hold that lack of a written agreement means dismissal at the pleading stage. Similarly, in the case of *SortiumUSA LLC v. Hunger*, No. 3:11-CV-1656, 2013 WL 11730655, at *12 (N.D. Tex. Mar. 31, 2013), the Northern District applies Georgia law to dismiss a trade secret claim (again, as part of a multi-factor analysis) in which the lack of *any* type of confidentiality agreement was one factor the court considered—not dismissal based solely on the lack of a written agreement, as Defendants misrepresent.

International Hotel, balance sheets, pro formas, and projected returns," do not actually divulge any of the details of these items but merely give the Court enough detail to ascertain the nature of the information identified as trade secrets. *See Vest Safety*, 2020 U.S. Dist. LEXIS 124453, at *11.

**(3) <u>Independent economic value and not readily ascertainable.</u>**

The facts alleged in Plaintiffs' Complaint describe the independent economic value of the trade secrets and why this information would be valuable to the Green Hollow Defendants. Again, even with the heightened pleading requirements under the Federal Rules, the primary purpose of a pleading is still to put the Defendants on fair notice of the claim. *See Twombly*, 550 U.S. at 555. As experienced real estate professionals, Defendants cannot possibly pretend to be confused by the value of business, financial, and economic information such as construction drawings, plans, contractor bids, the contract terms with the managing hotel brand, balance sheets, pro formas, capital structure, identity of investors, and projected returns—critical information related to any real estate development project, which is not generally known to the public. Nevertheless, to address any confusion, Plaintiffs' Amended Complaint provides additional details and context for the value of this information.[7]

Yet even within the Original Complaint, Plaintiffs plausibly alleged why the information was valuable to Plaintiffs by explaining how the Defendants intended to (and did) use it, and thus why it was important for Plaintiff Barton to receive assurances of confidentiality and noncompetition before disclosure:

> Upon information and belief, Madison's true intention for setting this meeting was to provide Glasgow with confidential information about the Project and allow Glasgow to see for himself the real prospective "return" that the B Note might offer, specifically, the full seizure of the Project. By discovering the extent of Barton's personal debt in the Project and his desire to de-leverage himself using the capital raise, Glasgow would have been able to identify the precise "pressure point" (i.e.,

[7] *See* Pls.' Am. Compl. ¶ 27.

> liquidity problems) that he might be able to exploit using the B Note—as long as the terms of the B Note gave enough control to Glasgow, that is.

*See* Compl. ¶ 27. The Original Complaint goes on to describe precisely how those liquidity issues were exploited (*see* Compl. ¶¶ 42-52) and how the plan to effect foreclosure on the Land was put into place long before any alleged default under the Loan ever occurred (*see* Compl. ¶¶ 28-32).

Moreover, the Complaint clearly describes the "economic value" of the third-party investors' identity because removing them from the picture was precisely what would create the cash flow issues that would enable the proper conditions for a default and seizure by HNGH. *See* Compl. ¶¶ 42-44. Moreover, as is clear from the alleged facts, the Green Hollow Defendants would have been unable to acquire this information without the false pretenses presented to Plaintiff Barton, as discussed below. Accordingly, Plaintiffs have plausibly pleaded the value of the trade secrets.

**ii. Plaintiffs have sufficiently pleaded a "misappropriation."**

Under the DTSA, misappropriation includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). "Improper means" includes the "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A).

Plaintiffs' Complaint describes the Green Hollow Defendants' misappropriation of Plaintiffs' trade secrets through numerous "improper means," including intentional misrepresentations, fraudulent nondisclosures, and breaches of confidentiality agreements. With regard to Glasgow:

> On November 4, 2019, Barton met with Josh Zegen and Glasgow at Madison's office in New York City. Just as in his earlier telephone call, Josh introduced Glasgow as a potential investor and Barton proceeded to present the entire pitch for the $100 million equity offering.

Compl. ¶ 24. The Complaint establishes that Glasgow quietly sat through Barton's pitch for the entire $100 million equity offering even though he had already been in talks with Madison, through Joshua and Marc Zegen, to purchase the B Note. *See* Compl. ¶ 22. The pleaded facts thus establish that Glasgow knew that Barton was under a false impression about the purpose of the meeting, but did nothing to correct that impression, while Barton disclosed confidential information (*see* Compl. ¶ 25), which Glasgow agreed to keep secret and not use for competition (*see* Compl. ¶ 24).[8]

With regard to Nambiar, the same is true. Nambiar and Glasgow had already formed HNGH to be the participant in Plaintiffs' Loan (*see* Compl. ¶¶ 28-32) when he met with Barton pretending to be an interested investor. *See* Compl. ¶ 34. Just like Glasgow, Nambiar knew that Barton was under a false impression about the meeting, but Nambiar did nothing to correct that or inform Barton about the B-Note purchase, but instead reinforced his false intentions by telling him he wanted to invest. *See id.* Based on these false pretenses and Nambiar's verbal assurances of confidentiality, Barton disclosed confidential information. *See* Compl. ¶ 35.

Thus, both Glasgow and Nambiar made false representations to Barton about their intentions to invest in the project, allowed him to maintain that false impression while he disclosed information about the Project, and then subsequently used that information they had obtained to (1) enter into the Participation Agreement as a vehicle to gain a controlling interest in Plaintiffs' Loan, (2) use the identity of Plaintiffs' investors to scare them away, and (3) use the knowledge of Plaintiffs' liquidity position to sabotage Plaintiffs' Loan. *See* Compl. ¶¶ 42-52.

---

[8] *See* Pls.' Am. Compl. ¶¶ 25-28.

Contrary to the misstatements in Defendants' Motion to Dismiss, Plaintiffs' Original Complaint denies that the Green Hollow Defendants were ever "expressly authorized" to possess or access the information. Although the Deed of Trust permitted disclosure of certain information by the lender to legitimate, good-faith participants, Plaintiffs' Complaint expressly denies that the Green Hollow Defendants fit this description:

> Lender's sale of the B Note and entry into the Participation Agreement with Plaintiffs' direct competitor was a breach of this provision. First, HNGH is not the type of entity enumerated or contemplated under Section 40. Second, the terms of the Participation Agreement did materially alter the terms of the Loan and Deed of Trust by assigning key rights of communication and enforcement to HNGH without permission, or even notification, to 2999TC, and stripping other key borrowers' rights inherent in every lending transaction, thereby causing injury to 2999TC.

*See* Compl. ¶ 78; *see also id.* at ¶¶ 21-22, 154-159.[9]

In sum, when taken as true and viewed in the light most favorable to Plaintiffs (*see Chauvin*, 495 F.3d at 237), Plaintiffs' pleaded facts plausibly establish that Plaintiffs held trade secrets that Defendants misappropriated in violation of 18 U.S.C. § 1839. As such, the Green Hollow Defendants' Motion to Dismiss should be denied as to Plaintiffs' statutory trade secret claim under the DTSA.

### B. Plaintiffs' Original Complaint Plausibly States a Claim Under the Texas Uniform Trade Secrets Act.

Because the definitions of "trade secret" in the DTSA and Texas Uniform Trade Secrets Act (TUTSA) are "functionally identical," federal courts typically consider federal and state trade secret misappropriation claims together. *See Vest Safety*, 2020 U.S. Dist. LEXIS 124453, at *8 (comparing 18 U.S.C. § 1839(3) with Tex. Civ. Prac. & Rem. Code § 134A.002(6)). In fact, the only difference between the DTSA and the TUTSA is the federal "interstate commerce" requirement, which the Green Hollow Defendants' Motion to Dismiss does not challenge.

[9] *See also* Pls.' Am. Compl. ¶¶ 23, 27, 85.

Accordingly, because Plaintiffs' have plausibly stated a claim for trade secret misappropriation under the DTSA, the pleading requirements under the TUTSA are likewise satisfied.

**C. Plaintiffs' Original Complaint Plausibly States Claims for Fraud and Fraud by Nondisclosure.**

The Green Hollow Parties claim that Plaintiffs' Original Complaint did not state reliance on a false representation or a duty of disclosure required for their fraud claims. However, when taken as true and viewed in the light most favorable to Plaintiffs, the alleged facts in the Original Complaint easily state claims for fraud and fraud by nondisclosure as to these elements.[10]

**i. Glasgow and Nambiar made false representations, individually and on behalf of Green Hollow and HNGH.**

With regard to Glasgow's affirmative misrepresentation, the Complaint states that Glasgow verbally agreed to keep all information disclosed at the meeting confidential and not use it to compete with Plaintiffs. *See* Compl. ¶ 24. This was clearly an intentional misrepresentation to induce Barton's disclosure of information about the Project when Glasgow was already intending to use the information to obtain a participation interest on the Loan in a competitive manner. *See* Compl. ¶¶ 22-26. The Complaint is clear that Glasgow made this misrepresentation both in his individual capacity and as a representative of Green Hollow at the meeting with Barton. *See id.* Moreover, the Complaint also states that Barton relied on these misrepresentations by making disclosures. Compl. ¶¶ 24-25.

Similarly, with regard to Nambiar's affirmative misrepresentations, at the meeting with Barton on January 26, 2020, Nambiar verbally agreed to refrain from disclosing the information he received from Barton or using it to compete with him. *See* Compl. ¶ 35. However, at the time

[10] Although the Original Complaint clearly pleaded the necessary facts, Plaintiffs' Amended Complaint provides greater detail about both the specific misrepresentations and duties to disclose that support these causes of action. *See* Pls.' Am. Compl. ¶¶ 23-29, 88-90, 99-101.

of the meeting, Nambiar had already established HNGH along with Glasgow and Green Hollow expressly for the purpose of obtaining the participation interest in Barton's Loan. *See* Compl. ¶¶ 28-32, 35. And indeed, less than one week after Nambiar's meeting with Barton, HNGH obtained the participation interest. *See* Compl. ¶ 37. The Complaint further states that Barton relied upon Nambiar's representation:

> Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential. He certainly would not have disclosed all of this confidential information had he known about Nambiar's affiliation with Glasgow or HNGH or their intention to purchase the B Note.

Compl. ¶ 35. Thus, the Original Complaint plainly alleges facts showing that Nambiar and Glasgow made false representations to Barton, and that Barton relied upon those misrepresentations.

**ii. Glasgow and Nambiar were under a duty to correct false impressions from their partial disclosures.**

Under Fifth Circuit precedent, it is well established that "a duty to speak the full truth arises when a defendant undertakes the duty to say anything." *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 625 (N.D. Tex. 1998) (*citing Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)); *see also Stabilis Fund II, LLC v. Compass Bank,* No. 3:18-CV-0283-B, 2018 U.S. Dist. LEXIS 126700, at *13 (N.D. Tex. July 30, 2018) ("a duty to disclose arises when one makes a partial disclosure and conveys a false impression").

Glasgow knew that Barton was under a false impression about the purpose of the New York meeting, with Glasgow having been introduced as a "prospective equity investor," even though Glasgow had no intention of becoming an equity investor and was only considering the participation interest. *See* Compl. ¶¶ 22, 24. Yet Glasgow allowed Barton to present his entire pitch for the $100 million equity raise. *See* Compl. ¶ 23. Rather than clear up the false pretenses

of the meeting, Glasgow even reinforced the ruse by offering to invest $50 million in mezzanine investment. *See* Compl. ¶ 26. Likewise, Defendant Nambiar knew that Barton was under a false impression about the purpose of the meeting on January 16, 2020, but throughout the meeting allowed him to believe that Nambiar was actually interested in becoming an investor in the development project. *See* Compl. ¶ 34. Glasgow and Nambiar had a duty to correct this false impression based on partial disclosures. *See* Compl. ¶ 92.

Accordingly, when taken as true in the light most favorable to Plaintiffs, the facts alleged in Plaintiffs' Original Complaint state a claim for both fraud and fraud by nondisclosure, and Defendants' Motion to Dismiss should be denied on that issue.

**D. Plaintiffs' Original Complaint Plausibly States a Claim for Tortious Interference.**

The Green Hollow Parties improperly claim that Plaintiffs' Original Complaint did not allege interference with an existing contract. To prevail on a motion to dismiss on a claim for tortious interference with contract, a plaintiff must allege the existence of a specific contract. *Randall v. L-3 Commc'ns Corp.*, No. 3:16-CV-3000-G, 2017 U.S. Dist. LEXIS 12872, at *7 (N.D. Tex. Jan. 31, 2017) (citing *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.--Houston [14th Dist.] 2011, pet. denied)). Plaintiffs' Original Complaint satisfies this pleading requirement.

Plaintiffs' Original Complaint alleges two contracts with which the Green Hollow Defendants tortiously interfered: (1) Plaintiffs' Loan on the Land (which Defendants' Motion does not challenge), and (2) Plaintiffs' contracts with certain third-party investors. With regard to the investors, Plaintiffs' Original Complaint states:

> Specifically, Barton had previously met with other potential investors for the Project, including a foreign investor from Korea, Aju Hotels and Resorts, and Daniel Minkowitz of Mink Development (the "***Investors***"), both of whom had negotiated and **finalized formal agreements** to invest in the Project.

Compl. ¶ 44 (emphasis added). Accordingly, the Original Complaint sufficiently alleges an

existing contract for purposes of this claim.

The Original Complaint also plausibly pleads interference with both of these contracts. As repeated many times in this Response, as parties who *intended to compete* with Plaintiffs by taking over the Land in foreclosure (long before any default ever occurred), each and every action taken by the Green Hollow Defendants, individually and collectively, to obtain the participation interest was an interference with the business relationship between Plaintiffs and Madison and Turtle Creek. Compl. ¶¶ 22-40. In fact, the concept of "interference" is actually *built into* the Participation Agreement, which expressly spells out all the various avenues through which HNGH intended to interfere with the Loan by interposing itself between Plaintiffs and the Lender. *See* Compl. Ex. C. Then, following the purchase of the participation interest, the Green Hollow Defendants did everything in their power to trigger default under the Loan, starting with encouraging Plaintiffs' third-party investors to back out of the deal. Compl. ¶¶ 44-58. Again, Defendants pretend to be confused about the ramifications of Nambiar's statements to the investors (regarding "owning" the Loan), but as clarified in Plaintiffs' Amended Complaint, this would have signaled financial trouble and dissuaded investment in the real-estate-development industry.[11] Defendants maintain that they (through HNGH) were merely "protecting their investment" by interfering in the Loan, but as the entire Original Complaint explains, it is an "investment" they had no right to make in the first place.

Finally, with regard to Plaintiffs' claim for tortious interference with prospective business relations (Mot. at 20-21), Plaintiffs' Original Complaint clearly states that Nambiar held a meeting with the third-party investors on a specific date, that the Loan was the topic of discussion at that meeting, that Nambiar persuaded the investors to back out, and that they did back out. Compl.

[11] *See* Pls.' Am. Compl. ¶ 47.

¶ 44. For purposes of Defendants' Motion to Dismiss, Plaintiffs' clearly pleaded facts must be taken as true and viewed in the light most favorable to Plaintiff. *Chauvin*, 495 F.3d at 237. Accordingly, Plaintiffs have stated a plausible claim for tortious interference with prospective business relations. The Green Hollow Defendants' Motion to Dismiss should be denied on the issues of tortious interference.

**E. Plaintiffs' Original Complaint Plausibly States a Conspiracy Claim.**

The Green Hollow Parties further argue that Plaintiffs' Original Complaint did not plausibly allege the element of meeting-of-the-minds to support their conspiracy claim.[12] However, Plaintiff's Original Complaint connects each and every Defendant and demonstrates the clear meeting of the minds that occurred, which ultimately enabled the Green Hollow Defendants to gain a controlling interest in Plaintiffs' Loan in order to seize the Land—which was the plan from the beginning.

- On October 24, 2019, the Madison Defendants reach out to Glasgow/Green Hollow to offer a participation interest in Plaintiffs' Loan. Compl. ¶ 22.[13]
- On November 4, 2019, the Madison Defendants meet with Glasgow and Barton, and the Madison Defendants and Glasgow collectively misrepresented that Glasgow and Green Hollow are prospective equity investors while they all know this to be false. Compl. ¶¶ 24-25.
- On November 15, 2019, shortly after the first fake meeting with Barton, the

[12] Although the Original Complaint is sufficiently pleaded, Plaintiffs' Amended Complaint gives greater detail and four exhibits showing that the Green Hollow Defendants and Madison Defendants clearly had a meeting of the minds with regard to the B-Note purchase and Participation Agreement with the express goal of foreclosing on the Land. *See* Pls.' Am. Compl. ¶¶ 23, 30, 33-34, 116, Exs. D-G.

[13] The Amended Complaint further clarifies that Glasgow even emailed Nambiar that same day to inform him that Joshua Zegen was "offering us a B-Note," showing they were already working together. Pls.' Am. Compl. ¶ 23, Ex. D.

Madison Defendants enter into a letter of intent with Green Hollow to sell the participation interest. Compl. ¶ 28.

- Through November and December 2019, the Madison Defendants and the Green Hollow Defendants secretly negotiate the terms of the participation agreement with the prospect of foreclosure as the primary focus. Compl. ¶ 31.[14]
- On December 16, 2019, HNGH is formed, which is to be the special-purpose entity for owning the participation interest. Compl. ¶ 32.
- On January 16, 2020, Nambiar holds the second fake investment meeting with Barton. Compl. ¶ 34.
- On January 24, 2020, the Participation Agreement is executed. Compl. ¶ 37. The Participation Agreement even contains an agreement whereby Madison will finance the remainder of the Land purchase price after HNGH forecloses. Compl. Ex. C.

Notably, all of these communications occur before the first "default" is ever alleged against Plaintiffs (*see* Compl. ¶ 47), but the collective plan for the Green Hollow Defendants to seize the property was clearly known to *all* Defendants from the early stages of negotiations. Moreover, while Plaintiffs believe that the entire negotiation process constitutes an "overt unlawful act" by all Defendants, certainly the two sham investment meetings (collectively attended by *all* Defendants), in which Glasgow and Nambiar blatantly misrepresented their intentions in order to induce confidential disclosures from Barton (Compl. ¶¶ 22-27, 34-35), meet this standard for pleading purposes. Plaintiffs' Original Complaint has plausibly pleaded facts that establish all Defendants' shared intent to give the Green Hollow Defendants a controlling interest in Plaintiffs'

[14] The Amended Complaint offers these emails as an exhibit as further evidence. Pls.' Am. Compl. Ex. G.

Loan (which, as discussed below, is bad faith under New York law), and more than one overt, unlawful act toward that end. Defendants' Motion to Dismiss on Plaintiffs' conspiracy claim should be denied.

**F. Plaintiffs' Original Complaint Plausibly States a Breach-of-Contract Claim Against Glasgow and Nambiar.**

The Green Hollow Defendants argue that Plaintiffs' Original Complaint did not sufficiently state that the verbal nondisclosure and noncompetition agreements with Glasgow and Nambiar were made prior to Barton's disclosure of confidential information. To the extent the Court believes Plaintiffs' Original Complaint requires clarification on this point, Plaintiffs' Amended Complaint further explains the content and timing of these agreements. *See* Pls.' Am. Compl. ¶¶ 26, 38. However, as discussed above, the Original Complaint pleads facts establishing that Barton obtained verbal agreements from both Glasgow and Nambiar in advance of, and in consideration for, disclosure. With regard to Glasgow, the Complaint states:

> Barton was aware that Glasgow was a real estate investor in the Dallas market and believed him to be a viable candidate as a potential equity investor. As a result, however, before, during, and after the pitch, Barton made clear that the information being presented was confidential and not to be used to compete with the Project. Glasgow verbally assented to this "gentlemen's agreement" to keep confidential all information disclosed at the meeting.

*See* Compl. ¶¶ 24-25. Contrary to Defendants' arguments, the Original Complaint shows that Barton sought and received verbal assurances from Glasgow before disclosure (*as well as* during and after the presentation).

Likewise, with regard to Nambiar, the Complaint states that "Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential," which clearly indicates that assurances as to confidentiality were sought and provided in advance of disclosure. *See* Compl. ¶ 35. Accordingly, Plaintiffs' Original Complaint is well pleaded on these breach-of-contract claims and Defendants' Motion to Dismiss

should be denied on this issue.

**G. Plaintiffs' Original Complaint Plausibly States a Claim for Declaratory Judgment.**

The Green Hollow Defendants' Motion to Dismiss essentially asks the Court to render summary judgment on Plaintiffs' causes of action for declaratory judgment. However, Defendants rely upon the faulty premise that there is no duty of good faith and fair dealing applicable to the underlying Loan Documents. This is not true. Plaintiffs' Original Complaint makes clear that the Loan Documents are governed under New York law (*see* Compl. Ex. A, Security Agreement ¶ 16), which imposes the covenant of good faith and fair dealing into every contract. *See, e.g.*, *Claridge v. N. Am. Power & Gas, LLC*, 12-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693, at *16 (S.D.N.Y. Sep. 2, 2015); *Moran v. Erk,* 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'").

Plaintiffs' Compliant describes the specific ways in which the Participation Agreement destroyed or injured Plaintiffs' right to receive the fruits of the contract through the interposition of a stranger to the original agreement (HNGH) into the middle of the contractual relationship between Lender and Plaintiffs in a manner that harmed Plaintiffs and hamstrung the successful development of the project as planned. Compl. ¶¶ 44-59, 69-73.[15] Accordingly, disposing of these claims at the pleading stage would be improper.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied in its entirety and that Plaintiffs have such other and further relief to which they may be justly entitled.

---

[15] *See also* Pls.' Am. Compl. ¶¶ 45-61, 77-79.

Dated: December 30, 2020.

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Kelsey M. Taylor, Esq.**
Texas Bar No. 24098507
taylor.kelsey@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2020, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. Michael Gruber, Esq.