**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **2999TC ACQUISITIONS, LLC f/k/a MO 2999TC, LLC, AND TIMOTHY L. BARTON** | § § § § | |
| **Plaintiffs** | § § | |
| **v.** | § § | **Case No. 3:20-CV-3229** |
| **2999 TURTLE CREEK, LLC, MADISON REALTY CAPITAL, LP, MARC ZEGEN, AND JOSHUA ZEGEN** | § § § § | |
| **Defendants.** | § | |

**PLAINTIFFS' RESPONSE DEFENDANTS' MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Plaintiffs 2999TC Acquisitions, LLC f/k/a MO 2999 TC, LLC, and Timothy L. Barton (together, "***Plaintiffs***") file this *Response* ("***Response***") *to Defendant 2999 Turtle Creek, LLC* ("***Lender***" or "***Turtle Creek***")*, Madison Realty Capital, LP* ("***Madison***")*, Marc Zegen, and Joshua Zegen's* (collectively, "***Defendants***") *Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)* (Doc. 53) ("***Motion to Dismiss***"), and respectfully show the Court as follows:

## I. BACKGROUND

1. Plaintiffs filed their Original Complaint (Doc. 1) on October 22, 2020, alleging numerous claims against Madison, Turtle Creek, and two of Madison's principals, Joshua Zegen and Marc Zegen, for numerous causes of action for, *inter alia*, Defendants' theft of trade secrets, fraud, and conspiracy related to Madison and Turtle Creek's bad-faith sale of a purported junior subordinate participation interest in Plaintiffs' loan and deed of trust ("***Loan***") on real property in Texas ("***Land***") related to the development of a luxury hotel and branded residence ("***Project***").

After Plaintiffs moved for leave, the Court permitted Plaintiffs to file their First Amended Complaint on January 4, 2021. Plaintiffs' Original and First Amended Complaints included four additional defendants, HNGH Turtle Creek, LLC, HN Green Hollow Capital Partners, LLC, Vipin Nambiar, and James Glasgow (collectively, the "***Green Hollow Parties***").

2. On January 5, 2021, Plaintiffs dismissed the Green Hollow Parties with prejudice after reaching an out-of-court settlement. Doc. 46.

3. On January 29, 2021, in lieu of an answer, Defendants filed a Motion to Dismiss (Doc. 53) related to Plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Because Rule 15(a)(1)(B) allows for amendment as a matter of course within 21 days following a motion under Rule 12(b), Plaintiffs timely filed their Second Amended Complaint (Doc. 60) on February 19, 2021, to clarify additional issues raised in Defendants' Motion to Dismiss and update the pleadings to reflect the dismissal of the Green Hollow Parties.

## II. ARGUMENTS & AUTHORITIES

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In analyzing a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Chauvin v. State Farm Fire & Casualty Co*., 495 F.3d 232, 237 (5th Cir. 2007). The pleading standard of Rule 8 requires plausible factual support for the allegations within the complaint but does not require "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). When a complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face, it is satisfactory for pleading purposes. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendants have challenged the sufficiency of Plaintiffs' pleadings related to their various claims against Defendants, including claims for federal and state trade-secret misappropriation, breach of the covenant of good faith and fair dealing, fraud, fraud by nondisclosure, conspiracy, breach of contract, fraudulent inducement, and declaratory judgment claims. For the reasons stated herein, Plaintiffs' complaint has plausibly stated each and every one of these claims, and Defendants' Motion should be denied in its entirety.

**A. Plaintiffs' Complaint Plausibly Pleads a Federal Trade Secret Claim.**

The DTSA permits an "owner of a trade secret that is misappropriated" to "bring a civil action under this subsection if the trade secret is related to a product of service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). To make a federal claim under the DTSA, a plaintiff must plausibly allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. *See id*; *Twombly*, 550 U.S. at 570.

Here, Defendants do not challenge the "interstate commerce" element, which is therefore not at issue, but incorrectly argue that Plaintiffs have failed to plead a "trade secret" and "misappropriation." For the reasons below, Defendants' Motion should be denied.

**i. Plaintiffs have sufficiently pleaded a "trade secret."**

Under the DTSA, a trade secret includes (1) all forms and types of financial, business, and economic information (2) "that the owner has taken reasonable measures to keep secret," and (3) "that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Plaintiffs' pleadings include supported factual allegations for each of these criteria.

**(1) <u>Financial, business, and economic information.</u>**

Plaintiffs' Second Amended Complaint ("***Complaint***") describes the general categories of financial, business, and economic information that Defendants misappropriated. In reference to Plaintiff Barton's meeting with Defendants and co-conspirator Glasgow, the Complaint describes the type of information that Plaintiff Barton disclosed to Glasgow based on Defendants' misrepresentations about Glasgow's identity and intentions:

> During the meeting, Barton disclosed information that he would never have disclosed to someone who intended to take over the Project, such as construction drawings, plans, contractor bids, the contract terms with the International Hotel, balance sheets, pro formas, projected returns, and most importantly, capital structure.

Compl at ¶ 28.

Similarly, with regard to Plaintiff Barton's meeting with Nambiar, who was acting in conjunction with Defendants to enable the Green Hollow Parties to seize control of Land, the Complaint describes the financial, business, and economic information disclosed, including but not limited to financial projections for the Project, the total amount of capital 2999TC intended to raise, the identity of Lender, the amounts of capital Lender and Madison expected to contribute to the Project, and the amount of debt Barton obligated himself to acquire the Land.

> As part of that meeting, Barton again shared confidential and proprietary information with Nambiar, including but not limited to the financial projections for the Project, details of the contractual terms with the International Hotel, the identities of certain investors, and the capital structure for the Project, including the total amount of capital 2999TC intended to raise, the identity of Lender, the amounts of capital Lender and Madison expected to contribute to the Project, and the amount of debt Barton obligated himself to acquire the Land.

Comp. at ¶ 39. And again, in its claim for relief, the Complaint states:

> Plaintiffs 2999TC and Barton are the owners of Trade Secrets related to the Project, including but not limited to, financial

> projections for the Project, the total amount of capital Plaintiffs intended to raise, the amount of debt the Project would incur and which Plaintiffs had already incurred, including and especially the capital structure for the Project, including the amount Plaintiff Barton had personally leveraged, the identity of the Project's Investors, contractor bids, the terms of the International Hotel contract, and designs and plans for the entire development.

Compl. at ¶ 69. Because federal courts do not require highly specific pleadings for trade secret claims, *see Vest Safety Med. Servs. v. Arbor Envtl., LLC*, No. H-20-0812, 2020 U.S. Dist. LEXIS 124453, at *11 (S.D. Tex. July 15, 2020), these facts as alleged within the Complaint are sufficient to plausibly describe the type of financial, business, and economic information that constitutes a "trade secret" under the DTSA. *See* 18 U.S.C. § 1839(3).

**(2) <u>Reasonable measures to keep secret.</u>**

Plaintiffs' Complaint describes the reasonable measures that Plaintiffs took to keep the information secret. Federal courts have made clear that a holder of a trade secret "may divulge his information to a limited extent without destroying its status as a trade secret" in situations where disclosure is "limited" and "communicated to further economic interests." *Eemso, Inc. v. Compex Technologies, Inc.*, No. 3:05-CV-0897-P, at *13 (N.D. Tex. Aug. 31, 2006). Neither a confidential relationship nor a written confidentiality agreement are necessary to establish "reasonable measures." *See id.* (holding that proof of whether disclosure is "limited" is a multi-factor determination and does not expressly require proof of a confidential relationship); *Hollomon v. O. Mustad Sons (Usa), Inc.*, 196 F. Supp. 2d 450, 459 (E.D. Tex. 2002) ("an express contractual provision is not required to establish a duty of confidentiality").

Here, before disclosing the trade secrets, Barton sought verbal agreements from Glasgow and Nambiar as a condition of disclosure. With regard to Barton's sham meeting with Glasgow, where Madison falsely represented that Glasgow was a bona fide equity investor, the Complaint

clearly pleads that Barton only disclosed this information conditioned upon Glasgow's verbal confidentiality agreement, Madison's representations about Glasgow's intent, and Barton's belief that disclosure would further the economic interests of the Project by recruit a new investor:

> Barton knew that Glasgow was a real estate investor and thus believed him to be a viable candidate as a potential equity investor, consistent with Defendants' representations. As a result, however, before, during, and after the pitch, Barton made clear that the information being presented was confidential and not to be used to compete with the Project. Before the presentation, Glasgow verbally agreed to keep confidential all information disclosed at the meeting. . . Prior to this meeting, Barton had not previously disclosed this information to Madison or any other person, and only did so due to Glasgow's verbal confidentiality agreement and Barton's belief that disclosure would further the economic interests of the Project.

Comp. at ¶¶ 27, 29. The Complaint makes clear that, absent this oral agreement and his belief that Glasgow was a bona fide investor, Barton would not have disclosed this information. *Id.* at ¶ 28. Likewise, with regard to Nambiar's sham investment meeting with Barton:

Likewise, with regard to Nambiar's sham investment meeting with Barton, the Complaint states:

> Before, during, and after the meeting, Barton informed Nambiar that the information about the Project was confidential and proprietary. Before the presentation, Nambiar agreed to keep the information confidential and not to use any information to compete with the Project. Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential and Barton's belief that disclosing the information would further the Project's economic interests. He certainly would not have disclosed all of this confidential information had he known about Nambiar's affiliation with Defendants, Glasgow, or HNGH, their intention to purchase the B-Note, or their plans to seize the Project.

Compl. ¶ 40. The fact that the agreement was never reduced to writing is immaterial because "*Nambiar agreed* to keep the information confidential and not to use any information to compete

with the Project." *See id.* (emphasis added). Plaintiffs' Complaint also provides direct evidence that Nambiar expressly lied about his intentions for meeting with Barton and, at the time of their meeting, was already in the advanced stages of preparation to purchase the participation interest ("***B-Note***") in Plaintiffs' Loan as part of his conspiracy with Defendants. *See* Compl. ¶ 38 & Exs. D, F, G, H.

In addition, the Complaint further describes measures Plaintiffs used to maintain confidentiality of the Trade Secrets the limited circumstances in which such information is shared:

> For this reason, capital structure and strategy is shared only with those the developer believes to be sincere investors, as those investors would expect to know how their investment would be used. Due to the confidential nature of the Trade Secrets, only Barton and one of his employees had access to the Trade Secrets and, when not in use, electronic data was stored on servers in a locked room, and hard copies were stored in locked cabinets.

Compl. ¶ 28.

Moreover, Defendants' argument that Plaintiffs' unredacted pleadings somehow defeat trade secret protection is nonsensical. Information such as Plaintiffs' capital structure and identity of the third-party investors has already been misused by Defendants to such an extent that the value has been destroyed, which is the entire reason for this lawsuit. Other information, such as "construction drawings, plans, contractor bids, the contract terms with the International Hotel, balance sheets, pro formas, and projected returns," do not actually divulge any of the details of these items but merely give the Court enough detail to ascertain the nature of the information identified as trade secrets. *See Vest Safety*, 2020 U.S. Dist. LEXIS 124453, at *11.

Finally, Defendants incorrectly argue that Plaintiffs "explicitly agreed" that Defendants could distribute Plaintiffs' Trade Secrets to the Green Hollow Parties. *See* Mot. to Dismiss at 10. Although Section 40 of the Deed of Trust permitted Lender to disclose certain information to

prospective participants, the Complaint and the language of the Deed of Trust make clear that the Green Hollow Parties were never the type of "participants' contemplated as proper recipients of Plaintiffs' confidential information.

> Typically, "B-Notes" or "junior subordinate interests" are used by lenders to spread out risk among other institutional investors (such as banks or real estate investment trusts), who then hold this junior subordinate participation interest as part of a larger investment portfolio for the duration of the loan in order to earn a return on their investment through the borrower's repayment of the original loan.

Compl. ¶ 23.

> Green Hollow is a real estate investor whose founding members, such as HN Capital Partners already had extensive experience investing in the Dallas luxury hospitality space. On October 24, 2019 a meeting took place in New York City, wherein Josh Zegen and Marc Zegen expressly offered Glasgow and Green Hollow the opportunity to purchase the B-Note on the Project, despite the fact that these parties were not the types of institutional investors contemplated under the Loan Documents as proper junior subordinate participants. *See* **Exhibit D**. At the time, Madison was aware that Glasgow and Green Hollow were already in partnership with Nambiar and that, collectively, they intended to find a backdoor method for Glasgow, Green Hollow, and Nambiar to acquire the Land and/or the Project.

Compl. ¶ 24.

> Under the terms of the Deed of Trust, Lender was permitted to enter into these agreements with specific types of investors, such as banks, insurance companies, trusts, and other types of traditional institutional lenders.

Compl. ¶ 43.

> Lender's sale of the B-Note and entry into the Participation Agreement with a party who intended to compete with 2999TC was a breach of this provision. First, HNGH is not the type of permitted lender enumerated or contemplated under Section 40. Again, participation interests are sold to other lenders or investors who intend to hold the note for the purpose of receiving interest and principal payments over time—parties who want to see the borrower *succeed*, not rooting for the borrower's default.

Compl. ¶ 87.

Defendants argue that the language of Section 40 gave Defendants carte blanche to sell a participation interest (and disclose Plaintiffs' confidential information) to absolutely anyone—including a party whom Defendants knew intended to compete with Plaintiffs and takeover their Project. However, under New York law,[1] the sale of a participation interest to a competitor of the borrower is considered bad faith. *See e.g.*, *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank*, *N.A.*, 680 F. Supp. 2d 625, 633 (S.D.N.Y. 2010). In *Empresas Cablevision*, the borrower sought to enjoin the lender from selling a participation interest in its loan to one of borrower's competitors.[2] The district court found that the lender "act[ed] in bad faith, under the guise of a purported 'participation' to effectuate what is in substance a forbidden assignment," which was "at a minimum" a violation of "the covenant of good faith and fair dealing automatically implied by law" in the contract.[3] "Such an end-run, if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."[4]

Accordingly, although Plaintiffs may have agreed to allow disclosure to good-faith participants, the Green Hollow Parties were not truly interested in holding a "participation interest," but in seizing control of the Project, an "end run" which Defendants not only knew about but conspired to effectuate. Plaintiffs were entitled to assume that Defendants were going to act in good faith under the Deed of Trust and, thus, Plaintiffs were not required to conform their behavior to the *possibility* that Defendants would take actions calculated to destroy the fruits of the contract—especially when Defendants made express representations about the nature of the

[1] The Deed of Trust is governed by New York law. *See* Compl. Ex. B § 54.
[2] *Id.*
[3] *Id.* at 631.
[4] *Id.* at 632.

Green Hollow Parties' intentions. Thus, for pleading purposes, Plaintiffs have properly alleged the reasonable measures used to maintain secrecy.

**(3) <u>Independent economic value and not readily ascertainable.</u>**

The facts alleged in Plaintiffs' Complaint describe the independent economic value of the trade secrets and why this information would be valuable to Defendants and their Green Hollow co-conspirators. Again, even with the heightened pleading requirements under the Federal Rules, the primary purpose of a pleading is still to put the Defendants on fair notice of the claim. *See Twombly*, 550 U.S. at 555. As experienced real estate professionals, Defendants cannot possibly pretend to be confused by the value of business, financial, and economic information such as construction drawings, plans, contractor bids, the contract terms with the managing hotel brand, balance sheets, pro formas, capital structure, identity of investors, and projected returns—critical information related to any real estate development project, which is not generally known to the public.

Plaintiff's Complaint describes the independent economic value of the trade secrets and why this information would be valuable to the Green Hollow Defendants. Defendants do not challenge the value of items such as construction drawings, plans, contractor bids, the contract terms with the International Hotel, balance sheets, pro formas, and projected returns. Rather, Defendants' Motion challenges the value of the Plaintiffs' capital structure and the identity of the Project's investors as lacking trade secret protection. The Complaint provides context for the value of a real estate developer's capital structure, which includes the identity of investors. For instance:

> In the competitive real-estate development industry, a developer's capital structure is highly confidential because it provides transparency into the developer's curated network of business contacts and investors, and the individual "deals" made with each, as well as the developer's cash position and relative level of liquidity, which competing developers could exploit to their

> advantage. As part of the capital structure for the overall project, a developer may make the strategic decision to take personal risk by borrowing money from this network of investors to make a down payment toward the land on which to develop a project. Especially when a developer is extensively leveraged, this capital structure is highly confidential because competing developers could use this information to interfere with a project and create liquidity issues for the developer. For this reason, capital structure and strategy is shared only with those the developer believes to be sincere investors, as those investors would expect to know how their investment would be used. . . . Based upon Barton's belief that Glasgow was a bona fide investor, Barton revealed information about this capital structure and strategy to Glasgow.

Compl. at ¶¶ 28-29.

> Upon information and belief, Madison's true intention for setting this meeting was to provide Glasgow with confidential information about the Project and allow Glasgow to see for himself the real prospective "return" that the B-Note might offer, specifically, the full seizure of the Project. By discovering the extent of Barton's personal debt in the Project and his desire to de-leverage himself using the capital raise, Glasgow and the Green Hollow Parties would have been able to identify the precise "pressure point" (i.e., liquidity problems) that he might be able to exploit using the B-Note. . . ."

Comp. at ¶ 31.

Moreover, the Complaint clearly describes the value of the investor's identity because removing them from the picture was precisely what would create the cash flow issues that would enable the proper conditions for a default and seizure by HNGH. *See* Compl. ¶¶ 47-49. Furthermore, as is clear from the alleged facts, the Green Hollow Parties would have been unable to acquire this information without the false pretenses presented to Plaintiff Barton by Defendants, as discussed below. Accordingly, Plaintiffs have plausibly pleaded the value of the trade secrets.

**ii. Plaintiffs have sufficiently pleaded a "misappropriation."**

Under the DTSA, misappropriation includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire

knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). "Improper means" includes the "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A).

Plaintiffs' Complaint describes Defendants' and Green Hollow Parties' misappropriation of Plaintiffs' trade secrets through numerous "improper means," including intentional misrepresentations, fraudulent nondisclosures, and breaches of confidentiality agreements. For instance:

> On November 4, 2019, Barton met with Josh Zegen and Glasgow at Madison's office in New York City. Just as in his earlier telephone call, Josh introduced Glasgow as a potential equity investor. Although Glasgow had already been offered the B-Note on the loan two weeks earlier, neither Defendants nor Glasgow disclosed this to Barton. Instead, Defendants and Glasgow permitted Barton to believe that Glasgow was indeed a "prospective equity investor" and present his pitch for the entire $100 million equity offering. Although Defendants and Glasgow knew that Barton was under a false impression about the purpose of the meeting and Glasgow's intentions, neither Defendants nor Glasgow made any effort to correct this false impression.

Compl. ¶ 26. The Complaint establishes that Defendants misrepresented Glasgow's identity and intentions and then sat through Barton's pitch for the entire $100 million equity offering even though they had already been in talks with the Green Hollow Parties for the B-Note sale. *See* Compl. ¶ 24 & Ex. D. The pleaded facts thus establish that Defendants knew that Barton was under a false impression about the purpose of the meeting, but did nothing to correct that impression, while Barton disclosed confidential information, which Glasgow agreed to keep secret and not use for competitive purposes (*see* Compl. ¶ 27).

With regard to Nambiar, the same is true. Nambiar and Glasgow had already conspired with Defendants and formed HNGH to be the participant in Plaintiffs' Loan (*see* Compl. ¶¶ 32-

36) when he also met with Barton pretending to be an interested investor in furtherance of the conspiracy. *See* Compl. ¶ 39. Just like Glasgow, Nambiar knew that Barton was under a false impression about the meeting, but Nambiar did nothing to correct that or inform Barton about the B-Note purchase, but instead reinforced his false intentions by telling him he wanted to invest. *See id.* Based on these false pretenses and Nambiar's verbal assurances of confidentiality, Barton disclosed confidential information. *See* Compl. ¶ 40.

Thus, both operating in conjunction with Defendants, Glasgow and Nambiar made false representations to Barton about their intentions to invest in the project, allowed him to maintain that false impression while he disclosed information about the Project, and then subsequently used that information they had obtained to (1) enter into the Participation Agreement as a vehicle to gain a controlling interest in Plaintiffs' Loan, (2) use the identity of Plaintiffs' investors to scare them away, and (3) use the knowledge of Plaintiffs' liquidity position to sabotage Plaintiffs' Loan. *See* Compl. ¶¶ 47-57.

Again, contrary to the misstatements in Defendants' Motion to Dismiss, Plaintiffs' Complaint denies that the Defendants were ever "expressly authorized" to share Plaintiffs' confidential information with the Green Hollow Parties. Although the Deed of Trust permitted disclosure of certain information by the lender to legitimate, good-faith participants, Plaintiffs' Complaint expressly denies that the Green Hollow Defendants fit this description. *See* Compl. ¶¶ 23-24, 43, 87.

In sum, when taken as true and viewed in the light most favorable to Plaintiffs (*see Chauvin*, 495 F.3d at 237), Plaintiffs' pleaded facts plausibly establish that Plaintiffs held trade secrets that Defendants misappropriated in violation of 18 U.S.C. § 1839. As such, Defendants' Motion to Dismiss should be denied as to Plaintiffs' statutory trade secret claim under the DTSA.

**B. Plaintiff's Complaint Plausibly States a Claim for Lender's Breach of Duty of Good Faith and Fair Dealing.**

Defendants' Motion to Dismiss relies upon the faulty premise that there is no duty of good faith and fair dealing applicable to the underlying Loan Documents. This is not true. Plaintiffs' Complaint and the Deed of Trust itself make clear that the Loan Documents are governed under New York law:

> THIS NOTE HAS BEEN EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND, EXCEPT AS OTHERWISE PROVIDED IN HEREIN, THIS NOTE, THE DEED OF TRUST AND EACH OF THE OTHER SECURITY DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITIIOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Compl. Ex. A, Security Agreement ¶ 16; see also Compl. Ex. B, Deed of Trust § 54 (containing substantial similar language).

New York law imposes the covenant of good faith and fair dealing into every contract. *See, e.g.*, *Claridge v. N. Am. Power & Gas, LLC*, 12-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693, at *16 (S.D.N.Y. Sep. 2, 2015); *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"). Accordingly, a breach of this duty occurs when a party's conduct frustrates the purpose of the contract, injures the other party's right to receive the fruits of the contract, or evades the spirit of the bargain.

Defendants argue that they were to free to sell a participation interest to anyone—including a party whom Defendants *knew* intended to compete with Plaintiffs and takeover their Project.

However, as stated above, the sale of a participation interest to a competitor of the borrower is considered bad faith. *See e.g.*, *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 633 (S.D.N.Y. 2010).

Defendants ask the Court to overlook the fact that they engaged in extensive bad-faith conduct with the specific intent to frustrate the purpose of the contract and deprive Plaintiffs of the right to receive the benefit of the bargain, such as declaring defaults where none existed, refusing to negotiate forbearance during the COVID-19 shutdowns, refusing to respond to requests for information and accounting, using harassment to intimidate and coerce Plaintiffs into an onerous contract modification, and wrongfully attempting to foreclose on the Land following numerous manufactured breaches. Compl. ¶¶ 18-67. More troubling is the fact that Lender engaged in such conduct in concert with, and for the benefit of, Plaintiffs' competitor. Plaintiffs have properly pleaded a breach of duty of good faith and fair dealing and Defendants' Motion should be denied on this point.

**C. Plaintiffs' Complaint Plausibly States a Claim for Breach of Deed of Trust.**

In addition to their general bad-faith conduct, Lender (through Madison and the Zegens) specifically breached the Deed of Trust by entering into the Participation Agreement with HNGH. Section 40 of the Deed of Trust governs Lender's ability to assign or sell participation interests in the Deed of Trust to a variety of possible investors clearly contemplated under the agreement as institutional real-estate investors.

> Borrower acknowledges that Beneficiary may sell and assign participation interests or other types of interests in this Deed of Trust to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations, REMICs, real estate investment trusts or other similar or comparable investment vehicles as may be selected by Beneficiary in its sole and absolute discretion)

> on terms and conditions satisfactory to Beneficiary in its sole and absolute discretion.

Compl. Ex. B § 40. This section clearly contemplates the types of institutional, passive investors who intend to hold a participation interest as part of an investment portfolio—not competitive entities who intend to stage a hostile takeover in direct opposition to the borrower's interests.

This section also makes clear that, in splitting Lender's interest by selling a subordinate interest in the Loan, the Lender is prohibited from modifying or amending any material economic term of the Loan or materially increasing the obligations or decreasing the rights of 2999TC under the Loan:

> [N]o such amendment described above shall (i) modify or amend any material economic term of the Loan, or (ii) materially increase the obligations, or decrease the rights, of Borrower under the Loan Documents. . . .

Compl. Ex. B § 40. As the Complaint plainly states, it was not the mere *selling* of the B-Note that was itself the breach of the Deed of Trust, but the terms of the Participation Agreement, which gave the Green Hollow Parties extensive and exclusive control over many facets of Plaintiffs' Loan, such as the right of communication, negotiation, and foreclosure, as well as the sole right to veto the sale of Defendants' interest to any other party:

> Under the terms of the Participation Agreement (which Lender and HNGH refused to provide until May of 2020 after Plaintiffs filed suit seeking an emergency order compelling production), Lender assigned away significant rights pertaining to the Loan and Deed of Trust. For instance, in the event of a default, HNGH was permitted to voluntarily cure the default by making payment to Lender for the benefit of 2999TC in order to secure its right to borrow funds from Madison to acquire the Land after a foreclosure. If HNGH elected to cure a default, then Lender would cede all control of the administration of the Loan to HNGH, and HNGH would become the "Lender" for purposes of the Loan, Deed of Trust, and Guaranty Agreement. Subject to this "cure" by HNGH, not only would

> HNGH have the exclusive right to communicate with Plaintiffs about these contracts, but had to approve the sale of any interests related to the Loan or workouts with 2999TC and would also have the *exclusive right* to foreclose on the Land. Lender was also prohibited from transferring any portion of the Loan to any affiliated entity, or from selling its interest to any party affiliated with Lender or any party who would be adverse to HNGH, an anti-competitive provision that completely eliminated any possibility for certain types note sales by Lender to third-party purchasers. Reputable lenders in the financial world would never have agreed to the onerous provisions contained in the Participation Agreement, deeply favoring the participant, unless they had previously devised a scheme with the participant or other parties to the detriment of the borrower. None of these terms concerning the sale/transfer of the Loan were known to or agreed upon by Plaintiffs.

Compl. ¶ 44. By ceding all power and control to HNGH, Defendants enabled the Green Hollow Parties to effectively hold the Loan hostage, making it impossible for Plaintiffs' to mitigate the situation by bringing alternative lenders to the table—which indeed occurred on multiple occasions. *See* Compl. ¶¶ 63-64. Thus, as a result of the Participation Agreement, Plaintiff's contract with Lender was modified to the point where it no longer resembled the original agreement. Accordingly, Plaintiffs have plausibly pleaded a breach under Section 40 of the Deed of Trust.

### D. Plaintiffs' Complaint Plausibly States Claims for Fraud, Fraud by Nondisclosure, and Fraudulent Inducement.

Defendants claim that Plaintiffs' Complaint did not state any reliance on a false representation or a duty of disclosure required for their fraud claims. However, when taken as true and viewed in the light most favorable to Plaintiffs, the alleged facts in the Complaint easily state claims for fraud and fraud by nondisclosure as to these elements.

#### i. Defendants, Glasgow, and Nambiar made false representations which Plaintiffs relied upon.

With regard to Defendant and Glasgow's affirmative misrepresentations, the Complaint states that Defendants represented that Glasgow was a prospective equity investor to induce Barton

to meet with him in New York.

> About a week later, unaware of this meeting between Madison and Glasgow, Barton received a telephone call from Josh Zegen from Madison. Marc Zegen and Josh Zegen asked Barton to drop everything and come to New York to meet with Glasgow, whom they represented to be a "prospective equity investor" for the Project. Because finding equity investors was precisely what Madison had told Barton and 2999TC that it would do, Barton promptly agreed to come to New York and pitch this "prospective equity investor" on the Project and the $100 million equity raise they were seeking.

*See* Compl. ¶ 25. This was an intentional misrepresentation to induce Barton's disclosure of information about the Project when Defendants had already offered the purchase of the B-Note to the Green Hollow Parties. *See* Compl. ¶ 24 & Ex. D. The Complaint states that Barton relied on these misrepresentations by making disclosures that he would not have made but for his reliance upon Defendants' representations. Compl. ¶ 29.

Similarly, with regard to Nambiar's affirmative misrepresentations, at the meeting with Barton on January 26, 2020, Nambiar affirmatively misrepresented his intentions for the meeting as part of his conspiracy with Defendants.

> On January 2, 2020, Barton and Nambiar communicated by email to schedule a meeting to discuss the Project. Nambiar did not disclose that was a partner with the Green Hollow Parties and was already involved in negotiations with Defendants for the purpose of purchasing the B-Note on the Loan, and had already formed a company (HNGH) for that express purpose. Instead, to further the combination or conspiracy with Defendants, Nambiar affirmatively represented that he was interested in becoming an investor—even warning Barton: "I don't run a passive LP [limited partner] program," which, to an experienced developer means: "If I invest in your project, I am going to want run this project like a partner alongside you." *See* **Exhibit H**. Thus, Barton understood that the purpose of the meeting was to pitch Nambiar on becoming an equity investor.

*See* Compl. ¶ 38. Thus, at the time of the meeting, Nambiar and the other Green Hollow Parties

were already conspiring with Defendants to obtain the participation interest in Barton's Loan. And consistent with the goal of the conspiracy, less than one week after Nambiar's meeting with Barton, HNGH obtained the participation interest from Defendants. *See* Compl. ¶ 42. The Complaint further states that Barton relied upon Nambiar's representation:

> Before, during, and after the meeting, Barton informed Nambiar that the information about the Project was confidential and proprietary. Before the presentation, Nambiar agreed to keep the information confidential and not to use any information to compete with the Project. Barton would not have shared any information regarding the Project with Nambiar but for his representations that he would keep the information confidential and Barton's belief that disclosing the information would further the Project's economic interests. He certainly would not have disclosed all of this confidential information had he known about Nambiar's affiliation with Defendants, Glasgow, or HNGH, their intention to purchase the B-Note, or their plans to seize the Project.

Compl. ¶ 40.

Finally, the Complaint also alleges facts describing Defendants intentional misrepresentations to induce Plaintiffs to enter into the Deed of Trust and Guaranty by promising to assist Plaintiffs in raising equity funds.

> Lender and Madison made false representations to Plaintiffs in connection with entering into the Loan and Deed of Trust. Namely, that they would act in good faith in dealing with Plaintiffs regarding the Loan and Deed of Trust, and would assist Plaintiffs in raising money for the Project, yet secretly intending to sell a controlling interest in the Loan to Plaintiffs' competitor.

Compl. ¶ 117. Thus, the Original Complaint plainly alleges facts showing that Defendants, Glasgow, and Nambiar made false representations to Barton in furtherance of their conspiracy and that Barton relied upon those misrepresentations in entering into the Deed of Trust and other loan documents and in disclosing confidential information about the Project that they would not have otherwise disclosed.

**ii. Defendants were under a duty to correct false impressions from their partial disclosures.**

Under Fifth Circuit precedent, it is well established that "a duty to speak the full truth arises when a defendant undertakes the duty to say anything." *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 625 (N.D. Tex. 1998) (*citing Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)); *see also Stabilis Fund II, LLC v. Compass Bank*, No. 3:18-CV-0283-B, 2018 U.S. Dist. LEXIS 126700, at *13 (N.D. Tex. July 30, 2018) ("a duty to disclose arises when one makes a partial disclosure and conveys a false impression").

Defendants knew that Barton was under a false impression about the purpose of the New York meeting, with introduced Glasgow as a "prospective equity investor," even though Glasgow had no intention of becoming an equity investor and was only considering the B-Note. *See* Compl. ¶¶ 24-26. Yet Defendants and Glasgow were deliberately silent while they allowed Barton to present his entire pitch for the $100 million equity raise. *See* Compl. ¶ 26. Rather than clear up the false pretenses of the meeting, Glasgow even reinforced the ruse by offering to invest $50 million in mezzanine investment, which Defendants made no effort to correct or clarify. *See* Compl. ¶ 30. *See* Compl. ¶ 37-40. Defendants had a duty to correct this false impression based on partial disclosures. *See* Compl. ¶ 97.

Accordingly, when taken as true in the light most favorable to Plaintiffs, the facts alleged in Plaintiffs' Original Complaint state a claim for both fraud and fraud by nondisclosure, and Defendants' Motion to Dismiss should be denied on that issue.

**E. Plaintiffs' Original Complaint Plausibly States a Conspiracy Claim.**

Defendants further argue that Plaintiffs' Complaint did not plausibly allege the element of meeting-of-the-minds to support their conspiracy claim. To the contrary, the Complaint connects each Defendant and the Green Hollow Parties and demonstrates the clear meeting of the minds

that occurred, which ultimately enabled the completion Green Hollow Parties to gain a controlling interest in Plaintiffs' Loan in order to seize the Land—which was the plan from the beginning.

- On October 24, 2019, the Madison Defendants reach out to Glasgow/Green Hollow to offer a participation interest in Plaintiffs' Loan. Compl. ¶ 24 & Ex. D.
- On November 4, 2019, the Madison Defendants meet with Glasgow and Barton, and the Madison Defendants and Glasgow collectively misrepresented that Glasgow and Green Hollow are prospective equity investors while they all know this to be false. Compl. ¶¶ 26-29.
- On November 15, 2019, shortly after the first fake meeting with Barton, the Madison Defendants enter into a letter of intent with Green Hollow to sell the participation interest. Compl. ¶ 32 & Ex. F.
- Through November and December 2019, the Madison Defendants and the Green Hollow Defendants secretly negotiate the terms of the participation agreement with the prospect of foreclosure as the primary focus. Compl. ¶ 35 & Ex. G.
- On December 16, 2019, HNGH is formed, which is to be the special-purpose entity for owning the participation interest. Compl. ¶ 36.
- On January 16, 2020, Nambiar holds the second fake investment meeting with Barton. Compl. ¶ 39.
- On January 24, 2020, the Participation Agreement is executed. Compl. ¶ 37. The Participation Agreement even contains an agreement whereby Madison will finance the remainder of the Land purchase price after HNGH forecloses. Compl. Ex. C.

These communications not only allege meeting of the minds—they prove meeting of the minds among the Defendants and the Green Hollow Parties. Notably, all of these communications occur before the first "default" is ever alleged against Plaintiffs (*see* Compl. ¶ 53), but the collective plan for the Green Hollow Parties to seize the property was clearly known to *all* Defendants and the Green Hollow Parties from the early stages of negotiations. *See* Compl. Ex. F. Moreover, while Plaintiffs believe that the entire negotiation process constitutes an "overt unlawful act" by all Defendants, certainly the two sham investment meetings (both planned and encouraged by Defendants), in which Glasgow and Nambiar blatantly misrepresented their intentions in order to

induce confidential disclosures from Barton (Compl. ¶¶ 24-31, 37-40), meet this standard for pleading purposes. Plaintiffs' Complaint has plausibly pleaded facts that establish all Defendants' shared intent to give the Green Hollow Parties a controlling interest in Plaintiffs' Loan (which, as discussed below, is bad faith under New York law), and more than one overt, unlawful act toward that end. Defendants' Motion to Dismiss on Plaintiffs' conspiracy claim should be denied.

### F. Plaintiffs' Original Complaint Plausibly States a Claim Under the Texas Uniform Trade Secrets Act.

Because the definitions of "trade secret" in the DTSA and Texas Uniform Trade Secrets Act (TUTSA) are "functionally identical," federal courts typically consider federal and state trade secret misappropriation claims together. *See Vest Safety*, 2020 U.S. Dist. LEXIS 124453, at *8 (comparing 18 U.S.C. § 1839(3) with Tex. Civ. Prac. & Rem. Code § 134A.002(6)). In fact, the only difference between the DTSA and the TUTSA is the federal "interstate commerce" requirement, which Defendants' Motion to Dismiss does not challenge. Accordingly, because Plaintiffs' have plausibly stated a claim for trade secret misappropriation under the DTSA, the pleading requirements under the TUTSA are likewise satisfied.

### G. Plaintiffs' Original Complaint Plausibly States a Claim for Declaratory Judgment.

As discussed above, Defendants' Motion to Dismiss as to Plaintiffs' four claims for declaratory judgment relies upon the erroneous premise that there is no duty of good faith and fair dealing applicable to the underlying Loan Documents. Plaintiffs' Complaint makes clear that the Loan Documents are governed under New York law (*see* Compl. Ex. A, Security Agreement ¶ 16), which imposes the covenant of good faith and fair dealing into every contract. *See, e.g.*, *Claridge v. N. Am. Power & Gas, LLC*, 12-cv-1261 (PKC), 2015 U.S. Dist. LEXIS 117693, at *16 (S.D.N.Y. Sep. 2, 2015); *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"). Plaintiffs' Complaint describes the specific ways in which the Participation Agreement destroyed or injured Plaintiffs' right to receive the fruits of the contract through the interposition of a stranger to the original agreement (HNGH) into the middle of the contractual relationship between Lender and Plaintiffs in a manner that harmed Plaintiffs and hamstrung the successful development of the project as planned. Compl. ¶¶ 47-63, 79-81. Against this framework of good faith, Plaintiffs have properly pleaded declaratory judgment claims related to Lender's conduct and the scheme by Defendants to give the Green Hollow Parties control over Plaintiffs' Land and Project. Accordingly, disposing of these claims for declaratory judgment at the pleading stage would be improper.

**i. <u>The Participation Agreement is invalid.</u>**

As stated above and alleged throughout the Complaint, although selling a participation interest was permissible under the Deed of Trust, the Participation Agreement that Lender entered into with HNGH was the product of a long-term conspiracy between Defendants and the Green Hollow Parties designed to enable the Green Hollow Parties to seize control of the Land and Project. The terms of the Participation Agreement lead to an outcome that has been proscribed under New York law—specifically, a participation interest that gives a competitor of the borrower a competitive interest over the borrower. *See Empresas Cablevision*, 680 F. Supp. 2d at 633.

The Complaint describes how this type of B-Note purchase, and the terms of the Participation Agreement, were highly unusual for a traditional participation-interest purchase on the secondary market for passive investors. Compl. ¶ 23. Moreover, the exhibits attached to the Complaint explicitly demonstrate that seizing control of the Land was the entire goal of the Participation Agreement. Compl. Exs. F & G. The Participation Agreement was made in bad faith

and is invalid under New York law, and every action that Defendants and HNGH took pursuant to that Participation Agreement was likewise invalid, including the ultimate transfer of the entire Loan to the HNGH in full consummation of the objective of the conspiracy. Accordingly, Plaintiffs' claims for declaratory judgment on the invalidity of the Participation Agreement (Count 9) and the invalidity of the ultimate transfer of the Loan to HNGH (Count 12) have been properly pleaded. Defendants' motion should be denied on both grounds.

**ii. <u>No default.</u>**

The Complaint provides ample background to describe the circumstances under which Lender and its conspirator HNGH first claimed a "default" under the Loan—which, as shown from the original Letter of Intent for the B-Note purchase was the plan from the beginning. See Compl. Ex. F. The Complaint describes Plaintiffs' plan to negotiate the tax payment with Dallas County, which was halted by the COVID-19 shelter-in-place orders. Compl. ¶ 50. Plaintiffs informed Lender of the plan to negotiate the property taxes, which is a common business practice in the real-estate development industry. Compl. ¶¶ 50, 52. The Complaint also describes how Lender not only *assented* to Plaintiffs' conduct, but gave no indication that, by negotiating with the County, Plaintiffs were unknowingly giving complete control of the Loan to the Green Hollow Parties. Compl. ¶ 52. The Green Hollow Parties then undertook to "cure" a default that did not exist in order to assume control of the Loan under the secret Participation Agreement that Plaintiffs' had no knowledge of. Compl. ¶¶ 52-53. This cure payment did not need to be made because there was no default due to Lender's assent to Plaintiffs' plan to negotiate with the County. Plaintiffs have properly pleaded a claim for declaratory judgment on this issue.

iii. **The Complaint properly pleads that performance was excused.**

As stated above, the whole concept of any "breach" under the Deed of Trust first arose with the property tax payment on the Land. Compl. ¶¶ 50-53. Lender did not object to the fact that Plaintiffs intended to negotiate with the County and gave no indication that this type of common practice would be considered a "breach" after receiving express notice of Plaintiffs' intent to do so. Compl. ¶ 52. The only reason these negotiations were unable to proceed was due to the shelter-in-place order arising from the COVID-19 pandemic. Compl. ¶ 50. These orders not only shut down Borrower's business, but shut down government offices that provide required permits, zoning approvals, and other construction-related authorizations for commercial real estate.

Defendants Motion asks the Court to adopt a draconian position with respect to the performance under a contract during a global pandemic that neither Plaintiffs nor Defendants could have anticipated when the contract was formed. It is precisely due to the magnitude and far-reaching effects of the pandemic that governments and courts have had to intercede to mitigate the inequitable results that would otherwise result from the type rigid contractual interpretation Defendants advocate. Although the parties assumed the risk of general market volatility, the parties did not contemplate the shutdown of government operations and business functions arising from the executive and judicial orders of the state and county. As a result, Plaintiffs have properly pleaded the need for a declaration that the business purpose of the Loan was frustrated in a manner that neither party could have anticipated.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied in its entirety and that Plaintiffs have such other and further relief to which they may be justly entitled.

Dated: February 19, 2021.

Respectfully submitted,

*/s/ G. Michael Gruber*

**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Kelsey M. Taylor, Esq.**
Texas Bar No. 24098507
taylor.kelsey@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2021, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*

G. Michael Gruber, Esq.